| | |
|---|---|
| Weston L. Harris UT #A1387 <br> Parsons Davies Kinghorn & Peters <br> 185 South State Street, Suite 700 <br> Salt Lake City, UT 84111 <br> (801) 363-4300 <br> (801) 363-4378 - Fax <br> PROPOSED COUNSEL FOR DEBTORS | Scott J. Goldstein MO #28698 <br> Spencer Fane Britt & Browne LLP <br> 1000 Walnut, Suite 1400 <br> Kansas City, MO 64106 <br> (816) 474-8100 <br> (816) 474-3216 - Fax <br> PROPOSED COUNSEL FOR DEBTORS |

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

In re: )
)  Case No. 02 22906 G:C
SIMON TRANSPORTATION SERVICES INC. )
)  Chapter 11
Debtor )
)
)
)
In re: )  02 22907 GEC
)
DICK SIMON TRUCKING, INC. )  Case No.
)  Chapter 11
Debtor )

### AFFIDAVIT OF ROBERT T. GOATES IN SUPPORT OF
### CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

STATE OF UTAH )
)
COUNTY OF SALT LAKE )

ROBERT T. GOATES, being duly sworn, states:

1. I am Chief Financial Officer of Simon Transportation Services Inc. and its wholly owned subsidiary Dick Simon Trucking Inc. (together, "Simon"), which maintain offices at 5175 West 2100 South, West Valley City, Utah, 84120 (the "Facility").

2. I have been Chief Financial Officer of Simon since October 2001.



0222906D6

3. I am familiar with the Simon's day-to-day operations and business and financial affairs.

4. On February 25, 2002 (the "Filing Date"), Simon filed separate voluntary petitions for relief under Chapter 11 of title 11 of the United States Code (the "Code"). Simon intends to continue to possess their property and manage their businesses as debtors-in-possession, streamlining their fleet and operations in anticipation of a sale under Code § 363. To enable Simon to operate as cost-effectively as possible and to avoid or minimize the adverse effects of these Chapter 11 filings, Simon will request relief in "first-day" applications and motions.

5. This Affidavit supports the Chapter 11 petitions and first-day motions filed in these Chapter 11 cases. The facts in this Affidavit are based on my personal knowledge and experience or on information reported to me by Simon's officers, agents, or employees. I am more than 18 years old and competent to testify concerning the facts in this Affidavit, which I am authorized to submit to the Court.

## I. BACKGROUND

Current Business Operations.

6. Simon Transportation Services Inc., a Nevada corporation, is the publicly traded holding company whose sole business is to hold 100 percent of the capital stock of Dick Simon Trucking Inc., a Utah corporation with its principal place of business in metropolitan Salt Lake City, Utah; and of Simon Terminal LLC, an Arizona limited liability company which owns the Facility. Simon specializes in providing premium truckload temperature-controlled transportation services for major

2

shippers, particularly those involved in the food industry. Simon operates nationwide and in eight Canadian provinces.

7. Founded in 1955, Simon is one of the nation's leading transportation companies specializing in carriage of temperature-sensitive foods and other goods. Its operations are supported by technologically advanced systems, providing Simon and their customers with capabilities such as tracking loads by satellite to monitor timeliness of pickups and deliveries.

8. By the end of calendar 2001, Simon's financial condition had substantially deteriorated because of a number of operating setbacks, including reduced shipping demand caused by the general national economic decline; a scarcity of qualified tractor-trailer operators that caused tractors to be unable to be used or "unseated"; declining market values of used tractors and trailers; problems stemming from the acquisition of two trucking companies in fiscal 2001, leading to overcapacity of equipment; periods of high fuel costs; and increased driver payroll and insurance costs. During August 2001, Simon's negative cash flow and operational losses led to partial deferral of payments owed for tractors and trailers. In January 2002, principally due to softness in the freight market Simon was forced to discontinue substantially all payments to lienholders.

9. In connection with the renewal of its auto and general liability insurance in November 2001 (the "Insurance"), Simon's insurer, RLI Insurance Company ("RLI"), required a $6 million letter of credit or bond to secure future claims on Simon's $1 million self insurance retention under a policy otherwise due to expire in November 2002. In December 2001, Simon provided a $3 million secured letter of credit to RLI with an agreement that Simon would provide the balance of the

collateral by January 23, 2002. In early January 2002, Simon received a commitment for a $6 million take-out surety bond. However, Simon's deteriorating financial condition caused the bonding company to be unwilling to provide the surety bond.

