


RECEIVED
APR 2 2 2002
XX CX

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF UTAH**

| | | |
|---|---|---|
| In re: | ) | **Case No. 02-22906** |
| | ) | **Case No. 02-22907** |
| | ) | **Case No. 02-24874** |
| | ) | **Chapter 11** |
| **SIMON TRANSPORTATION  SERVICES, INC.,** | ) | |
| **DICK SIMON TRUCKING, INC.,** | ) | |
| **SIMON TERMINAL, LLC** | ) | **(Jointly Administered)** |
| | ) | |
| Debtors. | ) | **Hon. Glen E. Clark** |
| | ) | |

**ORDER PURSUANT TO SECTIONS 105(a), 363, 365, AND 1146 OF THE**
**BANKRUPTCY CODE: (A) AUTHORIZING THE SALE OF SUBSTANTIALLY**
**ALL OF THE DEBTORS' ASSETS TO CENTRAL REFRIGERATED SERVICE, INC.**
**FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (B)**
**APPROVING THE ASSET PURCHASE AGREEMENT; AND (C) GRANTING**
**RELATED RELIEF**

THIS MATTER CAME BEFORE THE COURT on April 8, 2002 (the "Sale

Hearing") on the Motion for Approval of Sale of Substantially All of the Debtors' assets and to

Approve Assumption and Assignment of Leases and Executory Contracts (the "Motion") filed

by the above-captioned debtors and debtors-in-possession (together, the "Debtors") in these

chapter 11 cases (the "Cases").

NOW, THEREFORE, the Court having considered the Motion and the

testimony of Kenton E. Novotny of Morgan Keegan & Co., Inc. ("Morgan Keegan") with

respect to the marketing and sale of the Debtors' Business (as defined herein); statements of

counsel for Central Refrigerated Service, Inc., in support of the Motion and Sale (as defined

herein); the Debtors' oral report at the Sale Hearing regarding the results of the sale of

substantially all of their assets in accordance with "Bidding Procedures" approved by this

Court's Order entered on March 22, 2002 (the "Procedures Order") with respect to the Debtors'



0222906D407

Motion of the Debtors for an Order Approving: (1) Bidding and Auction Procedures and Sale

Date for Sale of Assets; (2) the Form of Bidding, Auction and Sale Notice; and (3) the

Scheduling of an Expedited Hearing on Motion for Sale Procedures, Notice, and Sales Hearing;

the Debtors' request that the Court approve the sale to Central Refrigerated Service, Inc. (the

"Purchaser") of the Debtors' assets specified in that certain Amended and Restated Asset

Purchase Agreement, dated as of April 18, 2002, a true and correct copy of which is attached

hereto as Exhibit A (the "Asset Purchase Agreement"),[1] pursuant to which the Debtors have

agreed to (i) assume, assign and sell to the Purchaser, pursuant to section 365 of title 11 of the

United States Code (11 U.S.C. §§ 101 et seq., the "Bankruptcy Code"), certain executory

contracts (the "Contracts") and (ii) sell to the Purchaser, pursuant to section 363(b) of the

Bankruptcy Code, all of the assets of the Debtors identified in Section 2.1 of the Asset Purchase

Agreement other than the Assumed Assets (as defined below)(the "Assets" and including the

Assumed Assets, the "Acquired Assets"), as such transactions (collectively, the "Sale") are more

fully set forth in the Asset Purchase Agreement; the evidence proffered or adduced at, objections

filed in connection with, and arguments of counsel made at, the Sale Hearing; and upon the

entire record of the Sale Hearing and the record in these Cases; and good cause, adequate notice

and hearing under the circumstances appearing therefor;

**IT IS HEREBY FOUND THAT:**

A. The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and

1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M) and (N).

Venue of the Cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

---

[1] All capitalized terms not otherwise defined herein shall have the meaning provided in the Asset
Purchase Agreement.



B.  The statutory predicates for the relief sought in the Motion are sections

105(a), 363(b), (f), (m) and (n), and 1146(c) of the Bankruptcy Code, and Rules 2002, 6004 and

9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

C.  The bidding procedures approved in the Procedures Order (the "Bidding

Procedures") have been fully complied with in all material respects.

D.  Proper, timely, adequate and sufficient notice of the Motion, the Bid

Procedures, the auction of the Assets, the Sale Hearing, the Sale and the transfer of the Assets

and the other transactions contemplated by the Asset Purchase Agreement have been provided in

accordance with sections 102(1), 105(a) and 363 of the Bankruptcy Code and Rules 2002, 6004

and 9014 of the Bankruptcy Rules and in compliance with the Bidding Procedures; such notice

was good and sufficient, and appropriate under the particular circumstances, and no other or

further notice of the Motion, the auction of the Assets, the Sale Hearing, the Sale and the transfer

of the Assets and the other transactions contemplated by the Asset Purchase Agreement or the

entry of this Sale Order, is required.

E.  A reasonable opportunity to object or be heard with respect to the Motion and

the relief requested therein has been afforded to all interested persons and entities, including (i)

the Office of the United States Trustee for the District of Utah; (ii) the Official Committee of

Creditors Holding Unsecured Claims (the "Committee"); (iii) all parties asserting liens, claims,

encumbrances or other interests of any kind or nature whatsoever (collectively, "Interests") in or

on the Acquired Assets; (iv) all known creditors, and equity security holders, including the list of

creditors holding the twenty largest unsecured claims; (v) all entities known to have expressed an

interest in potentially acquiring Debtors' assets; (vi) the Internal Revenue Service and all

appropriate federal, state and local taxing authorities; (vii) the Pension Benefit Guaranty

Corporation; (viii) counsel for the Purchaser; and (ix) all other entities that had filed requests for notices pursuant to Bankruptcy Rule 2002.

F. Danny C. Kelly, Paul W. Werner and Julia R. Pettit, of Stoel Rives LLP, and Earl H. Scudder of the Scudder Law Firm P.C., L.L.O., appeared on behalf of the Purchaser; Daniel D. Doyle, Scott J. Goldstein and Lisa A. Epps of Spencer Fane Britt & Browne LLP, and Weston L. Harris of Parsons Davies Kinghorn & Peters, appeared on behalf of the Debtors; Peter W. Billings and Gary E. Jubber of Fabian & Clendenin appeared on behalf of the Committee; Laurie A. Crandall appeared on behalf of the United States Trustee; and other appearances were made on the record.

G. Pursuant to the Asset Purchase Agreement, sections 105 and 365 of the Bankruptcy Code and Rule 6006 of the Bankruptcy Rules, the Debtors have filed and may file supplemental motions to assume and assign the Contracts to the Purchaser. After entry of an order approving such motion(s) and the assumption and assignment of the Contracts to the Purchaser (any such Contract which is so assumed and assigned shall be referred to herein as an "Assumed Asset" or collectively, as the "Assumed Assets"), upon proper, adequate and sufficient notice and an opportunity to object and be heard, the Assumed Assets shall constitute Acquired Assets under this Sale Order.

H. Pursuant to the Asset Purchase Agreement and section 365 of the Bankruptcy Code, (i) certain equipment under Contracts between the Debtors and (a) Fleet Capital Corporation (the "Fleet Equipment Lease"), (b) CitiCapital Commercial Leasing Corporation (the "CitiCap Equipment Lease"), and (c) First Union Commercial Corporation (the "FUCC Equipment Lease"), in each case, as modified by the terms, conditions and provisions of the Equipment Lease Assignments (as defined below) (as so modified, such equipment leases being

referred to herein collectively as, the "Equipment Leases"); and (ii) certain Contracts granting

the Debtors "buyback" or "trade-back" rights with respect to Freightliner LLC, Freightliner

Corporation and Freightliner Market Development Corporation (collectively, "Freightliner"),

including the Agreement between Dick Simon Trucking and Freightliner, the Used Truck

Conditional Trade Agreements and Agreements for Conditional Commitment to Repurchase (the

"Buyback Agreements"), as more fully described on Exhibit B , are all to be assumed and

assigned by the Debtors to the Purchaser. The Equipment Leases (as modified by the Equipment

Lease Assignments) and the Buyback Agreements constitute Assumed Assets and Acquired

Assets within the meaning of this Sale Order and the Asset Purchase Agreement.

      I.    Each of Fleet, CitiCap and FUCC consents to the assumption and assignment

of their respective Equipment Leases on the express terms and conditions stated on the record at

the Sale Hearing, and stated in certain stipulations filed with the Court after the Sale Hearing (as

more fully described below), and as more fully set forth in each of their respective assignment

agreements collectively attached hereto as Exhibit C (collectively, the "Equipment Lease

Assignments"). In order to facilitate the sale, Debtors and each of Fleet and FUCC have entered

into stipulations, subject to court approval, after notice, whereby each of Fleet and FUCC has

agreed to waive its respective administrative claims and unsecured claims arising from the

equipment that will become Assumed Assets and Acquired Assets pursuant to the terms of each

party's respective Equipment Lease Assignment, such stipulations to be effective upon the entry

of an order by the Bankruptcy Court approving the Debtors' release of all claims, known and

unknown, against, as the case may be, Fleet and FUCC.