10. On January 24, 2002, RLI issued a Notice of Cancellation effective 12:01 a.m. on February 26, 2002. Representatives of RLI promised, however, that if the additional collateral was provided, the Insurance would remain in effect. RLI later changed its position and told Simon it would terminate the Insurance regardless of whether the additional $3 million was obtained. Thereafter, RLI again changed its position stating that if the $3 million was provided by February 25, 2002 by 5:00 p.m. Eastern Standard Time, the Insurance would remain in effect.

11. Under the Interstate Commerce Act and Federal motor carrier regulations, Simon would be unable to operate its vehicles or legally transport freight without liability insurance.

12. Simon filed the captioned Chapter 11 proceedings to avoid a chaotic shutdown of operations due to lack of insurance, potentially stranding employees and temperature-sensitive freight throughout the continental United States and eight provinces in Canada.

13. Simon operates a large fleet of specialized equipment, including approximately 2,300 tractors and 3,000 temperature controlled trailers. Simon employs approximately 3,000 drivers and 500 non-driver employees. In addition to its Salt Lake City headquarters and primary terminal Simon operates terminals and driver recruitment centers at Fontana, California, Atlanta, Georgia and Denver, Colorado and trailer drop yards throughout the United States.

14. Simon's largest customers include Albertson's, ConAgra, Coors, Anheuser-Busch, Hershey Foods, Walmart, Kraft, Nestle, and Pillsbury. Simon's largest 25 shippers generated 50 percent of its revenue in the fiscal year ended September 30, 2001. On a consolidated basis (including Simon Terminal LLC) for the same fiscal year, Simon reported a net loss of $44,326,000 on operating revenues of $278,818,000. For the fiscal quarter end December 31, 2001, Simon incurred a net loss of $12,564,224 on operating revenues of $73,411,013.

15. A large percentage of Simon's tractors and trailers were acquired under financing agreements, through which Simon guaranteed payment of the stated residual value of each tractor and trailer at the end of the contract term. As of December 31, 2001, total financing obligations totaled approximately $220 million and the related residual guarantees totaled more than $126 million. Due to the decline in the market values of used tractors and trailers, the difference between the total financed obligations and market value of the equipment (on a forced liquidation basis) was an estimated $75 million.

Events Leading Up to Filing the Chapter 11 Petitions.

16. Simon incurred net losses of $44.3 million, $11.1 million and $3.2 million in fiscal years 2001, 2000, and 1999, respectively. Factors that contributed to Simon's illiquidity and inability to meet debt service include: (i) the decision to expand its fleet size through taking on additional debt; (ii) lower shipping demand caused by a weakened national economy; (iii) the resulting overcapacity in Simon's trailers and tractors; (iv) the decreasing market value for used tractors and trailers coupled with the guaranteed residual values under the financing agreements; (v) periods of high fuel

prices; (vi) driver shortages; (vii) industry-wide increases in insurance premiums, particularly after the attacks of September 11, 2001; and (iv) problems resulting from merging with two acquired companies.

17. Simon is in default of virtually all of its equipment financing agreements, resulting in outstanding related obligations of more than $220 million. The defaults under the equipment financing agreements triggered cross-default clauses in Simon's $30 million pre-petition line of credit with CitiCapital Business Credit, a division of CitiCapital Commercial Corporation.

18. Prior to the Filing Date, Simon closed several facilities, reduced staffing and wages for remaining employees and surrendered tractors to lenders. Simon has realized that it cannot profitably continue to operate its business long-term and can best maximize recoveries to their creditors by effecting an orderly sale of a streamlined premium food transportation business on a going concern basis. Accordingly, the Debtors have entered into Chapter 11 with the intention of: (i) obtaining adequate liquidity through debtor-in-possession financing, (ii) stabilizing and immediately scaling down its equipment fleet through abandonment of collateral and/or rejection of certain financing agreements, and (iii) immediately implementing a process to sell its business for the highest value.

19. Simon plans to file for approval of bidding and auction procedures for the sale of its business. The motion will seek approval to implement an expedited sale process, an auction, and a sale hearing.

## II. FIRST-DAY MOTIONS AND APPLICATIONS

<u>Joint Administration of the Chapter 11 Cases</u>

20. Simon Transportation Services Inc. is the parent corporation of Dick Simon Trucking, Inc. and has no substantive operations. The entities' operations have common officers and directors, so that officers and directors of each company are fully familiar with the business affairs of both entities. The financial records, and corporate books and records for each of the Debtors are maintained at the Debtors' main corporate offices in Salt Lake City, Utah. Simon operates pursuant to a consolidated cash management system.