      J.    Prior to commencing the Cases, the Debtors and DaimlerChrysler Services

North America LLC ("DCS")(formerly Mercedes-Benz Credit Corporation) entered into various



leases for the use of equipment. All leases with DCS have been rejected. The Purchaser has agreed to re-lease certain equipment from DCS. In order to facilitate the sale, the Debtors and DCS have entered into a stipulation, subject to court approval, after notice, whereby DCS has agreed to waive its administrative claims and unsecured claims arising from equipment which is to be re-leased by the Purchaser, on the condition that the Debtors release all claims, known and unknown, against DCS. DCS retains all other claims, including but not limited to claims arising from the equipment which is not re-leased by the Purchaser. Notwithstanding anything that might be construed to the contrary in this Sale Order or in the Asset Purchase Agreement, the rights of the Debtors or DCS to payment of insurance proceeds, if any, relating to physical damage to any equipment which is not re-leased by the Purchaser from DCS are not included within the Insurance-Related Proceeds (as defined below) that are being transferred to the Purchaser as part of the Sale.

K. Proper, timely, adequate and sufficient notice of the proposed assumption and assignment of the Buyback Agreements, as set forth in the Motion, has been provided to Freightliner, and Freightliner shall be deemed to have consented to the assumption and assignment of the Buyback Agreements pursuant to section 365 on the basis of its failure to object thereto.

L. Assumption and assignment of the Equipment Leases in accordance with the Equipment Lease Assignments and assumption and assignment of the Buyback Agreements represent an exercise of the Debtors' sound business judgment and will be in the best interests of the Debtors, their estates and their creditors.

M. No cure amounts are necessary to cure any defaults, or to pay any actual or pecuniary losses that have resulted from such defaults, under the Equipment Leases or the



Buyback Agreements within the meaning of, respectively sections 365(b)(1) (A) and

365(b)(1)(B) of the Bankruptcy Code. The Purchaser has provided adequate assurance of the

Purchaser's future performance of and under the Equipment Leases and the Buyback

Agreements within the meaning of section 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy

Code.

N. The Assumed Assets are an integral part of the Acquired Assets and,

accordingly, such assumption and assignment of the Assumed Assets is reasonable and enhances

the value of the Debtors' estates.

O. The Debtors have effectively and successfully marketed the Assets and

conducted the sale process through the efforts of their investment banker, Morgan Keegan, and

in compliance with the Bidding Procedures, the Orders of this Court, including, without

limitation, the Procedures Order, and the requirements of applicable law.

P. The Debtors have full corporate power and authority to execute the Asset

Purchase Agreement and all other documents contemplated thereby, and the sale of the Acquired

Assets has been duly and validly authorized by all necessary corporate action of the Debtors.

The Debtors have all the corporate power and authority to consummate the transactions

contemplated in the Asset Purchase Agreement.

Q. No consents or approvals, other than those expressly provided for in the Asset

Purchase Agreement or herein, are required for the Debtors to consummate the sale of the

Acquired Assets.

R. The Asset Purchase Agreement, including, without limitation, the proposed

assumption and assignment of the Contracts, reflects the exercise of the Debtors' sound business

judgment.



S.  Approval at this time of the Asset Purchase Agreement and consummation of the sale of the Acquired Assets and other transactions contemplated thereby is in the best interests of the Debtors, their creditors, their estates, and other parties in interest.

T.  The Debtors have demonstrated both (i) good, sufficient, and sound business purpose and justification; and (ii) compelling circumstances for the sale of the Acquired Assets and other transactions contemplated thereby pursuant to section 363(b) of the Bankruptcy Code without the filing and confirmation of a plan of reorganization or liquidation in the Cases, including, without limitation, that (a) the Debtors have been incurring, are incurring, and are projected to continue to incur substantial operating losses; (b) the Debtors are unable to obtain sufficient financing to continue their operations on a stand-alone basis; (c) the value of the Debtors is placed at risk by their current financial condition; (d) the Purchaser is a financially qualified  purchaser that made a substantial offer to acquire certain of the Debtors' assets; (e) the Debtors and their investment banker, Morgan Keegan, diligently and in good faith, marketed the Acquired Assets to secure the highest and best offer; (f) the auction process proposed by the Debtors, approved by the Court in the Procedures Order and required by section 363 of the Bankruptcy Code has permitted the Purchaser's offer to be tested against other offers; and (g) the interests of unsecured creditors have been adequately represented by the Committee throughout the entire Sale, including throughout the bidding and auction process and the negotiation of the Asset Purchase Agreement.

U.  The Asset Purchase Agreement was negotiated, proposed and entered into by the Debtors and the Purchaser without collusion, in good faith, and after arm's-length and lengthy bargaining.  Neither the Debtors nor the Purchaser has engaged in any conduct that

would cause or permit the Asset Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code.

V. The Purchaser is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby. The Purchaser shall act in good faith within the meaning of section 363(m) of the Bankruptcy Code by closing the transactions contemplated by the Asset Purchase Agreement in compliance with, and in reliance on, this Sale Order. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale of the Acquired Assets shall not affect the validity of the Sale to the Purchaser, unless such authorization is duly stayed pending such appeal with a bond posted in an amount of not less than the value of the Sale to the estates.

W. The terms and conditions of the Asset Purchase Agreement, the assumption of the Assumed Liabilities and the Purchase Price to be provided by the Purchaser pursuant to the Asset Purchase Agreement (i) are fair and reasonable, (ii) represent the highest or otherwise best offer for the Acquired Assets, (iii) will provide a recovery for the Debtors' creditors that is equal to or greater than what would be provided by any other practical available alternative and (iv) constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and other applicable laws.

X. The Sale must be approved and consummated promptly to preserve the value of the Acquired Assets.

Y. The transfer of the Assets and the assignment of the Assumed Assets pursuant to the Asset Purchase Agreement will (i) be legal, valid, and effective transfers of property of the Debtors' estates to the Purchaser, and (ii) vest the Purchaser with good title to the Assets and the Assumed Assets, free and clear of all Interests (other than the Assumed Liabilities).

Z. All of the provisions of this Sale Order are nonseverable and mutually dependent.

AA.   The Purchaser would not have entered into the Asset Purchase Agreement and would not consummate its purchase of the Acquired Assets and other transactions contemplated thereby, thus adversely affecting the Debtors, their estates, and their creditors, if the sale of the Acquired Assets to the Purchaser were not free and clear of all Interests (other than Assumed Liabilities), or if the Purchaser would, or in the future could, be liable for any Interests (other than Assumed Liabilities).

BB.   The Debtors may sell the Acquired Assets free and clear of all Interests (other than Assumed Liabilities) of any kind or nature whatsoever because, in each case, one or more of the standards set forth in sections 363(f)(1)-(5) and 365 of the Bankruptcy Code has been satisfied. Those (i) holders of Interests in the Assets and (ii) non-Debtor parties to Assumed Assets, in each case, who did not object, or who withdrew their objections, to the Sale and the assumption and assignment of Assumed Assets, and other transactions contemplated thereby or the Motion are deemed to have consented pursuant to sections 363(f)(2) and 365 of the Bankruptcy Code. Those (i) holders of Interests in the Assets and (ii) non-Debtor parties to Assumed Assets who did object to the sale and the assumption and assignment of Assumed Assets, and other transactions contemplated thereby or the Motion fall within one or more of the other subsections of sections 363(f) and 365 of the Bankruptcy Code and are adequately protected by having their interests attributed to the net proceeds of the property against or in which they claim an Interest.

CC.   Consummation of the Sale, including, without limitation, the transfer of the Assets to the Purchaser, the termination by the Debtors, and the hiring by the Purchaser or its

affiliates, of employees of the Debtors, and the assumption and assignment to the Purchaser of the Assumed Assets, will not subject the Purchaser to any liabilities of any kind or nature whatsoever (other than the Assumed Liabilities and liabilities to the Debtors under the express terms of the Asset Purchase Agreement) existing as of the date hereof or hereafter arising, of or against the Debtors, any affiliate of the Debtors, or any other person, by reason of the operation of the Business prior to the Effective Time on the Closing Date or by reason of such transfer, hiring or assignment, based, in whole or in part, directly or indirectly on any theory of law or equity, including without limitation, any theory of antitrust or successor or transferee liability.

DD.    The sale of the Acquired Assets to the Purchaser is a prerequisite to the Debtors' ability to confirm and consummate a plan of liquidation. The Sale is a sale in contemplation of a plan and, accordingly, a transfer pursuant to section 1146(c) of the Bankruptcy Code, which shall not be taxed under any law imposing a stamp, transfer, recording or similar tax.

EE. The Debtors have demonstrated that (i) it is an exercise of their sound business judgment to enter into the Asset Purchase Agreement and to consummate the sale of the Acquired Assets; and (ii) the transfer of the Assets and the assumption and assignment of the Assumed Assets, and other transactions contemplated by the Asset Purchase Agreement, and the relief requested in the Motion, including approval of the Asset Purchase Agreement, the Sale, and other transactions contemplated by the Asset Purchase Agreement, is in the best interests of the Debtors, their estates, and their creditors.