21. Joint administration of Debtors' separate Chapter 11 cases is appropriate because of the potential for duplication, unnecessary costs and waste of resources expended in two bankruptcy proceedings. Because of the financial and other interrelationships of Debtors, entry of an order permitting joint administration of these cases will avoid much unnecessary time and expense by obviating the necessity of filing duplicative motions and applications, entering duplicative orders and serving duplicative notices to creditors.

22. The rights of the respective creditors of each Debtor's estate will not be affected adversely by joint administration because the relief sought is purely procedural; it will not affect the creditors' substantive rights. Each creditor will maintain whatever rights it has against the particular estate which allegedly owes it money. Reduction in costs resulting from joint administration would instead benefit creditors of both estates; the Court and the clerks' office will be relieved of the burden of entering duplicative orders and maintaining duplicative and voluminous files; and joint

administration will greatly simplify the United States Trustee's task of supervising the administrative aspects of the two related chapter 11 cases.

Retention of Spencer Fane Britt & Browne LLP and Parsons, Davies, Klinghorn & Peters P.C.

23. Continued representation of Simon by their restructuring and bankruptcy counsel, Spencer Fane Britt & Browne LLP and Parsons, Davies, Klinghorn & Peters P.C. (collectively, the "Firms") is critical to Simon's goals in these proceedings.

24. Simon selected the Firms because of their extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under Chapter 11 of the Bankruptcy Code.

25. Simon desires to employ the Firms under retainers because of the extensive legal services that will be required in connection with these Chapter 11 cases.

26. The services of attorneys under retainers are needed to help Simon to meet the obligations and duties as debtors-in-possession.

Business Necessity to Pay Pre-Petition Employee Claims, Wages, Salary and Other Compensation

27. Simon's business is labor intensive, requiring more than 3,000 long-haul drivers, both solo and in teams, to pickup and deliver cargo to destinations throughout America and Canada. Because the Filing Date straddled pay periods for employees, some of whom are paid one week in arrears a portion of salary and other compensation owed arose pre-petition. The financial hardship to employees jeopardizes Simon's retention of drivers and support staff and its ability to maintain business operations until the realization of going-concern values for its operations.

8

28. The transportation industry's ongoing competition for qualified tractor-trailer operators would encourage many or all of the employees owed pre-petition wages and benefits to immediately seek and obtain employment elsewhere. Satisfying pre-petition employee obligations is essential to maintain the value of Simon's business during the sale process.

29. Debtors' Emergency Motion for Order Authorizing Payment of Prepetition Wages, Salaries and Reimbursable Employee Expenses and Medical and Other Employee Benefits (the "Prepetition Wages Motion") seeks authority to pay pre-petition employees and owner-operators no more than of $4,650 per person. As more fully described in the Prepetition Wages Motion, these prepetition obligations include wages, business expense reimbursements and welfare benefits.

30. Simon has established a variety of employee benefit plans and policies, including 401(k), medical, dental, vision, prescription drug, life insurance and disability plans, which should be honored in the ordinary course of business to enhance retention of employees vital to Simon's planned restructuring.

31. Simon maintains workers' compensation insurance in accordance with applicable state law. It is crucial to winding down operations to have the authority to pay, in Simon's discretion, pre-petition workers' compensation claims to the same extent such payments were made prior to the Filing Date.

32. A loyal, dedicated and cooperative work force is indispensable to maximize the going concern value of Simon's operations. Payment of all employee-related claims is needed to sustain

the loyalty, morale and the willingness of existing employees to continue to work for Simon, without which the value of the estates would be undermined.

33. Simon seeks this Court's order authorizing Simon to satisfy its prepetition obligations to employees to prevent the immediate deterioration of the value of the estates.

Critical Vendors

34. Simon has identified a limited number of certain vendors that are critical Simon's continued operation and successful restructuring and sale efforts (the "Critical Vendors").

35. The Critical Vendors' products or services cannot be easily replaced (the "Critical Vendors"). Debtors request authority to pay Critical Vendors' prepetition claims, as necessary, to obtain their products or services.

36. The Critical Vendors to be paid are Comdata, Ambest One Check ("Ambest") and Owner-Operator-related payments. An Owner-Operator is an independent contractor that contracts with Debtors to transport goods, using their own trucks.

37. Comdata provides payments to drivers on the road for services, fuel and supplies needed to operate their trucks. If Comdata ceases dealing with Debtors, it would have a catastrophic effect on Debtors' operations as drivers would leave their tractors, and the tractors, trailers and shipper's freight would be stranded nationwide.

38. Ambest provides fuel, with truck stops located throughout the United States. Without the use of Comdata and Ambest's services, Debtors' trucks will need to divert from their routes, at great expense and disruption to Debtor's business operations.