FF. The Debtors and (i) KeyBank National Association ("KeyBank") are parties to the certain Tri-Party Lockbox Agreement among Dick Simon Trucking, Inc. ("DSTI"), KeyBank and CitiCap dated as of November 29, 2001(the "KeyBank Lockbox Agreement"),

which establishes a lockbox account ("Lockbox Account No. 440580042411") and (ii) US Bank

are parties to the certain Blocked Account Agreement among DSTI, US Bank and Associates

TransCapital Services dated as of May 9, 2001 (the "US Bank Lockbox Agreement," and

together with the KeyBank Lockbox Agreement, the "Lockbox Agreements"), which establishes

a lockbox account ("Lockbox Account No. 153190223971," and together with Lockbox Account

No. 440580042411, the "Lockbox Accounts"), in each case, for the purpose of depositing

accounts receivable remitted by account obligors and transferring the proceeds of such accounts

receivable to the Debtors' working capital lender in accordance with the Debtors and such

lender's accounts receivable financing agreements.

GG.   The Purchaser's use of the Lockbox on the terms of the Lockbox

Agreements commencing as of the Effective Time on the Closing Date and continuing until the

Purchaser can enter into new lockbox agreements is necessary and essential to the sale and

transfer of accounts receivable under the Asset Purchase Agreement and will prevent disruption

in the Purchaser's receipt of current accounts receivable which could result in claims against the

Debtors and their estates. Each of KeyBank and US Bank has consented to the Purchaser's

continued use of the Lockbox Accounts on the terms of this Sale Order and their interests are and

will be adequately protected by the Purchaser's complying with the terms and conditions of the

Lockbox Agreements.

HH.   The transfer and registration of (i) the Common Carrier Certificate of

Public Convenience (Docket No. MC-135221 (Sub 26)) and Contract Carrier Permit (Docket No.

MC-135221 (Sub-28P)) (collectively, the "Carrier Certificates"), each of which is the subject of

an application filed by the Debtors and Purchaser with the United States Department of

Transportation, Federal Motor Carrier Safety Administration, (ii) the vehicular license plates and



correlative permits issued under the authority of the States of Oklahoma and Utah (the "Vehicular Permits"), and (iii) the other general business permits, authorities, certificates, and licenses currently held by the Debtors (the "Business Permits," and together with the Carrier Certificates and the Vehicular Permits, the "Transferred Permits") to the Purchaser, in each case effective as of the Effective Time on the Closing Date, is necessary and essential for the Purchaser to operate the Business from and after the Effective Time on the Closing Date and, hence, to the consummation of the Asset Purchase Agreement.

II. The value of the Sale to the Debtors and their estates as of March 31, 2002, is not less than $52,000,000.

## NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

### General Provisions

1. The Sale is in the best interests of the estates, constitutes an exercise of the Debtors' sound business judgment and the Motion shall be, and it hereby is, granted, with the modifications stated on the record.

2. All objections, if any, to the Motion or to the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby overruled on the merits.

### Approval of the Asset Purchase Agreement

3. The terms and conditions and transactions contemplated by the Asset Purchase Agreement between the Debtors and the Purchaser are hereby approved in all respects, and the closing under the Asset Purchase Agreement is hereby approved, authorized and directed under sections 105(a) and 363(b) of the Bankruptcy Code, and the Debtors and the Purchaser are



hereby authorized and directed to perform their respective obligations under the Asset Purchase
Agreement.

4.   Pursuant to section 363(b) of the Bankruptcy Code and Rule 6004(f)(2) of the
Bankruptcy Rules, the Debtors are hereby authorized, directed and empowered to fully assume,
perform under, consummate and implement the Asset Purchase Agreement, together with all
additional instruments and documents that may be reasonably necessary or desirable to
implement the Asset Purchase Agreement and the transactions contemplated thereby, and to take
all further actions as may reasonably be requested by the Purchaser for the purpose of assigning,
transferring, granting, conveying and conferring to the Purchaser, or reducing to possession, any
or all of the Acquired Assets, or as may be necessary or appropriate to the performance of the
Debtors' obligations as contemplated by the Asset Purchase Agreement.

Transfer of Acquired Assets

5.   Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code and subject to
the terms of this Sale Order, upon the Effective Time on the Closing Date, the Acquired Assets
shall be transferred to the Purchaser, free and clear of all Interests; provided, however, that the
Purchaser shall remain liable for the Assumed Liabilities as provided in the Asset Purchase
Agreement.

6.   Except as expressly permitted by the Asset Purchase Agreement with respect
to the Assumed Liabilities, all persons and entities, including, but not limited to, all debt security
holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade
creditors, unsecured creditors and other creditors, holding Interests against or in the Debtors or
the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured,
contingent or non-contingent, senior or subordinated), arising under or out of, in connection

with, or in any way relating to, the Debtor, the Acquired Assets, the operation of the Business prior to the Effective Time on the Closing Date, or the transfer of the Acquired Assets or the assumption and assignment of the Assumed Assets to the Purchaser are forever barred, estopped, and permanently enjoined from asserting such Interests against the Purchaser, its successors or assigns, its property or interests or the Acquired Assets.

7. The Purchaser and the Debtors shall cooperate in obtaining refunds of amounts in respect of unused insurance premiums and releases of letters of credit and other collateral not reasonably required to secure amounts reserved under the Debtors' insurance policies (all amounts received by the Debtors or the Purchaser in respect of such refunds, or upon release of letters of credit or other collateral, or upon release of collateral securing letters of credit being referred to herein as the "Insurance-Related Proceeds"). The Purchaser shall be entitled to the Insurance-Related Proceeds relating to insurance other than the RLI Excluded Asset, and such amounts shall be retained by the Purchaser or turned over to the Purchaser by the Debtors immediately upon receipt, as the case may be. With respect to Insurance-Related Proceeds relating to the RLI Excluded Asset, the Purchaser shall be entitled to the first $4,000,000 of such Insurance-Related Proceeds plus all of its costs of collection (if any). Any excess over such amounts shall be divided fifty percent (50%) for the Purchaser and fifty percent (50%) for the Debtors. The Court shall retain jurisdiction over the RLI Excluded Asset and the resolution of Insurance-Related Proceeds therefrom, and the Debtors and the Purchaser are directed to take such actions and to file such pleadings as may be required to resolve this matter forthwith.

8. Upon the Effective Time on the Closing Date and without further action of any party, each of the Headquarters, Atlanta Terminal, Fontana Terminal, Rupert Drop Yard and

Springville Drop Yard (collectively, the "Real Property Assets"), each as more fully described

on Exhibit D attached hereto, shall be, and hereby is, transferred and conveyed to the Purchaser

free and clear of any Interests, including any Interests, liens, trust deeds, mortgages, or other

encumbrances listed on Exhibit D, other than inchoate liens for taxes or special improvement

district assessments not yet due; provided, however, that the Purchaser may request, and the

Debtors are directed to execute, acknowledge and deliver, any documents that may be necessary

or advisable in the Purchaser's reasonable discretion to evidence the transfer and conveyance of

any Real Property Assets.  Notwithstanding anything to the contrary herein, the Headquarters

shall be transferred and conveyed to the Purchaser subject to the encumbrance arising in favor of

National Life Insurance under the terms of a certain Deed of Trust, Assignment of Leases and

Security Agreement by and between Simon Terminal, LLC, as Trustor in favor of First American

Title Insurance Agency, Inc., as Trustee and National Life Insurance Company, as Beneficiary,

dated June 22, 2001 and recorded June 22, 2001 as Entry No. 7929718 in Book 8471 at page

3381 of the official records of the Salt Lake County recorder; and (ii) *the tax lien arising in
favor of Salt Lake County for 2002 real property taxes assessed as of January 1, 2002 (but not now due and owing)
which shall have the priority provided to such lien under the applicable provisions of the Utah code Annotated.*

9.   The transfer of the Acquired Assets to the Purchaser pursuant to the Asset

Purchase Agreement constitutes a legal, valid and effective transfer of the Acquired Assets, and,

except as provided in the Asset Purchase Agreement with respect to any Assumed Liabilities,

vests or will vest the Purchaser with all right, title, and interest of the Debtors in and to the

Acquired Assets free and clear of Interests under section 363(f) of the Bankruptcy Code, except

as otherwise provided herein.  Except as provided in the Asset Purchase Agreement with respect

to the Assumed Liabilities, no claim of any kind asserted or assertable against the Debtors by any

party shall, directly or indirectly, be charged against or asserted against the Purchaser; and no

party holding any such claim shall, by imposing fees or charges above those customarily



assessed or otherwise, burden, affect or impair in any respect the Purchaser's use, enjoyment or operation of the Acquired Assets. The value of the Sale to the estates, as of March 31, 2002, is at least $52,000,000.

10. The transfer of the Acquired Assets pursuant to the Sale is not subject to taxation under any federal, state, local, municipal or other law imposing or purporting to impose a stamp, transfer, recording, sale or any other similar tax on any of the Debtors' transfers or sales of real estate, personal property or other assets owned by it in accordance with sections 1146(c) and 105(a) of the Bankruptcy Code.

**Assumption and Assignment to the Purchaser of the Equipment Leases
and the Buyback Agreements**

11. The terms and conditions and transactions contemplated by the Equipment Lease Assignments between the Debtors, the Purchaser and each counterparty to the Equipment Leases are hereby approved in all respects, and the assumption and assignment of the Equipment Leases (pursuant to the Equipment Lease Assignments), and the Buyback Agreements are hereby approved, authorized and directed under sections 105(a) and 365 of the Bankruptcy Code.