39.  Finally, as to the Owner-Operators, Debtors withhold certain monies from payments due to Owner-Operators and are required to pass these monies on to third parties on behalf of the Owner-Operators, for tractor lease payments, taxes, insurance, equipment maintenance, fuel and satellite communications. Additionally, Simon owes the Owner Operators for trips completed pre-petition. Similar to employee drivers, payment for these pre-petition trips is critical to maintaining Simon's fleet. If these amounts are not paid, the Owner-Operators will not work for Debtors, and the Owner Operators ability to maintain and run trucks will be substantially impaired.

40.  Payment of Critical Vendor pre-petition claims to ensure an uninterrupted post-petition sale of services or product for Simon's continued operations is in the best interest of the estates and Simon's reorganization efforts, and is consistent with sound business judgment.

Cash Management Motion

41.  Maintenance of Simon's current cash management system is essential to its short-term survival and to minimize disruption caused by the captioned bankruptcy filings and maximize the value of the estates prior to a sale. Like most large corporations, Simon, in the ordinary course of their businesses, maintains a consolidated cash management system with respect to the receipt and disbursement of cash. As a result, Simon has numerous bank accounts at various locations.

42.  The accounts which comprise Simon's cash management system include accounts from which payroll, employee benefits and related obligations are paid (collectively, the "Payroll Accounts"). Simon maintains other bank accounts for cash receipts and disbursements, lockbox,

11

accounts payable, depository and letter of credit accounts (collectively, "General Operating Accounts").

43. The Payroll Accounts and the General Operating Accounts are inter-connected through Simon's consolidated cash management system, which provides for the transfer of funds among these accounts, and for the ultimate disbursement of funds to third parties to satisfy payroll and other operating expenses.

44. Simon's cash management system has been used in its longstanding ordinary course of business. Simon must continue to be permitted to consolidate the management of their cash and transfer monies from the various accounts as needed to continue the operation of its business, or suffer operational freezes and delays while establishing and implementing new post-petition cash systems, controls, and procedures.

Maintenance of Bank Accounts

45. Simon would incur undue hardship if required to close bank accounts, open new accounts, and implement any new payroll, lockbox, collection and disbursement procedures that then might be required. Delays, confusion and disruption of Simon's system of paying employee compensation and benefits, and general operating expenses, can be expected if Simon were required to close their existing bank accounts and open new bank accounts.

46. The Court should (a) allow the maintenance of the Payroll Accounts for Simon's post-petition employee and owner-operator payments; and (b) permit banks to honor checks and drafts drawn on the Payroll Accounts, whether deposited, presented, drawn or issued prior or subsequent

to the Filing Date. Simon's business operations use more than 3,500 employees and owner-operators to transport cargo throughout America and Canada. If Simon closes old Payroll Accounts and establish new Payroll Accounts or any checks presented or drawn on the Payroll Accounts are not honored, the disruption to their payroll operations during any transition period would threaten Simon's employee relations and endanger this early stage of reorganization.

47. Simon should be permitted (a) to maintain the General Operating Accounts to pay post-petition operating expenses; and (b) to direct banks to honor checks and drafts drawn on the General Operating Accounts subsequent to the Filing Date. Stop payment orders will be issued against all outstanding pre-petition checks and drafts. To protect against the inadvertent payment of pre-petition claims, except as otherwise ordered by this Court, Simon's personnel and bank personnel will be instructed how to distinguish readily between pre-petition and post-petition obligations without closing and reopening accounts. Simon will leave a "gap" in their check numbers so that check numbers preceding the gap will be readily identifiable as pre-petition checks and check numbers following the gap will be readily identifiable as post-petition checks.

Maintenance of Simon's Business Forms

48. The nature and the scope of Simon's business and its numerous suppliers of goods and services and others, require that Simon initially be permitted to continue to use their existing correspondence, business forms (including, but not limited to letterhead, purchase orders, bills of lading, manifests, invoices, etc.) and checks without alteration or change to those used before the Filing Date, without reference to their status as debtors-in-possession.

13

49. Parties doing business with Simon undoubtedly will be aware of Simon's status as Chapter 11 debtors-in-possession due to anticipated publicity in transportation trade journals, on-line trade publications and general circulation newspapers. Changing correspondence and business forms would be unnecessary, burdensome to Simon's estates, expensive and disruptive to business operations.

_____
Robert T. Goates

Sworn to and subscribed before me, a Notary Public, for the State and County aforesaid, on this 25th day of February, 2002.

_____
Notary Public

My Commission expires:

```
NOTARY PUBLIC
SUZANNE WILLIAMS
185 So. State, Ste. 700
Salt Lake City, Utah 84111
My Commission Expires
October 9, 2005
STATE OF UTAH
```