12. The Debtors' assumption and assignment to the Purchaser, and the Purchaser's assumption, of the Equipment Leases (pursuant to the Equipment Lease Assignments) and the Buyback Agreements, in each case on the terms set forth in the Asset Purchase Agreement, herein, and, in the case of the Equipment Leases, the Equipment Lease Assignments, is approved and the requirements of section 365(b)(1) and 365(f) of the Bankruptcy Code with respect thereto are deemed satisfied. The Debtors are hereby authorized and directed, in accordance with sections 105(a) and 365 of the Bankruptcy Code, and subject to the terms of the Asset Purchase Agreement and herein, and in the case of the Equipment Leases,



the Equipment Lease Assignments, to (i) assume and assign to the Purchaser each of the

Equipment Leases and each of the Buyback Agreements, pursuant to the provisions of section

365 of the Bankruptcy Code, in each case, free and clear of all Interests (other than the Assumed

Liabilities), and (ii) execute and deliver to the Purchaser such documents or other instruments as

may be necessary to assign and transfer such Equipment Leases or Buyback Agreements to the

Purchaser.

13. Neither the Debtors nor the Purchaser shall have any obligation to make any

true-up or other payments arising out of any post-Closing Date order, law or regulation that

purports to increase charges under any of the Equipment Leases or Buyback Agreements for any

pre-Closing Date period.

14. No claim of any kind asserted by the Debtors at any time against any party to

an Equipment Lease (pursuant to the Equipment Lease Assignments) or a Buyback Agreement

shall (a) entitle such party to assert, as against the Purchaser, any claim, counterclaim, defense,

credit or offset, or (b) affect or impair in any respect the obligations of such party to the

Purchaser under such Equipment Lease (pursuant to the Equipment Lease Assignments) or

Buyback Agreement.

15. The Equipment Leases and Buyback Agreements shall, upon assignment to

the Purchaser, be deemed to be valid and binding and in full force and effect and enforceable in

accordance with their respective terms, without giving effect to (i) any oral or written

amendment, waiver, supplement or other modification thereto, except as otherwise provided in

the Equipment Lease Assignments with respect to the Equipment Leases;  and (ii) any provision

(including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that

prohibits, restricts, or conditions such assignment or transfer.  Pursuant to section 365(k) of the



Bankruptcy Code, the Debtors shall be relieved from any liability for failure on the part of the Purchaser to perform any Assumed Liability.

16. No cure amounts are necessary to cure any defaults, or to pay any actual or pecuniary losses that have resulted from such defaults, under the Equipment Leases (as modified by the Equipment Lease Assignments) or Buyback Agreements within the meaning of, respectively sections 365(b)(1) (A) and 365(b)(1)(B) of the Bankruptcy Code. The Purchaser has provided adequate assurance of the Purchaser's future performance of and under the Equipment Lease Assignments and Buyback Agreements within the meaning of section 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

17. Any defaults or other obligations of the Debtors under the Equipment Lease Assignments or the Buyback Agreements, including, without limitation, any obligations on account of credits or offsets, arising or accruing prior to the Effective Time on the Closing Date (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) are hereby waived by each of the counterparties to the Equipment Lease Assignments or the Buyback Agreements.

18. Except as otherwise provided herein, each counterparty to an Equipment Lease Assignment or a Buyback Agreement is hereby forever barred, estopped and permanently enjoined from asserting against the Debtors or the Purchaser, its successors or assigns, or the property or interests of any of them, or any of the Acquired Assets, any default existing as of the Effective Time on the Closing Date or any counterclaim, defense, setoff, credit or any other claim asserted or assertable against the Debtors, in each case on account of such Equipment Lease Assignment or Buyback Agreement.

19. The equipment that is described in the Equipment Lease Assignments does not constitute all of the equipment that was covered by the original Fleet Equipment Lease, CitiCap Equipment Lease and FUCC Equipment Lease (collectively referred to herein as the "Original Equipment Leases") prior to the Original Equipment Leases having been modified by the Equipment Lease Assignments.  Notwithstanding anything that might be construed to the contrary in this Sale Order or in the Asset Purchase Agreement, the equipment that was covered by the Original Equipment Leases but which is not described in the Equipment Lease Assignments does not constitute Assumed Assets or Acquired Assets within the meaning of this Sale Order and the Asset Purchase Agreement (such equipment is referred to herein as the "Non-Assumed Leased Equipment").  Notwithstanding anything that might be construed to the contrary in this Sale Order or in the Asset Purchase Agreement, Fleet, CitiCap and FUCC have reserved and not waived all of their claims and rights against the Debtors under the terms of the Original Equipment Leases as to the Non-Assumed Leased Equipment and Fleet, CitiCap and FUCC are not prohibited by the terms of this Sale Order from asserting such claims or rights against the Debtors.  Furthermore, notwithstanding anything that might be construed to the contrary in this Sale Order or in the Asset Purchase Agreement, the rights of the Debtors (and Fleet, CitiCap and FUCC) to payment of insurance proceeds, if any,  relating to physical damage to any of the Non-Assumed Leased Equipment are not included within the Insurance-Related Proceeds that are being transferred to the Purchaser as part of the Sale.  Notwithstanding anything that might be construed to the contrary in this Sale Order or in the Asset Purchase Agreement, the term "Assumed Liabilities" as used in this Sale Order and as defined in the Asset Purchase Agreement includes all of the liabilities and obligations of the Purchaser to Fleet, CitiCap and FUCC arising



after the Effective Time on the Closing Date under the Equipment Leases being assumed by the Purchaser pursuant to the Equipment Lease Assignments.

20. The failure of the Debtors to enforce at any time prior to the Effective Time on the Closing Date one or more of the terms or conditions of any Equipment Lease or Buyback Agreement shall not be a waiver of any such terms or conditions, or of the Purchaser's right to enforce from and after the Effective Time on the Closing Date every term and condition of, as the case may be, the Equipment Lease or Buyback Agreement. Likewise, the failure of the other parties to any Equipment Lease or Buyback Agreement to enforce at any time from and after the Effective Time on the Closing Date one or more of the terms or conditions of any Equipment Lease or Buyback Agreement shall not be a waiver of any such terms or conditions, or of such party's rights to enforce from and after the Effective Time of the Closing Date every term and condition of, as the case may be, the Equipment Lease or Buyback Agreement.

<u>Additional Provisions</u>

21. On the Effective Time on the Closing Date of the Sale and other transactions contemplated by the Asset Purchase Agreement, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Interests (other than the Assumed Liabilities), against the Acquired Assets, as such Interests may have been recorded or may otherwise exist.

22. This Sale Order (a) is and shall be effective as a determination that, on the Effective Time on the Closing Date, all Interests (other than the Assumed Liabilities) existing as to the Acquired Assets prior to the Effective Time on the Closing Date have been unconditionally released, discharged and terminated, and that the conveyance of the Acquired Assets described herein has been effected, and (b) is and shall be binding upon and shall govern

the acts of all entities, including, without limitation, all filing agents, filing officers, title agents,

title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of

patents, trademarks or other intellectual property, administrative agencies, governmental

departments, secretaries of state, federal, state, and local officials, and all other persons and

entities who may be required by operation of law, the duties of their office, or contract, to accept,

file, register or otherwise record or release any documents or instruments, or who may be

required to report or insure any title or state of title in or to any of the Acquired Assets.

23. Each and every authority, license, permit or certificate necessary or desirable

for the Purchaser to operate the Business, including without limitation, the Transferred Permits,

as an interstate and intrastate motor carrier of property which have been acquired by the

Purchaser under the Asset Purchase Agreement shall be deemed assigned, transferred and

conveyed to the Purchaser, in each case, (a) effective as of the Effective Time on the Closing

Date, (b) without further action of any party or federal, state or local governmental authority, (c)

at no cost to the Purchaser or the Debtors; provided, however, that any customary and nominal

filing or similar fee, but not any actual or prorated amount relating to the license, permit,

authority or certificate itself, or the transfer thereof, may be charged and borne by the Purchaser;

and (d) in full force and effect until expiry (if any) of their customary terms absent any transfer.

Without limiting the effectiveness of the foregoing, if, at any time, the Purchaser or Buyer

desires to file or record any document or instrument to reflect the transfer of such operating

authorities, licenses or permits to the Purchaser, each and every federal, state, and local

governmental agency or department is hereby directed to (i) accept any and all such documents

and instruments that may be necessary or desirable to evidence such assignment, transfer or

conveyance to the Purchaser; and (ii) honor and implement any such documents or instruments



evidencing the assignment, transfer or conveyance to the Purchaser, in each case, effective as of the Effective Time on the Closing Date.

24. Each and every federal state, and local governmental agency or department is hereby directed to accept any and all documents and instruments that may be necessary or appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.

25. If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Interests (other than the Assumed Liabilities) in the Acquired Assets shall not have delivered to the Debtors prior to the Effective Time on the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all such Interests that the person or entity has with respect to the Acquired Assets or otherwise, then (a) the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Acquired Assets and (b) the Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Interests of any kind of nature whatsoever (other than the Assumed Liabilities) in the Acquired Assets.

26. All entities who are presently, or on the Effective Time on the Closing Date may be, in possession of some or all of the Acquired Assets are hereby directed to surrender possession of said Acquired Assets to the Purchaser on the Closing Date; provided, however, that the Debtors, the Committee, their representatives and any other person that this Court may later designate, shall have full access to data generated prior to the Closing Date during normal office

hours and upon reasonable notice to the Purchaser, until the entry of an order closing all of these

Cases.

27. Except as provided in the Asset Purchase Agreement with respect to Assumed

Liabilities, the Purchaser is not assuming nor shall it in any way whatsoever be liable or

responsible, as a successor or otherwise, for any liabilities, debts, commitments or obligations

(whether known or unknown, disclosed or undisclosed, absolute, contingent, inchoate, fixed or

otherwise) of the Debtors or any liabilities, debts, commitments or obligations in any way

whatsoever relating to or arising from the Acquired Assets or the Debtors' operations or use of

the Acquired Assets on or prior to the Effective Time on the Closing Date or any such liabilities,

debts, commitments or obligations that in any way whatsoever relate to periods on or prior to the

Effective Time on the Closing Date or are to be observed, paid, discharged or performed on or

prior to the Effective Time on the Closing Date (in each case, including any liabilities that result

from, relate to or arise out of tort or other product liability claims), or any liabilities calculable by

reference to the Debtors or their assets or operations, or relating to continuing conditions

existing on or prior to the Effective Time on the Closing Date, which liabilities, debts,

commitments and obligations are hereby extinguished insofar as they may give rise to successor

liability, without regard to whether the claimant asserting any such liabilities, debts,

commitments or obligations has delivered to the Purchaser a release thereof. Without limiting

the generality of the foregoing, except as expressly provided in the Asset Purchase Agreement,

the Purchaser shall not be liable or responsible, as a successor or otherwise, for the Debtors'

liabilities, debts, commitments or obligations, whether calculable by reference to the Debtors or

their assets or operations, arising on or prior to the Effective Time on the Closing Date and under

or in connection with (i) any employment or labor agreements, consulting agreements,

severance arrangements, change-in-control agreements or other similar agreement to which

either of the Debtors is a party, (ii) any pension, welfare, compensation or other employee

benefit plans, agreements, practices and programs, including, without limitation, any pension

plan of the Debtors, (iii) the cessation of the Debtors' operations, dismissal of employees, or

termination of employment or labor agreements or pension, welfare, compensation or other

employee benefit plans, agreements, practices and programs, obligations that might otherwise

arise from or pursuant to the Employee Retirement Income Security Act of 1974, as amended,

the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964, the Age Discrimination

and Employment Act of 1967, the Federal Rehabilitation Act of 1973, the National Labor

Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, COBRA, or the

Worker Adjustment and Retraining Notification Act, (iv) workmen's compensation,

occupational disease or unemployment or temporary disability insurance claims, (v)

environmental liabilities, debts, claims or obligations arising from conditions first existing on or

prior to the Effective Time on the Closing Date (including, without limitation, the presence of

hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted  on

any basis, including, without limitation, under the Comprehensive Environmental Response,

Compensation and Liability Act, 42 U.S.C. §9601 et. seq., (vi) any bulk sales or similar law, (vii)

any liabilities, debts, commitments or obligations of, or required to be paid by, the Debtors for

any taxes of any kind for any period, (viii) any litigation, and (ix) any products liability or

similar claims, whether pursuant to any state or federal laws or otherwise.  The foregoing

recitation of specific agreements, plans or statutes is not intended, and shall not be construed, to

limit the generality of the categories of liabilities, debts, commitments or obligations referred to

therein.

28. Under no circumstances shall the Purchaser be deemed a successor of or to the Debtors for any interest against or in the Debtors or the Acquired Assets of any kind or nature whatsoever. Except as provided in the Asset Purchase Agreement with respect to Assumed Liabilities, no person or entity, including, without limitation, any federal, state or local governmental agency, department or instrumentality, shall assert by suit or otherwise against the Purchaser or its successors in interest any claim that they had, have or may have against the Debtors, or any liability, debt or obligation relating to or arising from the Acquired Assets, or the Debtors' operations or use of the Acquired Assets, including, without limitation, any liabilities calculable by reference to the Debtors or their assets or operations, and all persons and entities are hereby enjoined from asserting against the Purchaser in any way any such claims, liabilities, debts or obligations. Following the Closing Date, and except as otherwise provided herein, no holder of an interest in the Debtors shall interfere with the Purchaser's title to or use and enjoyment of the Acquired Assets based on or related to such interest, or any actions that the Debtors may take in the Cases.

29. This Court retains jurisdiction (i) to enforce and implement the terms and provisions of the Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith; (ii) to compel the transfer and delivery of the Acquired Assets to the Purchaser; (iii) to compel delivery of the Purchase Price under the Asset Purchase Agreement; (iv) to resolve any disputes, controversies or claims arising out of or relating to the Asset Purchase Agreement; (v) to protect the Purchaser against (a) any liabilities not expressly assumed as part of the Assumed Liabilities or (b) any Interests in the Debtor or the Acquired Assets (which by this Sale Order attach to the proceeds of the Sale); (vi) to resolve any and all claims relating to the Insurance-Related Proceeds due to the

Purchaser, the Debtors or their estates relating to the RLI Excluded Asset ; and (vii) to interpret, implement, and enforce any provision or term of this Sale Order.

30. Each and every federal, state and local governmental agency or department is hereby directed to accept and honor immediately any and all documents, instruments and transfer applications necessary and appropriate to consummate the transactions contemplated by this Sale Order.

31. Commencing on the Effective Time of the Closing Date, the Purchaser is authorized to use the Lockbox Accounts on the terms and conditions of the Lockbox Agreements until the earlier of the Purchaser entering into new lockbox agreements or the entry of an order conditioning, modifying or terminating its use of the Lockbox Accounts.

32. In the absence of a stay pending appeal, if the Purchaser and the Debtors elect to close under the Asset Purchase Agreement at any time after entry of this Sale Order, then, with respect to the Sale and the assumption and assignment of the Assumed Assets and other transactions contemplated by the Asset Purchase Agreement approved and authorized herein, the Purchaser, as a purchaser in good faith, shall be entitled to the protections of 363(m) of the Bankruptcy Code if this Sale Order or any authorization contained herein is reversed or modified on appeal.

33. The terms and provisions of the Asset Purchase Agreement, together with the terms and provisions of this Sale Order, shall be binding in all respects upon, and shall inure to the benefit of the Debtors, their estates and creditors, the Purchaser, and their respective affiliates, successors and assigns, and shall be binding in all respects upon any affected third parties, including, but not limited to, all non-Debtor parties to the Assumed Assets, and all persons asserting a claim against or Interest in the Debtors' estates or any of the Acquired Assets



to be sold to the Purchaser pursuant to the Asset Purchase Agreement. The Asset Purchase Agreement and the Sale shall be specifically performable and enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtors or any chapter 7 or chapter 11 trustee or examiner of the Debtors or their respective estates.

34. The failure specifically to include any particular provisions of the Asset Purchase Agreement, or any document, instrument or agreement entered into in connection therewith, in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Asset Purchase Agreement be authorized and approved in its entirety. To the extent of any inconsistency between the provisions of the Asset Purchase Agreement, any other documents to be executed in connection with the Sale and this Sale Order, the provisions of this Sale Order shall govern.

35. The Asset Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court, but upon notice to the Committee, provided that any such modification, amendment or supplement is not material.

36. Effective as of the Effective Time on the Closing Date, (i) each of the Carrier Certificates shall be deemed transferred to the Purchaser and registered with all applicable governmental authorities and agencies and the Purchaser hereby is empowered and authorized to operate the Business under the Carrier Certificates on the same terms and with the same rights and privileges as the Debtors prior to the Effective Time on the Closing Date, subject to the Purchaser's compliance with applicable law, including any regulations adopted by the U.S. Department of Transportation; and (ii) each of the Vehicular Permits and Business Permits shall be deemed transferred to the Purchaser and registered with all applicable governmental

authorities and agencies and the Purchaser is hereby authorized and empowered to operate the

Business under the Vehicular Permits and Business Permits on the same terms and with the same

rights and privileges as the Debtors prior to the Effective Time on the Closing Date until the

stated expiry of such Vehicular Permits or Business Permits, as the case may be, and subject to

the Purchaser's compliance with applicable law.

37. Upon the request of the Purchasers or the Debtors, the Clerk of the United

States Bankruptcy Court for the District of Utah is authorized, empowered and directed to issue

the certificate attached hereto as Exhibit E, advising governmental authorities, agencies, officers

and employees of the entry of this Sale Order, the transfer of the Acquired Assets, including the

Carrier Certificates and Vehicular Permits, and the authorization for the Purchaser to engage in

the conduct of the Business on and after the Effective Time on the Closing Date with the same

rights and privileges as the Debtors, subject to compliance with applicable law.

38. The Debtors shall not be obligated to pay any amounts that may be necessary

to cure any defaults, or to pay any established actual or pecuniary losses that have resulted from

such defaults, under the Assumed Assets within the meaning of sections 365(b)(1) or (f) of the

Bankruptcy Code, and, pursuant to Section 365(k), from and after the Effective Time on the

Closing Date, the Debtors shall have no liability with respect to any Assumed Asset.

39. Notwithstanding Section 5.9 of the Asset Purchase Agreement, the Debtors

shall not undertake any action to amend their charter documents to reflect a corporate name

change, and no such amendment shall be deemed effective, until after such date that all

instruments, deeds and documents transferring or otherwise conveying the Real Property Assets

have been duly executed, acknowledged and delivered to the Purchaser.



40. This Court hereby orders that the ten-day stays provided for in Bankruptcy Rules 6004(g) and 6006(d) shall not be in effect with respect to the Sale and the assumption and assignment of Assumed Assets and other transactions contemplated thereby, and thus this Sale Order shall be effective and enforceable immediately upon entry.

41. The provisions of this Sale Order are nonseverable and mutually dependent. Nothing contained in any plan(s) of reorganization or liquidation confirmed in these Cases or any order of this Court confirming such plan(s) shall conflict with or derogate from the provisions of the Asset Purchase Agreement or the terms of this Sale Order.

42. Notwithstanding anything to the contrary herein, this Sale Order shall be effective only upon entry of an order approving the "Motion to Approve Stipulations for Waiver and Release of Certain Claims," dated as of April 12, 2002.

[Execution Page Follows]




Dated this 22 day of April, 2002.

The Honorable Glen E. Clark
CHIEF UNITED STATES BANKRUPTCY
JUDGE

Approved as to form:

Douglas M. Monson, Esq.
RAY QUINNEY & NEBEKER
Counsel for First Union
   Commercial Corporation

Mark R. Gaylord, Esq.
BALLARD SPAHR ANDREWS & INGERSOLL
Counsel for Fleet Capital Leasing

Peter W. Billings, Esq.
Gary E. Jubber, Esq.
FABIAN & CLENDENIN
Counsel for Unsecured Creditors' Committee

Kim P. Gage, Esq.
COOKSEY, TOOLEN, GAGE, DUFFY & WOOG
Counsel for DaimlerChrysler Services
   North America LLC

Scott J. Goldstein, Esq.
SPENCER FANE BRITT & BROWNE LLP
Counsel for Debtors

Danny C. Kelly, Esq.
Paul W. Werner, Esq.
Julia R. Pettit, Esq.
STOEL RIVES LLP
Counsel for Jerry Moyes,
   The Jerry And Vickie Moyes Family Trust,
   Interstate Equipment Leasing, Inc.,
   DST Leasing, LLC,
   Central Freight Lines, Inc., and
   Central Refrigerated Service, Inc.


Vernon L. Hopkinson, Esq.
COHNE RAPPAPORT & SEGAL
Counsel for CitiCapital Business Credit
   and CitiCapital Leasing,
   fka Associates Leasing, Inc.

Scott J. Goldstein, Esq.
SPENCER FANE BRITT & BROWNE LLP
Counsel for Debtors


Danny C. Kelly, Esq.
Paul W. Werner, Esq.
Julia R. Pettit, Esq.
STOEL RIVES LLP
Counsel for Jerry Moyes,
   The Jerry And Vickie Moyes Family Trust,
   Interstate Equipment Leasing, Inc.,
   DST Leasing, LLC,
   Central Freight Lines, Inc., and
   Central Refrigerated Service, Inc.


Thomas Lallier, Esq,
FOLEY & MANSFIELD, P.L.L.P.
Counsel for CitiCapital Business Credit
   and CitiCapital Leasing,
   fka Associates Leasing, Inc.

**Exhibit A**

## Asset Purchase Agreement

A copy of the Amended and Restated Asset Purchase Agreement dated as of April 18, 2002, between the Debtors and the Purchaser, with exhibits, has been filed with the United States Bankruptcy Court for the District of Utah, 350 South Main Street, Room 348, Salt Lake City, Utah 84101 (the "Bankruptcy Court") and may be reviewed during regular business hours at the Bankruptcy Court or by logging on to the website established by the Bankruptcy Court at https://ecf.utb.uscourts.gov.

**Exhibit B**

**Buyback Agreements**

A copy of the Buyback Agreements has been filed with the United States Bankruptcy Court for
the District of Utah, 350 South Main Street, Room 348, Salt Lake City, Utah 84101 (the
"Bankruptcy Court") and may be reviewed during regular business hours at the Bankruptcy
Court or by logging on to the website established by the Bankruptcy Court at
https://ecf.utb.uscourts.gov.

**Exhibit C**

**Equipment Lease Assignments**

A copy of the Equipment Lease Assignments, with exhibits, has been filed with the United States Bankruptcy Court for the District of Utah, 350 South Main Street, Room 348, Salt Lake City, Utah 84101 (the "Bankruptcy Court") and may be reviewed during regular business hours at the Bankruptcy Court or by logging on to the website established by the Bankruptcy Court at https://ecf.utb.uscourts.gov.



**Exhibit D**

Real Estate Legal Descriptions and
Descriptions of Liens (including, where noted, Property Tax Liens)
from which the Real Estate will be Sold Free and Clear

## ATLANTA TERMINAL (DEKALB COUNTY, GEORGIA)

Legal Description:

All that tract or parcel of land lying and being in Land Lots 18 and 19 of the 15th District of
DeKalb County, Georgia, being more particularly described as follows:

Beginning at the intersection formed by the easterly right of way of Southern Railroad (150 foot
right-of-way) and the southerly right of way of Cedar Grove Road (variable right-of-way), said
point of intersection being marked by an iron pin placed and running thence North 84 degrees 43
minutes 09 seconds East along the southerly right of way of Cedar Grove Road a distance of
948.55 feet to a right of way monument; running thence South 05 degrees 04 minutes 14 seconds
East along the westerly right of way of Cedar Grove Road a distance of 25.96 feet to a right of
way monument; running thence North 84 degrees 38 minutes 21 seconds East along the
southerly right of way of Cedar Grove Road a distance of 400 feet to an iron pin placed; running
thence South 54 degrees 25 minutes 29 seconds East along the southwesterly right of way of
Cedar Grove Road a distance of 52.63 feet to an iron pin placed on the westerly right of way of
Bowman Industrial Court (60 foot right-of-way); running thence South 02 degrees 26 minutes 00
seconds East along the westerly right of way of Bowman Industrial Court a distance of 177.23
feet to a point; running thence along the westerly right of way of Bowman Industrial Court and
along the arc of a curve to the left 213.93 feet to a point on the westerly right of way of Bowman
Industrial Court (said arc having a chord distance of 213.81 feet on a bearing of South 05 degrees
51 minutes 00 seconds East and a radius of 1793.780 feet); running thence South 09 degrees 16
minutes 00 seconds East a distance of 19.51 feet to an iron pin placed on the westerly right of
way of Bowman Industrial Court; running thence South 85 degrees 42 minutes 19 seconds West
a distance of 1307.21 feet to an iron pin placed on the easterly line of the Southern Railroad right
of way (150 foot right-of-way); running thence along the arc of curve to the left 235.45 feet to an
iron pin placed on the easterly line of the Southern Railroad right of way (150 foot right-of-way)
(said arc having a chord distance of 234.88 feet on a bearing of North 12 degrees 06 minutes 20
seconds West and a radius of 980.131 feet); running thence North 18 degrees 59 minutes 15
seconds West a distance of 133.90 feet to a point on the easterly line of the Southern Railroad
right of way (150 foot right-of-way); and running thence along the easterly right of way of
Southern Railroad and along the arc of a curve to the left 86.29 feet to the intersection formed by
the easterly right of way of Southern Railroad (150 foot right-of-way) (said arc having a chord
distance of 86.26 feet on a bearing of North 16 degrees 13 minutes 18 seconds West and radius



of 893.810 feet) and the southerly right of way of Cedar Grove Road (variable right-of-way) said point being marked by an iron pin placed and being the Point of Beginning; said property containing 13.7942 acres and being more particularly shown on that certain survey for Bowman Transportation, Inc. prepared by G.M. Gillespie, Ga. Reg. Land Surveyor No. 2121 of Watts & Browning Engineers, Inc., dated August 28, 1990, last revised February 28, 1992, and said survey is incorporated herein by reference thereto.

Lien From Which the Real Property Will Be Sold Free and Clear:

Security Deed from McClendon Services Corporation, an Alabama corporation, to Columbus Bank and Trust Company, dated March 18, 1992, filed for record March 23, 1992 at 11:57 a.m., recorded in Book 7217, Page 257, Records of DeKalb County, Georgia.

## RUPERT DROP YARD (RUPERT, MINIDOKA COUNTY, IDAHO)

Legal Description:

TOWNSHIP 10 SOUTH, RANGE 23 EAST, BOISE MERIDIAN, MINIDOKA COUNTY, IDAHO

SECTION 11: part of the NE1/4NE1/4, more particularly described as follows:

Commencing at the Northeast corner of the NE1/4NE1/4, of said Section 11; thence South 88°34'18" West for 198.69 feet (South 89°54'15" West for 198.60 feet recorded) to the TRUE POINT OF BEGINNING;
Thence South 88°34'18" West along said section line for 210.58 feet (South 89°55'31" West for 200.91 feet recorded) to a point on the Southeasterly right of way of State Highway 24 (formerly Highway 30 North);
Thence South 45°12'55" West for 52.54 feet (South 45°14'15" West for 66.29 feet recorded) along said highway right of way to a State Highway right of way marker;
Thence South 45°27'09" West along said highway right of way for 163.32 feet (South 45°10'52" West for 162.01 feet recorded);
Thence South 44°49'08" East for 399.82 feet (400.00 feet recorded);



Thence North 88°44'44" East for 86.45 feet (South 88°30'44" East for 86.77 feet recorded),
Thence North 00°00'16" West for 56.02 feet (North 0°15'45" East for 56.00 feet recorded);
Thence North 89°26'54" East for 21.05 feet (North 89°44'15" East for 21.00 feet recorded);
Thence North 01°06'06" West for 207.00 feet (North 0°15'45" West recorded);
Thence South 89°12'13" West for 25.00 feet (South 89°44'15" West recorded);
Thence North 01°16'00" East for 175.75 feet (North 0°15'45" West for 180.30 feet recorded) to
the TRUE POINT OF BEGINNING.

<u>Liens From Which the Real Property Will Be Sold Free and Clear</u>:  Notices of liens in favor of
the State Tax Commission, the Department of Labor, and Department of Health and Welfare of
the State of Idaho, filed in the office of the Secretary of State pursuant to Chapter 19, Title 45,
Idaho Code.

## HEADQUARTERS (WEST VALLEY CITY, SALT LAKE COUNTY, UTAH)

<u>Legal Description</u>:

Part of the North Half of Section 24, Township 1 South, Range 2 West, Salt Lake Base and
Meridian, situated in the County of Salt Lake, State of Utah, described as follows:

Beginning at a point which lies South 0°06'42" West 80.00 feet from the North Quarter Corner
of said Section 24, to a point on the South line of the 2100 South Freeway right of way line and
running thence North 89°53'03" East 330.72 feet along said South line; thence South 0°05'53"
West 586.45 feet; thence North 89°49'59" East 330.87 feet; thence South 0°05'04" West 1998.47
feet to the East-West center of Section line; thence South 89°40'47" West 1263.69 feet along said
East-West center of Section line; thence North 0°06'42" East 1532.08 feet to the South line of the
Gates Rubber Company property; thence North 89°40'44" East 535.00 feet along said South line
to the Southeast Corner of the Gates Rubber Company property; thence North 0°06'42" East
1050.00 feet along the East line of the Gates Rubber Company Property to the South line of the
2100 South Frontage Road; thence North 85°26'00" East 66.22 feet along said South line to the
point of beginning.

Excluding from the above described property all the property formerly known as Lots 25, 26 and
27, Block 5, Town of El Dorado Plat "A", together with one-half (1/2) the vacated street and
alleys abutting said lots.

Also excepting therefrom the following:

Beginning at a point which lies South 0°06'42" West 80.00 feet, South 85°26'00" West 66.22
feet, South 0°06'42" West 1050.00 feet and South 89°40'44" West 445.00 feet from the North
Quarter Corner of said Section 24, Township 1 South, Range 2 West, Salt Lake Base and
Meridian; said point also lies on the South line of the Gates Rubber Company Property and
running thence South 0°06'42" West 60.00 feet; thence South 89°40'44" West 90.00 feet; thence
North 0°06'42" East 60.00 feet to the Southwest Corner of the Gates Rubber Company Property;



thence North 89°40'44" East 90.00 feet along the South line of the Gates Rubber Company
Property to the point of beginning.

Also excepting therefrom the following:

Part of the Northeast Quarter of Section 24, Township 1 South, Range 2 West, Salt Lake Base
and Meridian, described as follows:

Beginning at a point which lies South 0°06'42" West 80.00 feet, North 89°53'03" East 330.72
feet and South 0°05'53" West 586.45 feet from the North Quarter Corner of Section 24,
Township 1 South, Range 2 West, Salt Lake Base and Meridian (said point lies on an East line of
the property conveyed to Richard D. Simon in the certain Special Warranty Deed recorded June
14, 1994 as Entry No. 5849753 in Book 6961 at Page 1889 of Official Records), and running
thence North 89°49'59" East 330.87 feet along a North line of said Richard D. Simon property;
thence South 0°05'04" West 263.31 feet along the East of said Richard D. Simon property;
thence South 89°49'59" West 330.93 feet; thence North 0°05'53" East 263.31 feet to the point of
beginning.

Also less and excepting therefrom:

This is part of the Warranty Deed dated the 10th of October, 1997 from Dick Simon Trucking,
Inc. grantor to Richard D. Simon, grantee:

Part of the North Half of Section 24, Township 1 South, Range 2 West, Salt Lake Base and
Meridian, described as follows:

Beginning at a point which lies South 00°05'53" West 586.45 feet; North 89°49'59" East 330.87
feet and South 00°05'04" West 1615.47 feet from the North Quarter Corner of said Section 24
and running thence South 00°05'04" West 383.00 feet to the East-West center of Section line;
thence South 89°40'47" West 350.00 feet along the East-West center of Section line; thence
North 00°05'04" East 383.00 feet; thence North 89°40'47" East 350.00 feet to the point of
beginning.

Excepting the South 33.00 feet for a public road right of way.

Liens From Which the Real Property Will Be Sold Free and Clear: Charges and assessments
made by the Granger-Hunter Improvement District now due, including all interest, taxes and
penalties owing thereon or in connection therewith, and including any acceleration of charges
and assessments not yet due in connection with such due or past due charges and assessments.

## FONTANA TERMINAL (FONTANA, SAN BERNARDINO, COUNTY, CA)

Legal Description:

The West 1/2 to the East 1/2 of Farm Lot 855 according to map showing Subdivision of Lands
belonging to the Semi-Tropic Land and Water Company, in the County of SAN BERNARDINO,



State of California, as per map recorded in Book 11, page(s) 12, of Maps, in the office of the County Recorder of said County.

<u>Liens From Which the Real Property Will Be Sold Free and Clear:</u>

1) Deed of Trust, dated September 29,1989, that secures indebtedness in the amount $700,000, granted by Richard D. Simon, Trustor, to Commonwealth Land Title Company, as Trustee, for the benefit of Zions First National Bank, that was recorded October 5, 1989 as Instrument No. 89-374153. Said Deed of Trust was subordinated to the Deed of Trust that was recorded February 28, 1990 as Instrument No. 90-076925, by an agreement that was recorded February 28, 1990 as Instrument Nos. 90-076926.

2) Deed of Trust, dated February 23, 1990, that secures indebtedness in the amount of $1,000,000, granted by Richard D. Simon, Trustor , to Commonwealth Land Title Company, a California corporation, as Trustee, for the benefit of Zions First National Bank, that was recorded February 28, 1990 as Instrument No. 90-076925. An assignment of the beneficial interest under said Deed of Trust, was made to First Interstate Bank of Utah, N.A., that was recorded October 7, 1991 as Instrument No. 91-381720.

3) Deed of Trust, dated September 11, 1992, that secures indebtedness in the amount of $1,230,000, granted by Richard D. Simon, Trustor, to Commonwealth Land Title Company, as Trustee, for the benefit of Bank of Utah, that was recorded October 14, 1992 as Instrument No. 92-423337.

4) Real Property taxes, including general and special taxed, personal property taxes and assessments collected with such taxes, levied for the fiscal year 2001 –2002 under Code Area 074031, Assessment No. 0237-101-11-0-000, in the amount of $7,128.03 for the second installment, plus all related penalties, costs and interest.

## SPRINGVILLE DROP YARD (SPRINGVILLE CITY, UTAH COUNTY, UTAH)

<u>Legal Description:</u>

Lot 6, Revised Plat "A", GQ Industrial Park Subdivision, Springville City, Utah County, Utah, according to the official plat thereof on file in the office of the Recorder, Utah County, Utah.

<u>Liens:</u> None.



**Exhibit E**

**Proposed Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH

| | | |
|---|---|---|
| In re: | ) | **Case No. 02-22906** |
| | ) | **Case No. 02-22907** |
| | ) | **Chapter 11** |
| SIMON TRANSPORTATION  SERVICES, INC., | ) | |
| DICK SIMON TRUCKING, INC., | ) | |
| SIMON TERMINAL, LLC | ) | **(Jointly Administered)** |
| | ) | |
| Debtors. | ) | **Hon. Glen E. Clark** |
| | ) | |

## NOTICE OF ENTRY OF ORDER

**PLEASE BE ADVISED:**

On April 19, 2002, the United States Bankruptcy Court for the District of Utah (the "Bankruptcy Court") entered the "Order Pursuant to Sections 105(A), 363, 365, and 1146 of the Bankruptcy Code: (A) Authorizing the Sale of Substantially all of the Debtors' Assets to Central Refrigerated Service, Inc. Free and Clear of Liens, Claims, Interests and Encumbrances; (B) Approving the Asset Purchase Agreement; and (C) Granting Related Relief" (the "Sale Order").

Pursuant to the terms of the Sale Order:

1.      The common carrier certificate of public convenience and necessity issued to Dick Simon Trucking, Inc. in Docket No. MC-135221 (Sub 26), the contract carrier permit issued to Dick Simon Trucking, Inc. in Docket No. MC-135221 (Sub 28-P), and the other authorities issued under Docket No. MC-135221, are deemed to be transferred to Central Refrigerated Service, Inc. at 12:01 a.m. on April 22, 2002, and such authorities shall be deemed registered in all 48 of the contiguous states of the United States, effective at the aforesaid date and time.

2.      All base license plates, permits, certificates, and other licenses affixed to or carried by tractors, trailers, and service vehicles of Dick Simon Trucking, Inc. shall be deemed transferred to Central Refrigerated Service, Inc. at 12:01 a.m. on April 22, 2002, and shall be valid authorizations to operate thereunder until the original term under which they were issued shall have expired.

3.      Each and every federal, state, and local governmental agency, department, or law enforcement official is hereby directed, upon presentation of this Notice by Central Refrigerated



Service, Inc., or any officer, agent or employee thereof,  and without cost or further action or compliance thereby, to honor and refrain from challenging the transfer of such operating authority, base license plates, permits, certificates, and licenses, except upon motion, duly made and filed by such party, and heard and ordered to the contrary by this court.

This Notice of Entry of Order is executed and issued at the direction of the United States Bankruptcy Court and pursuant to the terms of the Sale Order.

Dated this ___ day of April, 2002.

William C. Stillgebauer
Clerk of the United States Bankruptcy Court

[Court Seal]



In re: Simon Transportation Services Inc., Debtor

U.S. Bankruptcy Court, District of Utah, Central Division
Case No. 02-22906

# Index of Exhibits

## To

ORDER PURSUANT TO SECTIONS 105(a), 363, 365, AND 1146 OF THE
BANKRUPTCY CODE: (A) AUTHORIZING THE SALE OF SUBSTANTIALLY
ALL OF THE DEBTORS' ASSETS TO CENTRAL REFRIGERATED SERVICE, INC.
FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (B)
APPROVING THE ASSET PURCHASE AGREEMENT; AND (C) GRANTING
RELATED RELIEF

## VOLUME I

| Exhibit | Description |
| --- | --- |
| A | Asset Purchase Agreement |
| B | Buyback Agreements |





## AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

THIS AMENDED AND RESTATED ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of April 18, 2002, by and among Central Refrigerated Service, Inc., a Nebraska corporation ("Buyer"), and Simon Transportation Services Inc., a Nevada corporation ("SIMN"), and its subsidiaries, Dick Simon Trucking, Inc., a Utah corporation ("DSTI"), and Simon Terminal, LLC, an Arizona limited liability company ("Terminal"; SIMN, DSTI, and Terminal are sometimes referred to herein as the "Debtors" or "Sellers").

## RECITALS

WHEREAS, on March 25, 2002, the parties submitted to the Bankruptcy Court (as defined below) that certain Asset Purchase Agreement (the "Original Asset Purchase Agreement");

WHEREAS, the parties wish to amend and restate the Original Asset Purchase Agreement to reflect in writing certain amendments thereto;

WHEREAS, Sellers are engaged in the business of owning and operating tractors, trailers, and terminal facilities for use in the interstate transportation of freight (the "Business");

WHEREAS, Sellers are debtors and debtors-in-possession in a jointly administered chapter 11 case, styled In re: SIMON TRANSPORTATION SERVICES INC., et al, Case Nos. 02-22906 GEC, 02-22907 GEC, and 02-24874 GEC Jointly Administered (collectively, the "Case"), pending before the United States Bankruptcy Court for the District of Utah, Central Division (the "Bankruptcy Court");

WHEREAS, Sellers wish to sell to Buyer and Buyer wishes to purchase from Sellers certain assets and to assume from Sellers certain liabilities related to the operation of the Business, pursuant to, *inter alia*, Sections 363 and 365 of the Bankruptcy Code (as hereinafter defined) and the applicable Federal Rules of Bankruptcy Procedure; and

WHEREAS, Buyer may designate certain of its Affiliates (as hereinafter defined) to take title to certain of the Acquired Assets (as hereinafter defined) at the Closing (as hereinafter defined).

## AGREEMENTS

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the terms and conditions hereof, the parties, intending to be legally bound, hereby agree as follows:

# ARTICLE I
## Definitions

1.1    Defined Terms.   For purposes of this Agreement, unless otherwise provided, the following terms, when capitalized, shall have the meanings ascribed to them below:

"Adequate Assurance" shall mean the method(s) by which Buyer may demonstrate its ability to perform and discharge its obligations under the Assumed Assets from and after the Closing in order to effectuate, pursuant to Section 365 of the Bankruptcy Code, the assumption by Sellers and assignment to Buyer of the Assumed Assets assigned to Buyer under the terms of the Sale Order.

"Affiliate" shall have the meaning set forth in (a) Rule 12b-2 of the General Rules and Regulations of the Securities Exchange Act of 1934, as amended. In addition, for purposes of Section 2.1(l), the term Affiliate shall be deemed to include Jerry and Vickie Moyes, the Jerry and Vickie Moyes Family Trust, the Moyes Children's Limited Partnership, Swift Transportation Co., Inc., DST Leasing, LLC, Interstate Equipment Leasing, Inc., SME Steel Contractors, Inc., SME Industries Inc., Central Freight Lines, Inc., Earl H. Scudder, and Scudder Law Firm, P.C., L.L.O.

"Agreement" shall mean this Amended and Restated Asset Purchase Agreement (together with all schedules and exhibits referenced herein).

"Assumed Assets" shall mean the Assumed Contracts and the Assumed Leases.

"Assumed Leases" shall mean the Tractor Leases, Trailer Leases, IEL Leases, and Miscellaneous Leases.

"Bankruptcy Code" shall mean title 11 of the United States Code, as amended from time-to-time.

"Benefit Plans" shall mean all contracts, plans, arrangements, policies, and understandings providing for any compensation or benefit other than base wages or salaries that are maintained by Sellers or affect their employees or independent contractors, regardless of whether defined as an "employee benefit plan" under ERISA or subject to any provision of ERISA, including, without limitation: all pension, profit-sharing, retirement, thrift, 401(K), ESOP, and other similar plans and arrangements (defined benefit and defined contribution); all health and welfare, disability, insurance (including self-insurance), workers' compensation, supplemental unemployment, severance, vacation, and similar plans and arrangements; and all bonus, stock option, incentive compensation, stock appreciation rights, phantom stock,

2



overtime guaranty, employment contract, employee handbook, and other similar plans or arrangements.

"Bid Procedures Order" shall mean an Order of the Bankruptcy Court, in form and substance reasonably satisfactory to Buyer, as more particularly described in Section 5.12(a) of this Agreement.

"Business Day" shall mean any day other than a Saturday, Sunday or a legal holiday on which banking institutions in the State of Utah are not required to open.

"Buyer" shall mean Central Refrigerated Service, Inc., a Nebraska corporation.

"Carve Outs" shall mean the Chapter 7 Carve Out and the CitiCapital Carve Out.

"Chapter 7 Carve Out" shall mean the Chapter 7 Carve Out, as defined in the Cash Collateral Agreement

"CitiCapital" shall mean CitiCapital Business Credit, a division of CitiCapital Commercial Corporation, formerly known as Associates Commercial Corporation, and CitiCapital Commercial Leasing Corporation, formerly known as Associates Leasing, Inc.

"CitiCapital Carve Out" shall mean the $150,000 carve out to fund payments to CitiCapital for fees, costs, and expenses, including attorneys' fees, incurred in connection with this Agreement, the Cash Collateral Stipulation, the CitiCapital Credit Agreement, and the Equipment Indebtedness.

"CitiCapital Credit Agreement" shall mean that certain Transportation Accounts Financing and Security Agreement dated April 25, 2001, and all documents relating thereto, between CitiCapital and DSTI.

"Code" shall mean the Internal Revenue Code of 1986, as amended, or any successor federal tax Law, and the Treasury Regulations promulgated thereunder.

"Cure Amount" or "Cure Amounts" shall mean the amount(s) payable on account of defaults in order to effectuate, pursuant to Section 365 of the Bankruptcy Code, the assumption by Sellers and assignment to Buyer of the Assumed Assets assigned to Buyer under the terms of the Order.

"DIP Credit Agreement" shall mean that certain Debtor-In-Possession Credit Agreement dated February 26, 2002 between SIMN, DSTI, and Jerry Moyes.

"Debtors" shall mean SIMN, DSTI, and Terminal.

3



"DSTI" shall mean Dick Simon Trucking, Inc., a Utah corporation.

"Eligible Accounts" shall have the definition used in the CitiCapital Credit Agreement.

"Excluded Records" shall mean: (a) all tax records of Sellers, (b) all minute books of Sellers, and (c) all written materials that Sellers are required by Law to retain; provided, however, that Buyer may request copies of any such Excluded Records and the copies shall be Acquired Assets.

"GAAP" shall mean United States generally accepted accounting principles as in effect from time to time.

"Governmental Entity" shall mean any (a) federal, state, local, municipal, foreign, or other government; (b) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); or (c) body exercising, or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any tribunal.

"Judgment" shall mean any judgment, order, writ, injunction, decree, award, or settlement of any Proceeding.

"Law" means any federal, state, local, or foreign statute, law, ordinance, regulation, rule, code, order, principle of common law, judgment enacted, promulgated, issued, enforced, or entered by any Governmental Entity, or other requirement or rule of law.

"Liabilities" shall mean, as to any Person, all debts, adverse claims, liabilities, commitments, responsibilities, and obligations of any kind or nature whatsoever, direct, indirect, absolute or contingent, of such Person, whether accrued, vested, or otherwise, whether known or unknown and whether or not actually reflected, or required to be reflected, in such Person's balance sheets or other books and records.

"Lien" shall mean any claim, pledge, option, charge, hypothecation, easement, security interest, right-of-way, encroachment, mortgage, deed of trust, or other encumbrance.

"Material Adverse Effect" or "Material Adverse Change" shall mean with respect to Sellers or the Acquired Assets any change, circumstance, event, or effect that, individually or in the aggregate with all other changes, circumstances, events, and effects, is materially adverse to or which could be reasonably expected to be materially adverse to (a) the Acquired Assets, (b) the Assumed Liabilities, (c) the results of operations or financial condition of the