

J. THOMAS BECKETT (5587)
ANNE E. RICE (7971)
PARSONS BEHLE & LATIMER
Attorneys for the Freightliner Companies
One Utah Center
201 South Main Street, Suite 1800
Post Office Box 45898
Salt Lake City, UT  84145-0898
Telephone: (801) 532-1234
Facsimile: (801) 536-6111

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>**SIMON TRANSPORTATION SERVICES, INC.; DICK SIMON TRUCKING, INC., AND SIMON TERMINAL, LLC,**<br><br>Debtors. | Case No. 02-22906<br>Case No. 02-22907<br>Case No. 02-24874<br>(Jointly Administered)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING FREIGHTLINER'S MOTION FOR (I) RECONSIDERATION OF APRIL 22, 2002 ORDERS AUTHORIZING SALE, ETC. AND APPROVING ASSUMPTION AND ASSIGNMENT OF EXECUTORY VENDOR CONTRACTS, ETC., AND (II) EXCLUSION OF THE FREIGHTLINER COMPANIES FROM THE EFFECTS OF THOSE ORDERS**<br><br>Judge Glen E. Clark |

Freightliner LLC (f/k/a/ Freightliner Corporation) and Freightliner Market

Development Corporation (together, the "Freightliner Companies" or "Freightliner"),

by and through their undersigned counsel, Parsons Behle & Latimer, respectfully

465914.1



0222906D454

submit the following Memorandum of Points and Authorities Supporting Their Motion

for

- Reconsideration of this Court's April 22, 2002 Order Pursuant to Sections 105(a), 363, 365, and 1146 of the Bankruptcy Code: (A) Authorizing the Sale of Substantially All of the Debtors' Assets to Central Refrigerated Service, Inc. Free and Clear of Liens, Claims, Interests and Encumbrances; (B) Approving the Asset Purchase Agreement; and (C) Granting Related Relief (the "Sale Order");

- Reconsideration of this Court's April 22, 2002 Order (A) Granting Joint Motion of Debtors and Central Refrigerated Service, Inc.; (B) Authorizing Assumption and Assignment of Executory Contracts (Vendor Contracts); and (C) Granting Related Relief (the "Contracts Order;" together with the Sale Order, the "Orders"); and

- Exclusion of the Freightliner Companies, and all agreements to which they are a party with the Debtors, entirely from the effects of those Orders.

## I.
## Overview

1.     As the blizzard of paper subsides in this case, the Freightliner Companies

discover that they were fleeced in the fray.

2.     By this motion, Freightliner seeks to set things straight.

3.     The Freightliner Companies manufacture freight trucks and sell them to

truckers such as the Debtors.  They are also party to certain prepetition conditional

commitments with one of the Debtors, Dick Simon Trucking.  These commitments (the

"Freightliner Commitments") relate to Freightliner's selective program of making

conditional offers to repurchase used freight trucks upon qualifying new truck

purchases by Dick Simon.

465914.1

4.      The Freightliner Commitments are potentially very valuable to Dick
Simon, but they are not executory contracts, and they cannot be assumed and assigned.
So the purchaser of the Debtors' assets, Central Refrigerated Service, Inc. (the
"Purchaser") had to obtain them by stealth.

5.      Without adequate notice to Freightliner, or anyone else, the Purchaser
appropriated the Freightliner Commitments, through assumptions and assignments, in
connection with *both* the Sale Order *and* the Contracts Order.

6.      These assumptions and assignments now must be unwound, for they
were obtained without proper notice to Freightliner.

7.      For example, the motion that resulted in the Sale Order (the "Sale
Motion") was served on some 6,500 parties in interest, but not Freightliner.  The Sale
Motion proposed that the Debtors would file motions seeking authorization to assume
and assign contracts *after* the sale to the Purchaser closed.   But the Sale Order (which
was entered *pre*-closing) approved the assumption and assignment of the Freightliner
Commitments as a *fait accompli.*  Notwithstanding that Freightliner had not been given
notice of the Sale Motion, the Sale Order contained an incredible finding that notice to
Freightliner had been "proper, adequate, timely and sufficient."  And, notwithstanding
that no such relief had been requested in the Sale Motion, the Sale Order relieved
Freightliner of virtually all of the rights they had bargained for in those commitments.

8.      Similarly, in the joint motion that resulted in the Contracts Order (the

"Contracts Motion"), the Debtors sought this Court's authorization to assume and

assign to the Purchaser "each of the executory contracts … listed on the attached Exhibit

A."[1] But no contracts were listed on the attached Exhibit A, and no contracts were

described in the Contracts Motion. Instead, Exhibit A included only a microscopic list

of vendors, including Freightliner. A part of that list is pasted below, actual size:[2]

| | | | | | |
|---|---|---|---|---|---|
| Freightliner Corporation | $3.00 | 4747 N Channel Ave | Portland | OR | 97217 |
| Freightliner Market Development Corporation | $3.00 | 2701 NW Vaughn St., Ste. 778 | Portland | OR | 97210 |
| Ferzco Food Partners Industries Inc. | $3.00 | 1145 Empire Central Plaza | Dallas | TX | 75247 |

The certificate of service relating to the Contracts Motion shows that notice of that

motion was not directed to any responsible person or registered agent, as required by

law, but rather by ordinary mail sent to the Freightliner Companies at their "general

delivery" addresses.[3] Therefore, if notice of the Contracts Motion was even given to

---

[1]  No effort was made to prove, or even assert, that the relevant contracts were in fact executory.

[2]  The Purchaser will argue that notice was adequate and/or that his failure to give notice was inadvertent. Neither is true. This single microscopic reference to Freightliner was the first reference to Freightliner in this case – until the Sale Order was entered. In the Sale Order, Freightliner suddenly loomed significant, now clearly identified by name with its commitments defined as the "Buy-back Agreements." Numerous paragraphs of the Sale Order are devoted to restricting Freightliner's rights under the Freightliner Commitments and precluding Freightliner's ability to object to the assignment of those commitments to the Purchaser. See, e.g., Sale Order ¶¶ 11-18. Significantly, none of these points was included in the original Sale Motion or in the proposed order accompanying it, nor was the name "Freightliner," or the term "Buy-back Agreements," used in the Contracts Motion or the Contracts Order. If the Freightliner Commitments were an insignificant issue to the Purchaser, Freightliner's treatment in the Sale Order would not have been writ large. Since that issue was clearly significant to the Purchaser, then the failure to give notice strongly appears to have been purposeful. Ultimately, whether the failure to give notice was purposeful or not, the fact remains that notice to Freightliner was virtually non-existent.

[3]  Freightliner continues to investigate whether it indeed received any such notices. On the date of this Memorandum, it was learned that a creditor manager at Freightliner received the Contracts Motion

Freightliner, it was given in the manner *least* likely to actually inform Freightliner of the relief that was being sought against it. Finally, like the Sales Order, the Contracts Order granted relief that went far beyond that which had been sought in the Contracts Motion.

9.      The Purchaser attempted to appropriate the Freightliner Commitments twice: once in the Sale Order and once in the Contracts Order. But its attempts will ultimately fail because it did not give Freightliner adequate or timely notice of the Sale or Contracts Motions.

10.      The Purchaser's failure to give proper notice to Freightliner was calculated to prevent Freightliner from objecting. But that failure should have the opposite effect: it should exclude the Freightliner Companies from the effects of those Orders. "[P]rinciples of fairness require that when relief is being sought against [a] party [that] party *must be told in unambiguous terms* that its specific rights are to be adjudicated." In re Automationsolutions International, LLC, 274 B.R. 527, 529 (Bankr. N.D. Cal. 2002) (emphasis added).

---

earlier this week (after the Sales and Contracts Orders were entered). The Court will be fully apprised of the results of our investigation at the hearing.

II.
Statement of Facts

The Sale Order

11.      On March 28, 2002, the Debtors filed their Motion for Approval of Sale of

Substantially All of the Debtors' Assets and to Approve Assumption and Assignment of

Leases and Executory Contracts (the "Sale Motion").   A copy of the Sale Motion is

attached hereto as Exhibit "A."

12.      Among other things, the Sale Motion sought an order

[a]uthorizing the Debtors to assume or reject any and all executory
contracts or unexpired leases sought to be transferred to the Buyer
through the approved sale *(i) after the closing of the Sale; [and] (ii) upon 10
days' notice to the counterparty of each such agreement, with an opportunity for
prompt hearing upon written objection....*

Sale Motion, ¶ 23 and "Wherefore" clause, subsection (C) (emphasis added).

13.      A proposed order (the "Proposed Sale Order") was served and filed with

the Sale Motion.   The Proposed Sale Order reiterated exactly the same relief that the

Debtors sought in the Sale Motion.   See Proposed Sale Order, ¶ D.   A copy of the

Proposed Sale Order is attached as Exhibit "B."

14.      The Sale Motion contained no reference whatsoever to any of the

Freightliner Companies or to any of the Freightliner Commitments.   See Sale Motion.

15.      By Order dated March 22, 2002 (the "Auction Procedures and Notice

Order"), this Court directed the Debtors to provide notice of the Sale Motion "to all

known creditors and parties in interest, including ... all parties to executory contracts

and leases...."  Auction Procedures and Notice Order, ¶ A, pp. 1 and 2.  A copy of the

Auction Procedures and Notice Order is attached as Exhibit "C."

16.    Some 6,500 parties in interest were served with notice pursuant to the

Auction Procedures and Notice Order, but not Freightliner.  See Debtors' Certificates of

Service regarding the Sale Motion (the "Sale Certificates of Service").  Copies of the Sale

Certificates of Service are attached as Exhibit "D" and "E."

17.    On April 22, 2002, and upon the Sale Motion, this Court entered the Sale

Order.  A copy of the Sale Order is attached as Exhibit "F."

18.    Incredibly, the Sale Order contained the following Finding:[4]

Proper, timely, adequate and sufficient notice of the proposed assumption
and assignment of the [Freightliner Commitments], as set forth in the
[Sale] Motion, has been provided to Freightliner. ...

Sale Order, ¶ K, p. 6.

19.    It is remarkable that the Sale Order included a finding that "adequate and

sufficient" notice had been given to Freightliner with respect to "the proposed

assumption and assignment of the [Freightliner Commitments], *as set forth in the [Sale]*

*Motion*."  No notice of that motion had been given to Freightliner, and that motion is

utterly silent with respect to any assumption or assignment of those agreements.

---

[4] Like the rest of the Order, this Finding was clearly proposed and drafted by the Debtors and the
Purchaser.  This Court reasonably relied on them.  But it is difficult to conclude that they included this
Finding through mere carelessness or oversight, inasmuch as the specific corporate identities of the
Freightliner Companies are listed in the Order on the previous page.  It should not have been difficult to
check for those Freightliner names among the parties listed on the Certificates of Service before asking
this Court to enter that Finding.

Actually, what was "set forth in the [Sale] Motion" was the Debtors' stated intention to file subsequent post-closing motions for that relief. See ¶ 12, supra. See also Sale Motion.

20. Nevertheless, the Sale Order provided (without notice to Freightliner) for the immediate assumption and assignment to the Purchaser of the Freightliner Commitments. See Sale Order, ¶ 11, p. 17.

21. Not only did the Sale Order approve an immediate assumption and assignment of the Freightliner Commitments (although that relief had not even been sought in the Sale Motion), and not only did the Sale Order grant relief against the Freightliner Companies (although none of them had been served with notice of the Sale Motion), the Sale Order also imposed truly extraordinary additional and further relief against Freightliner: a judgment that the [Freightliner Commitments] shall *"be deemed to be valid and binding and in full force and effect and enforceable in accordance with their respective terms, without giving effect to (i) any oral or written amendment, waiver, supplement or other modification thereto;* [or] ... (ii) any provision [of the Bankruptcy Code] that prohibits, restricts, or conditions such assignment or transfer (Sale Order, ¶ 15, p. 18) (emphasis added).[5] This relief was not requested in the Sales Motion; it was not even hinted at. See Sales Motion.

---

[5] See also, e.g., Sale Order, ¶ 18, p. 19 (injunction against asserting pre-closing claims against Debtors or Purchaser[5]); ¶ 13, p. 18 (order protecting against legal price escalators); ¶ 16, p. 19 (no cure of defaults required); ¶ 17, p. 19 (all claims waived by Freightliner); and ¶ 19, p. 21 (no waiver ever by Purchaser).

22.    In its zeal to circumscribe Freightliner's rights, the Purchaser achieved that which is prohibited by law: among other things, it "cherry-picked" the best aspects of the Freightliner Commitments to assume, and smuggled provisions into the Sale Order to vitiate the rest.    See, e.g., Sale Order, ¶ 15, p. 8 (the Freightliner Commitment documents attached to the Sale Order (which were neither complete nor supplied by Freightliner) would "be deemed to be in full force and effect," but no regard would be given to any amendments, waivers or modifications to those documents).  This not only constitutes "a fast one," it is also prohibited.  See In re National Gypsum Company (Century Indemnity Co. v. National Gypsum Company Settlement Trust), 208 F.3d 498, 506 (5th Cir. 2000) ("Where the debtor assumes an executory contract, it must assume the entire contract, *cum onere…*").

23.    If the Debtors had proceeded as they proposed in the Sale Motion – by filing post-closing motions for authorization to assume and assign prepetition contracts – the Freightliner Companies could have responded (i) by pointing out that the Freightliner Commitments are not executory and are therefore incapable of assumption and assignment, (ii) by submitting to this Court all relevant oral and written evidence on the actual intent and proper interpretation of these contracts, and (iii) by identifying and pursuing the defaults, offsets, counterclaims, and other rights for which they had bargained in good faith.

465914.1

24.     However, as the Sale Order presently is written, the Freightliner Companies have purportedly been prohibited (without any notice, hearing or opportunity to object) from protesting the loss of their rights.

25.     Obviously, this result is fundamentally, constitutionally and entirely unfair.

### The Contracts Order

26.     On April 9, 2002, the Debtors and the Purchaser filed the Contracts Motion. A copy of the Contracts Motion is attached as Exhibit "G."

27.     In the Contracts Motion, the Debtors and the Purchaser sought this Court's authorization for the Debtors to assume and assign to the Purchaser "each of the executory contracts ... listed on the attached Exhibit A." Contracts Motion, ¶ 2, p. 2.

28.     Exhibit A to the Contracts Motion did not list any executory contracts, and it did not describe any executory contracts. See Contracts Motion, Exhibit A.

29.     Instead, Exhibit A to the Contracts Motion comprised only a microscopic list of parties, including Freightliner, with their "general delivery" addresses. See id. See also ¶ 8, supra.

30.     As the Bankruptcy Court for the Central District of California has noted

The motion [to assume or reject] must state with "particularity" the trustee's grounds for wishing to assume the obligation. .... Neither creditors, nor the U.S. Trustee, nor ... the Court, is required to be a "mind-reader" of Debtor's assumptions regarding assumption.

In re Prestige Point, 113 B.R. 643, 652 (Bankr. C.D. Cal. 1990).[6]  Without producing more than a microscopic list of vendors, or any description of the agreements that the Debtor intended to assume and assign to the Purchaser, the Debtors failed to satisfy this requirement to state their grounds with "particularity."

31.     The Certificate of Service of the Contracts Motion (the "Contracts Certificate of Service") indicates that notice of the Contracts Motion was directed to Freightliner at their "general delivery" addresses. See Contracts Certificate of Service. A copy of the Contracts Certificate of Service is attached as Exhibit "H."

32.     On April 22, 2002, and upon the Contracts Motion, this Court entered the Contracts Order.  The Contracts Order authorized the assumption and assignment of "the executory contracts with the non-debtor parties referenced in the [Contracts] Motion."   Like the Contracts Motion, however, the Contracts Order also failed to identify, describe or even list the specific contracts that were slated for assumption and assignment. See Contracts Order.  A copy of the Contracts Order is attached as Exhibit "I."

33.     Similarly, just as the Sales Order granted relief against Freightliner that had not been sought in the Sales Motion, the Contracts Order granted relief against Freightliner that went far beyond the relief that had been requested in the Contracts Motion. Compare Contracts Motion with Contracts Order.

---

[6] This opinion was originally reversed on appeal, see In re Prestige Point, 130 B.R. 362 (BAP 9th Cir. 1991), but the Ninth Circuit subsequently reinstated it, see In re Prestige Point, 985 F.2d 573 (9th Cir. 1993).

465914.1

III.

Discussion

The Failure of Adequate Notice
to The Freightliner Companies
of the Sale and Contracts Motions
Requires Reconsideration of the Orders
And Exclusion of Freightliner from their Effects

34.     There is no question that notice to Freightliner was entirely inadequate in

this case.

> An elementary and fundamental requirement of due process in any
> proceeding which is to be accorded finality is notice reasonably calculated,
> under all the circumstances, to apprise interested parties of the pendency
> of the action and afford them an opportunity to present their objections.
> The notice must be of such nature as reasonably to convey the required
> information, and it must afford a reasonable time for those interested to
> make their appearance.

Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950) (internal

citations omitted).  Under the Supreme Court's constitutional analysis, notice here was

as inadequate as notice gets.

35.     With respect to the Sale Order: First, the Sale Certificates of Service show

that no notice was given at all to Freightliner.  Second, the Sale Motion did not even

request the relief that would ultimately be granted against Freightliner.  Third, to the

contrary, the Sale Motion provided that motions to assume and assign would be

submitted *after* the sale closed, *if* the sale were approved.  Yet, out of the blue, the Sale

Order was entered with the Freightliner Commitments already having been assumed

and assigned to the Purchaser.

36.     With respect to the Contracts Order: First, that order (as well as the Contracts Motion) is defective for failing to identify the contracts to be assumed. Second, that order is defective for granting relief beyond that which was sought in the motion.   Third, the Purchaser's service of the Contracts Motion on the Freightliner Companies, at their "general delivery" addresses, is simply insufficient.

> Rule 6006 of the Federal Rules of Bankruptcy Procedure governs the assumption, rejection, or assignment of executory contracts.  Rule 6006(c) requires notice of a proceeding to assume, reject, or assign an executory contract to be given to the other party to that executory contract.  Rule 6006(a) provides that a proceeding to assume, reject, or assign an executory contract, other than as part of a plan, is a contested matter, governed by Rule 9014.   Rule 9014, in turn, states that motions in contested matters must be served in the same manner provided for service of a summons and complaint in Rule 7004.  Rule 7004(b)(3) provides for service by mail:
>
>> Upon a domestic or foreign corporation or upon a partnership or other unincorporated association, by mailing a copy of the [notice] to the attention of an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process. ...

In re Golden Books Family Entertainment, Inc., 269 B.R. 300, 305 (Bankr. D. Del. 2001).

See also ¶ 8, supra;  In re Automationsolutions International, LLC, 274 Bankr. 527, 528 (Bankr. N.D. Cal. 2002) ("Any time relief is sought against a particular party, it must be in the context of at least a contested matter pursuant to FRBP 9014").

IV
Conclusion

37.     The Orders are substantively and procedurally fatally defective, at least as they pertain to Freightliner.

38.    This Court should therefore reconsider those Orders and exclude Freightliner from their effects.

WHEREFORE, for all the foregoing reasons, the Freightliner Companies respectfully request that this Court reconsider its April 22, 2002 Orders and modify those Orders to exclude the Freightliner Companies and the Freightliner Commitments entirely from the effects of those Orders.

RESPECTFULLY SUBMITTED this 2nd day of May, 2002.

PARSONS BEHLE & LATIMER

By _____
    J. THOMAS BECKETT
    ANNE E. RICE
    Attorneys for the Freightliner Companies

Weston L. Harris (A1387)
PARSONS DAVIES KINGHORN & PETERS
185 South State Street, Suite 700
Salt Lake City, UT 84111
(801) 363-4300
(801) 363-4378– Fax

Counsel for Debtors

Scott J. Goldstein  (MO #28698)
Daniel D. Doyle   (MO # 36724)
Spencer Fane Britt & Browne LLP
1000 Walnut, Suite 1400
Kansas City, MO 64106
(816) 474-8100
(816) 474-3216– Fax

## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| In re: | ) | **Case Nos.** 02-22906 |
| | ) | 02-22907 |
| SIMON TRANSPORTATION SERVICES INC., | ) | |
| and DICK SIMON TRUCKING, INC., | ) | **Chapter 11 proceedings** |
| | ) | **Jointly administered** |
| Debtors. | ) | |

### MOTION FOR APPROVAL OF SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND TO APPROVE ASSUMPTION AND ASSIGNMENT OF LEASES AND EXECUTORY CONTRACTS

Simon Transportation Inc. and Dick Simon Trucking, Inc., debtors and debtors in possession (together, "Debtors"), for their Motion, state:

1. This Court has jurisdiction over this case and over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(M)and (N).

2. Debtors filed their voluntary Chapter 11 petitions on February 25, 2002 ("Petition Date"). The Debtors have continued to operate their business and manage their properties pursuant to sections §§ 1107 and 1108 of the U.S. Bankruptcy Code.

3. The Debtors operate one of the country's largest transporters of temperature-controlled freight. The Debtors have under lease or under sale contracts approximately 2,300 tractors and 3,000 trailers.

4. Due to declining market conditions for freight rates, shipper demand, and equipment

F:\WD\dms\ddd\bkrp\00115328.WPD

0222906D106

values, coupled with an overcapacity of equipment, the Debtors have incurred severe financial losses for a sustained period. Operating losses at the Petition Date were estimated at $100,000 per day.

5. With such losses, the Debtors can be expected to remain in operation no more than 60 days.

6. Both before and after the Petition Date, the Debtors have streamlined their fleet, personnel, and operations significantly to reduce its fleet of tractors and trailers, attempted to carry higher revenue shipments, and attempted to retain key customers, so as to retain an efficient business attractive to potential buyers. Debtors have moved to reject or abandon hundreds of tractors and trailers that are burdensome to the estates, despite its ability to retain the equipment under 11 U.S.C. § 365(d)(10).

7. Debtors have actively marketed the sale of the tractors, trailers, and related assets through Morgan Keegan & Company, which distributed marketing materials to potential buyers last week. Morgan Keegan is establishing a data room to facilitate due diligence of prospective bidders for Debtors' assets.

8. Debtors hope that a buyer might seamlessly operate the Debtors' core business without interruption of its shipper, vendor, and other business relationships, essentially taking over profitable key shipper accounts so as to create value for the estates and their creditors. Debtors also anticipate that the successful bidder will retain at least a portion of Debtors' employees and preserve jobs both in the Salt Lake City area and nationally.

9. Debtors also contemplate that the successful bidder will relieve the Debtor's of burdensome debt arising from the financing of tractors and trailers under which the Debtors

with the provisions of the attached term sheet and of a subsequent asset purchase agreement incorporating those provisions that is to be filed in conjunction with the proposed auction, and subject to any topping bid that is higher and better than the Central Bid, the Debtors request that the Court authorize and approve the sale of the assets listed on the Central Bid term sheet pursuant to 11 U.S.C. § 363 or to the highest and best bidder for the assets (the "Buyer").

15.   The Debtors additionally request that the Court enter an order providing for all liens, claims, interests, and encumbrances to attach to the sale proceeds in their respective priorities, with payment of proceeds in compliance with applicable priorities and loan documents; approving the Debtors' assumption and assignment of specified unexpired leases and executory contracts as are later identified by the Debtors and with written consent of each counterparty; waiving the 10 day stay of the effectiveness of the order provided by Bankruptcy Rule 6004(g); and finding that the sale to the Buyer is in good faith, bona fide, and protected by 11 U.S.C. § 363(m).

16.   The Debtor's precarious financial position, which has been exacerbated by the departure of at least one large shipper and the withholding of freight by others during the short pendency of this bankruptcy case, requires a sale of Debtors' assets as quickly as possible so as to preserve going concern sale values for the estates.  Any unnecessary delays in marketing, auctioning and selling the Debtor's assets likely will result in Debtors running out of cash before closing the sale.

17.   In addition, Debtors' largest creditor, Mercedes-Benz Credit Corporation, has informed the Debtors that MBCC will permit assumption of its debt by the Buyer only until April 1, 2002, requiring that any applicable notice periods be reduced to facilitate the auction and sale

guaranteed a residual value for each tractor and trailer. Any cure amounts or residual obligations are expected to be re-negotiated and paid by the successful bidder prior to actual assumption and assignment of any financing agreement, including finance leases, by the Debtor.

10. In conjunction with ongoing attempts to sell the Debtors' assets at auction, Debtors have obtained a term sheet for a substantial portion of its assets from Central Freight Lines, Inc. (the "Central Bid"). Central Freight Lines, Inc., is a entity controlled, directly or indirectly, by Jerry Moyes, who also is the principal and controlling shareholder, directly or indirectly, of the Debtors.

11. The Central Bid, which Debtors plan to use as a stalking horse, provides for, among other terms, Central's assumption of liabilities arising under financing agreements and under a mortgage of the Salt Lake City terminal and driver training center (mortgaged by a non-debtor, Simon Terminal LLC, of which Dick Simon Trucking is the sole member). In addition to relieving the estates of more than $100 million in liabilities, the Central Bid would provide a cash payment of $2 million to purchase goodwill and other general intangibles. A copy of the Central Freight Lines term sheet, entitled "Acquisition of Assets of Simon Transportation Services Inc. and Subsidiaries – Summary of Terms" dated March 8, 2002, is attached as Exhibit "A".

12. The Debtors contemporaneously have filed their motion to establish bidding, auction and sale procedures and to provide adequate notice of the sale and of the bidding, auction and sale procedures.

13. The Central Bid is currently the only offer the Debtors have received for their assets.

14. Subject to this Court's order approving the sale to Central Freight Lines consistent

on that date.

18. Section 363(b)(1) permits the Debtors to sell property outside the ordinary course of their business after notice and a hearing, based upon the Debtors' reasonable business judgment. *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986).

19. Section 363(f) allows the Debtors to sell property free and clear of liens, claims and encumbrances if the sale is permitted under non-bankruptcy law, if the secured party consents to the sale, or if the party asserting the interest can be compelled in a legal or equitable proceeding to accept a money satisfaction for such interest.

20. Debtors' financial adviser, Morris Anderson & Associates, has actively been negotiating with equipment vendors, including MBCC, concerning acceptable buyout or lease assumption terms for tractors and trailers.

21. Debtors anticipate that the equipment financing entities and others with interests in the assets to be sold, given the declining market values for tractors and trailers and due to the Morris Anderson negotiations, will not object to the sale to any qualified buyer. The Debtors may exclude from the sale any or all collateral or leased property in which an objecting creditor has an interest.

21. Section 363 provides for rejection of unexpired leases and executory contracts if supported by the Debtors' business judgment. Debtors lack any equity in its tractors and trailers for which Debtors have guaranteed payment of residual values, and for which they were in arrears up to five months prior to the Petition Date.

22. Because of the lack of equity and the potential for millions of dollars in unsecured claims arising from the rejection or abandonment of leased or purchased tractors and trailers, the

F:\WDdms\ddd\bkrp\00115328.WPD

estates' interests are best served by permitting the assumption and assignment of contracts and

leasing agreements to the Buyer only if the Buyer cures defaults and assumes the agreements

after an opportunity for the Buyer to negotiate the amounts due and terms of the agreements.

23.    Under the circumstances, the Court should permit the Debtors to assume or reject

any and all executory contracts or unexpired leases sought to be transferred to the Buyer in the

sale (a) after the closing of the Sale; (b) upon 10 days' notice to the counterparty of each such

agreement, with an opportunity for prompt hearing upon written objection; (c) if the Buyer agrees

to provide for the cure of any default amount as may be negotiated; and (d) if the Debtors and

their estates are released from any liability for any further cure of defaults or other amounts due.

24.    Under the circumstances, particularly the Debtors' continuing and severe negative

cash flow and the erosion of market values due to market conditions that will increase potential

unsecured deficiency claims against the estates, imposition of the 10-day stay of the

effectiveness of a sale order likely would chill bidding, generate an unnecessary additional

diminution of the value of estate property, and increase the difficulties involved in renegotiating

unexpired leases and executory contract terms and cure amounts prior to assumption and

assignment to the Buyer. The circumstances warrant a waiver of the stay provided by

Bankruptcy Rule 6004(g).

WHEREFORE, the Debtors request that this Court enter an Order in substantially the

form attached hereto as Exhibit "B":

(A) Authorizing the Debtors to sell all or substantially all of their assets to Central Freight
Lines, Inc., pursuant to the terms of the Central Bid term sheet, subject to approval of a
forthcoming asset purchase agreement and subject to higher and better bids for purchase of the
assets;

F:\WDdms\ddd\bkrp\00115328.WPD

(B) Directing that all liens, claims, and other encumbrances in the purchased assets attach to the proceeds of the sale in their respective priorities;

(C) Authorizing the Debtors to assume or reject any and all executory contracts or unexpired leases sought to be transferred to the Buyer through the approved sale (i) after the closing of the Sale; (ii) upon 10 days' notice to the counterparty of each such agreement, with an opportunity for prompt hearing upon written objection; (iii) if the Buyer agrees to provide for the total cure of any default amount as may be negotiated; and (iv) if the Debtors and their estates are released from any liability for any further cure of defaults or other amounts due;

(D) Finding that the Buyer is a bona fide purchaser in good faith entitled to the protections of 11 U.S.C. § 363(m);

(E) Lifting the 10-day stay of the effectiveness of the sale order as permitted by Bankruptcy Rule 6004(g), so as to make the sale order effective upon entry;

(F) Reducing any applicable notice periods to permit the sale to occur on April 5, 2002; and

(G) Providing such other and further relief as is just and proper.

Dated: March 11, 2002.

Respectfully submitted,

SPENCER FANE BRITT & BROWNE LLP
Scott J. Goldstein       MO #28698
Daniel D. Doyle         MO #36724
Lisa A. Epps            MO #48544
1000 Walnut Street, Suite 1400
Kansas City, MO  64106
(816) 474-8100
(816) 474-3216– Fax

– and –

PARSONS DAVIES KINGHORN & PETERS

*Weston L Harris*

Weston L. Harris   (A1387)
185 South State Street, Suite 700
Salt Lake City, Utah 84111
(801) 363-4300
(801) 363-4378 – fax

COUNSEL FOR DEBTORS

F:\W1\dmx\ddd\hkrp\00115328.WPD

### ACQUISITION OF ASSETS
### OF
### SIMON TRANSPORTATION SERVICES INC.
### AND SUBSIDIARIES

#### Summary of Terms
#### March 8, 2002

Set forth below is an outline of the principal terms and conditions of a proposed transaction (the "Transaction") pursuant to which Central Freight Lines, Inc. or an affiliate formed or to be formed corporation or other business entity (the "Buyer") will purchase substantially all of the assets of Simon Transportation Services Inc. ("SIMN") and its subsidiaries, Dick Simon Trucking, Inc. ("DSTI") and Simon Terminal, LLC ("Terminal"). SIMN and DSTI are sometimes referred to herein as the "Debtors" and the Debtors collectively with Terminal are referred to as the "Sellers." The Debtors have filed for reorganization under Chapter 11 of the Bankruptcy Code (the "Code") and anticipate a sale of assets under Section 363 of the Code. This Summary of Terms represents a non-binding statement of the present intentions of the parties, and it is subject to investigation, due diligence, negotiation of a definitive agreement, negotiation of lease assumptions with lessors, approval of the Bankruptcy Court, and other matters. The Buyer shall be bound only if the parties execute a definitive agreement relating to the matters addressed herein (the "Definitive Agreement") that has been approved by the Bankruptcy Court after notice and a hearing. The principal terms and conditions of the Transaction, which are anticipated to be embodied in the Definitive Agreement, are as follows:

1.    **Tractors.** The Debtors will sell or assign (as defined and qualified below) to the Buyer the approximately 1,108 tractors listed on attached Exhibit A (the "Tractors") on terms and conditions mutually determined by the Buyer and the applicable lessor. The Buyer also will assume the leases on approximately 370 tractors leased to the Debtors by the Buyer's affiliates. The Buyer will accept the Tractors, on an "AS IS" and "WHERE IS" basis; provided that the Buyer will accept as Tractors only those identified units that are located and meet certain physical or operating condition requirements specified in the Definitive Agreement as of the closing (the "Closing") of the Definitive Agreement. As used in this Summary of Terms, "sell or assign" shall mean that the Debtors will either (a) sell and transfer the property or rights in question to the Buyer under Section 363(f) of the Code, or (b) assume and assign to the Buyer, on such terms as may be acceptable to the Buyer in its sole discretion, the contracts or leases relating to the property in question under Section 365(f) of the Code, as the case may be. The Buyer believes it has negotiated the principal economic terms of a lease with the lessor of 827 of the Tractors.

2.    **Trailers.** The Debtors will sell or assign to the Buyer the approximately 1,969 trailers listed on attached Exhibit B (the "Trailers") on terms and conditions mutually determined by the Buyer and the applicable lessor. The Buyer will accept the Trailers, on an "AS IS" and "WHERE IS" basis; provided that the Buyer will accept as Trailers only those identified units that are located and meet certain physical or operating condition requirements specified in the Definitive Agreement as of Closing. The Buyer believes it has negotiated the principal economic terms of a lease with the lessor of approximately 779 of the Trailers.

3.    **Tractor and Trailer Licenses and Permits.**  The Tractors and Trailers will be sold or assigned to the Buyer with all unexpired licenses and permits, and the Debtors will seek an order of the Bankruptcy Court approving the transfer of all unexpired licenses and permits to the Buyer and compelling the licensing/permitting jurisdiction to honor the transfer.

4.    **Tractor and Trailer Repurchase Agreements.**  The Debtors will sell or assign to the Buyer all of the Debtors' rights in the Conditional Commitment to Repurchase Agreements, letters, and similar "buyback" and "trade-back" agreements or other arrangements between the Debtors and equipment manufacturers.  The Debtors will seek an order of the Bankruptcy Court approving the transfer of such agreements to the Buyer and compelling the manufacturer(s) to honor the transfer.

5.    **Schedule I Values.**  Schedule I hereto sets forth the value to the Debtors' estates under this Summary of Terms, including the approximate principal balance of on and off balance sheet obligations from which the Debtors would be relieved as estimated from information provided by the Debtors.

6.    **Purchase of Headquarters, Atlanta and Fontana Terminals, and Other Fixed Assets.**  The Debtors will sell or cause to be sold to the Buyer: (a) the real property, improvements, buildings, and fixtures situated in West Valley City, Utah, owned by Terminal (collectively, the "Headquarters"); or, at the Buyer's election, DSTI will sell to the Buyer all of DSTI's outstanding LLC membership interests of Terminal; (b) the real property, improvements, buildings and fixtures situated at Conley, Georgia (the "Atlanta Terminal") and Fontana, California (the "Fontana Terminal"); (c) the approximately 70 model year 1998 FLD120 tractors and 195 model year 1996 trailers listed on attached Exhibit C; (d) all office equipment, office supplies, furniture, computer and telecommunications equipment, and other office assets; (e) all shop equipment, inventory of parts, tires, fuel, Qualcomm equipment, service vehicles and other shop, garage and service assets; and (f) all other tangible assets of the Debtors except as excluded below or pursuant to the Definitive Agreement.  In exchange, the Buyer will: (w) assume the debt in the amount of approximately $13,000,000 owed by the Sellers to National Life Insurance and secured by the Headquarters (the "Assumed Headquarters Debt"); (x) assume the debt in the amount of approximately $3,000,000 owed by the Debtors to The Jerry and Vicky Moyes Family Trust and secured by the Atlanta Terminal; (y) assume the debt of approximately $4,630,000 owed by the Debtors to Interstate Equipment Leasing, Inc. and secured by the Fontana Terminal and the tractors and trailers listed on Exhibit C; and (z) pay to the Debtors approximately $2,185,000, based on a balance sheet dated January 31, 2002, subject to adjustment through Closing for changes in assets and as set forth in the Definitive Agreement, such payment to be made in cash, through assumption of the obligations of the Debtors under the DIP Credit Agreement or under any other obligations owed to the Buyer or any of its affiliates, or a combination thereof.

7.    **Intentionally Omitted.**

8.     **Purchase of Intangible and Business Record Property.**   The Buyer shall pay $2,000,000 in cash (or, to the extent any obligations remain outstanding from the Debtors to the Buyer or any of its affiliates, the Buyer may assume such obligations and the cash payment shall be reduced accordingly) for all intangible and business record property of the Debtors, which shall include but not be limited to all customer lists; operating authority; license plates; permits; goodwill; vendor rebates and warranties; customer contracts; equipment repurchase agreements; telephone numbers, fax numbers, domain names, and Websites; trademarks, trade names, copyrights, and other intellectual property; business records applicable to the ongoing business, including those relating to Tractors, Trailers, owner-operators, employees, and drivers, but excluding corporate minute books, income tax returns, and other records relating to the Debtors themselves and not useful in the ongoing business; and all claims the Sellers, the Debtors' estate, or any other party in interest may have against the Buyer or any person or entity affiliated with the Buyer, including but not limited to any claims for any alleged preference, fraudulent conveyance, or contribution or participation in the liability of any preference or fraudulent conveyance or for any claim or cause of action that could be brought under Bankruptcy Code Section 542, 543, 544, 547, 548, or 549.

9.     **Owner-Operator Withholdings.**   The Buyer will acquire all of the amounts withheld from owner-operator settlements to be paid directly to finance companies and other payees at the direction of the owner-operators (the "Withholdings").   In exchange, the Buyer will assume the obligation to remit such funds to the payees.

10.     **Excluded Assets.**   The following assets shall be excluded from the purchased or leased assets:  all cash and cash equivalents; accounts and notes receivable; deposits (other than the Withholdings); all of the Sellers' rights under the Definitive Agreement including the cash portion of the purchase price; all claims and causes of action of the Sellers except those specified in Section 8 above; equity securities of subsidiaries (except to the extent Terminal's LLC interests are transferred); all rights under the Sellers' insurance policies with respect to events occurring prior to the Closing; all Rejected Equipment (as defined in Section 17) and leases thereof; and any other asset excluded pursuant to the Definitive Agreement.

11.     **Assumed/Excluded Liabilities.**   Except for the Assumed Headquarters Debt, the assumed obligations relating to the Tractors and Trailers (as indicated in Sections 1 and 2 hereof), the debt assumed with respect to the Atlanta Terminal, the Fontana Terminal, and other assets acquired under Section 6 hereof, the obligation to remit funds under Section 9 hereof, and any other liability that the Buyer specifically assumes under the Definitive Agreement (the "Assumed Liabilities"), the Buyer will not assume, become responsible for as a result of the Transaction, or be deemed to have assumed or become responsible for as a result of the Transaction, any other debt, claim, obligation, or other liability of the Sellers or arising from the Transaction.

12.     **Prorations.**   Employee compensation, owner-operator settlements, rentals, security deposits, utility charges, real property taxes, personal property taxes, and similar assessments and accruals payable in respect of any of the purchased or leased assets and any liabilities other than the Assumed Liabilities, applicable to periods both prior to and after the Closing, shall be

3

prorated as of the Closing of the Definitive Agreement. The Buyer will assume no liabilities, late fees, penalties, or other amounts with respect to the Assumed Liabilities arising prior to the Closing of the Definitive Agreement.

13.    **Employees/Owner-Operators.** The Buyer will be afforded access to and the right to offer employment to any employees and a contract to any owner-operators of the Debtors it desires. The Debtors shall be responsible for bringing current all accrued and unpaid vacation, sick leave, reimbursements, severance, stay bonuses, and other amounts due employees that are identified by the Buyer as employees anticipated to be hired by the Buyer at Closing as well as all settlements for owner-operators that are identified by the Buyer as contractors anticipated to be contracted with by the Buyer at Closing. The Debtors shall comply with and be responsible for any liability under the WARN Act and any state or local counterpart.

14.    **Conditions to Closing.** The Definitive Agreement will include reasonable and customary conditions to closing in similar transactions, including but not limited to the accuracy of the respective parties' representations and warranties and performance of their respective covenants and agreements; the absence of a materially adverse change in the business and assets of the Sellers; and entry by the Bankruptcy Court of an order or orders in form and substance reasonably acceptable to the Buyer approving the Definitive Agreement, and authorizing and directing the Debtors to consummate the transactions contemplated thereby. Without limiting the generality of the foregoing, such order or orders shall find and provide, among other things, that (i) the assets sold to the Buyer shall be transferred free and clear of all liens, claims, and encumbrances of any kind or character pursuant to an order of the Bankruptcy Court; (ii) the Buyer has acted in good faith within the meaning of Section 363(m) of the Code and, as such, is entitled to the protections afforded thereby; (iii) the Definitive Agreement was negotiated, proposed, and entered into by the parties without collusion, in good faith, and from arm's length bargaining positions; (iv) the Buyer is not acquiring or assuming any of the Sellers' or any other person's liabilities except as expressly provided in the Definitive Agreement; (v) any and all Tractor leases and Trailer leases shall be assumed by the Debtors and assigned to the Buyer pursuant to Section 365 of the Code; (vi) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to the Definitive Agreement, or the breach thereof; (vii) the Definitive Agreement and the transactions and instruments contemplated thereby shall be specifically performable and enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtors or any chapter 7 or chapter 11 trustee; (viii) the Buyer is not a successor corporation to any of the Sellers and is not liable for any obligations or liabilities of the Sellers (including any administration expenses) except for those expressly assumed by the Buyer under the Definitive Agreement; and (ix) the transactions contemplated hereby are exempt from transfer taxes pursuant to Section 1146(c) of the Bankruptcy Code.

15.    **Terms of Definitive Agreement.** The Definitive Agreement shall contain terms and conditions that are reasonable and customary in transactions of this nature. The representations and warranties of the respective parties shall not survive the Closing of the Definitive Agreement.

16.    **Intentionally Omitted.**

4

17.   **Transition Services.** Following the Closing of the Definitive Agreement, the Buyer will offer the services described below to the Debtors' estate and the creditors, any or all of which services may be accepted or not accepted:

(a)   The Buyer will assist lessors of tractors and trailers not included in the Tractors and Trailers sold or assigned to the Buyer under Sections 1 and 2 above ("Rejected Equipment") with identifying, locating, and recovering such Rejected Equipment.  Any movement of the Rejected Equipment by the Buyer will be at a rate of $1.25 per mile (all miles) to a Debtors' terminal facility or other destination acceptable by both the Buyer and such lessor.  The Buyer may transport freight in such equipment while it is being returned, and any revenue generated shall be for the account of the Buyer.  The equipment movements would be coordinated by the Buyer so as not to disrupt the Buyer's equipment balance and position.  The lienholders or lessors of the Rejected Equipment will be responsible for all insurance coverage and risk of loss to the Rejected Equipment.

(b)   The Buyer will offer the services of its employees to collect the pre-Closing accounts receivable of the Debtors on behalf of the estate and the creditors.  The Buyer's fee for such service will be five percent (5%) of the collected amount plus one-half of any amount collected over 90% of the outstanding balance at Closing.

(c)   The Buyer will afford representatives of the Debtors' estates with access during normal business hours and the right to use without charge a reasonable amount of unused office space at the Headquarters building and, as available and not being used by the Buyer, office equipment, for ninety (90) days after the Closing.

(d)   The Buyer will afford the representatives of the Debtors' estates and any affected creditors or lessors ingress, egress, and parking rights at designated locations for up to 120 days after the Closing for the purpose of assembling, storing, and if necessary auctioning Rejected Equipment, all to be conducted in a manner that does not interfere with the Buyer's business operations.  The fee for such rights will be a reasonable amount per day per piece of Rejected Equipment payable weekly and in any event prior to removal of such equipment from the premises.  The owners of the Rejected Equipment will have sole responsibility for insurance and risk of loss.

(e)   The Buyer will permit the representatives of the Debtors' estates access to the Buyer's employees on a dedicated or as needed basis, to the extent that such access does not unreasonably interfere with the Buyer's operation of the business.  The charge for such access will be an amount equal to twice the hourly pay rate of the subject employees.

18.   **Preparation of Definitive Agreement.** Upon execution of this Summary of Terms and entry of an order concerning the bid procedures referred to below, the Buyer will begin its due diligence and preparation of the Definitive Agreement.

19.   **Access.**  Upon execution of this Summary of Terms and entry of an order concerning the bid procedures, the Sellers will provide the Buyer and its representatives with full and complete access to their assets, properties, employees, accountants, attorneys, business records and contracts, and all other information reasonable requested by the Buyer; provided that such access shall be at reasonable times and in a manner reasonably designed not to unduly disrupt the Sellers' business.  In addition, at such time, the Sellers hereby authorize the Buyer to contact the Sellers' lenders, lessors, customers, vendors, creditors, attorneys, accountants, and other business partners as to matters relating to the business and operations of Sellers and the negotiation, execution, and Closing of the Definitive Agreement and the terms of any arrangements or continued business with such persons, and the Sellers authorize such persons to provide information to and cooperate with the Buyer in this process.

20.   **Alternative Transaction.**  If the Debtors consummate an alternative transaction relating to the sale or other disposition of all or substantially all of their assets or a similar business combination transaction involving one or more third parties (an "Alternative Transaction"), the Debtors shall pay to the Buyer, as a condition to closing such Alternative Transaction, an amount in cash equal to $500,000 out of the closing proceeds.  The bid procedures will provide for a minimum overbid of $850,000.

21.   **Expenses.**  Each party shall be responsible for its own expenses; provided, that the Debtors shall be responsible for the Buyer's expenses of due diligence, bid analysis, negotiation, and preparation of this Summary of Terms and the Definitive Agreement, and other related matters in the event the Debtors fail to accept the Definitive Agreement on substantially the terms and conditions set forth herein, select any other bidder as the winning bid at auction, or otherwise agree to or consummate an Alternative Transaction.  The amount payable under this section shall not exceed $250,000.   All amounts payable hereunder shall be priority administrative claims under Section 503 of the Code.

22.   **Bid Procedures.**  Within three business days of the date hereof, the Debtors shall prepare and file with the Bankruptcy Court, and seek prompt approval of, a motion seeking approval of the terms hereof and bid procedures consistent with Sections 20 and 21 hereof and otherwise reasonably acceptable to the Buyer.

** Remainder of Page Intentionally Left Blank **

Signature Page
To
Summary of Terms
Dated
March 8, 2002

Central Freight Lines, Inc.

By _____
Jerry Moyes, Chairman

Schedule I
To
Summary of Terms
Value to Debtors

| Section of Summary of Terms | Nature of Payment | Approximate Dollar Value |
|---|---|---|
| 1 | Leased Tractor Assumption | $  52,000,000* |
| 2 | Leased Trailer Assumption | 61,000,000* |
| 6 | Terminals and Fixed Assets | 20,150,000+ |
| 6 | Exhibit C Tractors and Trailers | 2,665,000 |
| 8 | Intangibles/Business Records | 2,000,000 |
|  | Total | $ 137,815,000 |

* Approximate principal balance of remaining lease payments on assumed fleet of approximately 1,108 tractors and 1,969 trailers estimated from information provided by the Debtors. The 370 IEL and DST tractors are not included but will be assumed by the Buyer.

+ Includes Headquarters, Atlanta Terminal, and Fontana Terminal; inventory of parts, tires, and fuel; service vehicles, shop and shop equipment; office equipment and furniture; Qualcomm equipment; 26 old owned tractors; and other miscellaneous assets.

Exhibit A
To
Summary of Terms
Dated
March 8, 2002

| Current Lessor | Quantity of Tractors |
|---|---|
| DaimlerChrysler (f/k/a MBCC) | 827 |
| Ameritech Credit | 45 |
| CIT Group | 87 |
| First Source | 5 |
| G.E. Capital (f/k/a Safeco) | 69 |
| G.E. Capital | 13 |
| Orix | 62 |
| TOTAL | 1,108 |

Exhibit B
To
Summary of Terms
Dated
March 8, 2002

| Current Lessor | Quantity of Trailers |
|---|---|
| DaimlerChrysler (f/k/a MBCC) | 779 |
| Associates | 147 |
| CIT Group | 130 |
| Fleet Capital | 611 |
| G.E. Capital | 2 |
| G.E. Capital | 58 |
| TCF | 63 |
| Trans Lease | 59 |
| US Bancorp | 120 |
| TOTAL | 1,969 |

Exhibit C
To
Summary of Terms
Dated
March 8, 2002


See attached list of 70, 1998 Freightliners Model FLD120 and 195, 1996 Utility Trailers.

EXHIBIT C
Page 1 of 7

70 Tractors
1998 Freightliners Model FLD120



| UNIT# | SERIAL# |
|---|---|
| 2493 | 1FUYDDYB7WP840048 |
| 2494 | 1FUYDDYB8WP840049 |
| 2495 | 1FUYDDYB8WP840050 |
| 2496 | 1FUYDDYB7WP840051 |
| 2497 | 1FUYDDYB9WP840052 |
| 2498 | 1FUYDDYB0WP840053 |
| 2499 | 1FUYDDYB2WP840054 |
| 2500 | 1FUYDDYB4WP840055 |
| 2501 | 1FUYDDYB6WP840056 |
| 2502 | 1FUYDDYB8WP840057 |
| 2503 | 1FUYDDYBXWP840058 |
| 2504 | 1FUYDDYB1WP840059 |
| 2505 | 1FUYDDYB8WP840060 |
| 2506 | 1FUYDDYBXWP840061 |
| 2507 | 1FUYDDYB1WP840062 |
| 2508 | 1FUYDDYB3WP840063 |
| 2509 | 1FUYDDYB5WP840064 |
| 2510 | 1FUYDDYB7WP840065 |
| 2511 | 1FUYDDYB9WP840066 |
| 2512 | 1FUYDDYB0WP840067 |
| 2513 | 1FUYDSEB5WP840777 |
| 2514 | 1FUYDSEBXWP840778 |
| 2515 | 1FUYDSEB1WP840779 |
| 2516 | 1FUYDSEB8WP840780 |
| 2517 | 1FUYDSEBXWP840781 |
| 2518 | 1FUYDSEB1WP840782 |
| 2519 | 1FUYDSEB3WP840783 |
| 2520 | 1FUYDSEB5WP840784 |
| 2521 | 1FUYDSEB7WP840785 |
| 2522 | 1FUYDSEB9WP840786 |
| 2523 | 1FUYDSEB0WP840787 |
| 2524 | 1FUYDSEB2WP840788 |
| 2525 | 1FUYDSEB4WP840789 |
| 2526 | 1FUYDSEB0WP840790 |
| 2527 | 1FUYDSEB2WP840791 |
| 2528 | 1FUYDSEB4WP840792 |
| 2529 | 1FUYDSEB6WP840793 |
| 2530 | 1FUYDSEB8WP840794 |
| 2531 | 1FUYDSEBXWP840795 |
| 2532 | 1FUYDSEB1WP840796 |



05/07/2002 18:45 FAX 1 402 435 4333    SCUDDER LAW FIRM    ☑014

EXHIBIT C
Page 2 of 7

| Tractor | Make/Model | | Year | Miles | VIN |
|---|---|---|---|---|---|
| 2440 | FRGHT FLD 120 | 70" FT/CONDO | 1998 | 441757 | 1FUYDDYB4WP840024 |
| 2441 | FRGHT FLD 120 | 70" FT/CONDO | 1998 | 346076 | 1FUYDDYB6WP840025 |
| 2443 | FRGHT FLD 120 | 70" FT/CONDO | 1998 | 460722 | 1FUYDDYBXWP840027 |
| 2444 | FRGHT FLD 120 | 70" FT/CONDO | 1998 | 273243 | 1FUYDDYB1WP840029 |
| 2446 | FRGHT FLD 120 | 70" FT/CONDO | 1998 | 401228 | 1FUYDDYB8XWP840030 |
| 2451 | FRGHT FLD 120 | 70" FT/CONDO | 1998 | 426805 | 1FUYDDYB9WP840035 |
| 2455 | FRGHT FLD 120 | 70" FT/CONDO | 1998 | 470940 | 1FUYDDYB6WP840038 |
| 2456 | FRGHT FLD 120 | 70" FT/CONDO | 1998 | 308798 | 1FUYDDYB2WP840040 |
| 2458 | FRGHT FLD 120 | 70" FT/CONDO | 1998 | 405967 | 1FUYDDYB8WP840042 |
| 2460 | FRGHT FLD 120 | 70" FT/CONDO | 1998 | 416673 | 1FUYDDYBXWP840044 |
| 2463 | FRGHT FLD 120 | 70" FT/CONDO | 1998 | 840338 | 1FUYDDYB5WP940047 |
| 2465 | FRGHT FLD 120 | 70" FT/CONDO | 1998 | 286653 | 1FUYDSEB5WP840749 |
| 2468 | FRGHT FLD 120 | 70" FT/CONDO | 1998 | 423108 | 1FUYDSEB3WP840752 |
| 2470 | FRGHT FLD 120 | 70" FT/CONDO | 1998 | 417098 | 1FUYDSEB7WP840754 |
| 2472 | FRGHT FLD 120 | 70" FT/CONDO | 1998 | 480895 | 1FUYDSEB0WP840756 |
| 2473 | FRGHT FLD 120 | 70" FT/CONDO | 1998 | 458771 | 1FUYDSEB2WP840757 |
| 2477 | FRGHT FLD 120 | 70" FT/CONDO | 1998 | 379493 | 1FUYDSEB4WP840761 |
| 2478 | FRGHT FLD 120 | 70" FT/CONDO | 1998 | 388449 | 1FUYDSEB6WP840762 |
| 2480 | FRGHT FLD 120 | 70" FT/CONDO | 1998 | 388277 | 1FUYDSEBXWP840764 |
| 2481 | FRGHT FLD 120 | 70" FT/CONDO | 1998 | 396583 | 1FUYDSEB1WP840766 |
| 2482 | FRGHT FLD 120 | 70" FT/CONDO | 1998 | 450860 | 1FUYDSEB3WP840766 |
| 2483 | FRGHT FLD 120 | 70" FT/CONDO | 1998 | 298285 | 1FUYDSEB9WP840767 |
| 2485 | FRGHT FLD 120 | 70" FT/CONDO | 1998 | 134605 | 1FUYDSEB5WP840769 |
| 2486 | FRGHT FLD 120 | 70" FT/CONDO | 1998 | 325333 | 1FUYDSEB5WP840770 |
| 2487 | FRGHT FLD 120 | 70" FT/CONDO | 1998 | 421713 | 1FUYDSEB7WP840771 |
| 2489 | FRGHT FLD 120 | 70" FT/CONDO | 1998 | 424673 | 1FUYDSEB3WP840772 |
| 2490 | FRGHT FLD 120 | 70" FT/CONDO | 1998 | 352828 | 1FUYDSEB0WP840773 |
| 2491 | FRGHT FLD 120 | 70" FT/CONDO | 1998 | 393065 | 1FUYDSEB2WP840774 |
| 2492 | FRGHT FLD 120 | 70" FT/CONDO | 1998 | 417728 | 1FUYDSEB4WP840775 |
|  | FRGHT FLD 120 | 70" FT/CONDO | 1998 | 408022 | 1FUYDSEB6WP840776 |

05/01/2002 10:46 FAX 1 402 435 4333      SCUDDER LAW FIRM                    ☑015

| TRLER # | 195-1996 UTILITY TRLERS | | EXHIBIT C |
|---------|--------------------------|---|-----------|
| | | | Page 3 of 7 |

| TRLER # | 195-1996 UTILITY TRLERS |
|---------|--------------------------|
| 530273 | 1UYVS2537TU897654 |
| 530276 | 1UYVS2538TU897659 |
| 530286 | 1UYVS2535TU897887 |
| 530291 | 1UYVS2539TU897872 |
| 530307 | 1UYVS2532TU897888 |
| 530309 | 1UYVS2530TU897890 |
| 530310 | 1UYVS2532TU897891 |
| 530311 | 1UYVS2534TU897892 |
| 530314 | 1UYVS253XTU897895 |
| 530316 | 1UYVS2533TU897897 |
| 530317 | 1UYVS2535TU897898 |
| 530318 | 1UYVS2537TU897899 |
| 530321 | 1UYVS2533TU943402 |
| 530323 | 1UYVS2537TU943404 |
| 530325 | 1UYVS2530TU943406 |
| 530327 | 1UYVS2534TU943408 |
| 530330 | 1UYVS2534TU943411 |
| 530331 | 1UYVS2536TU943412 |
| 530335 | 1UYVS2533TU943418 |
| 530338 | 1UYVS2539TU943419 |
| 530340 | 1UYVS2537TU943427 |
| 530342 | 1UYVS2530TU943423 |
| 530343 | 1UYVS2532TU943424 |
| 530345 | 1UYVS2536TU943428 |
| 530347 | 1UYVS253XTU943428 |
| 530348 | 1UYVS2531TU943429 |
| 530350 | 1UYVS253XTU943431 |
| 530355 | 1UYVS2539TU943438 |
| 530356 | 1UYVS2530TU943437 |
| 530358 | 1UYVS2534TU943438 |
| 530359 | 1UYVS2530TU943440 |
| 530363 | 1UYVS2538TU943444 |
| 530364 | 1UYVS253XTU943445 |
| 530367 | 1UYVS2535TU943448 |
| 530369 | 1UYVS2538TU943450 |
| 530370 | 1UYVS2538TU937601 |
| 530371 | 1UYVS253XTU937502 |
| 530372 | 1UYVS2531TU937503 |
| 530373 | 1UYVS2533TU937504 |
| 530375 | 1UYVS2537TU937508 |
| 530377 | 1UYVS2530TU937506 |
| 530378 | 1UYVS2532TU937509 |
| 530379 | 1UYVS2538TU937510 |
| 530380 | 1UYVS2530TU937511 |
| 530381 | 1UYVS2532TU937512 |
| 530383 | 1UYVS2536TU937514 |



EXHIBIT C
Page 4 of 7

| | |
|---|---|
| 530385 | 1UYVS253XTU937516 |
| 530386 | 1UYVS2531TU937517 |
| 530389 | 1UYVS2631TU937520 |
| 530392 | 1UYVS2537TU937523 |
| 530393 | 1UYVS2539TU937524 |
| 530394 | 1UYVS2530TU937526 |
| 530402 | 1UYVS253XTU937533 |
| 530404 | 1UYVS2533TU937535 |
| 530406 | 1UYVS2537TU937537 |
| 530408 | 1UYVS2530TU937539 |
| 530410 | 1UYVS2539TU937541 |
| 530411 | 1UYVS2530TU937542 |
| 530412 | 1UYVS2532TU937543 |
| 530413 | 1UYVS2534TU937544 |
| 530414 | 1UYVS2536TU937545 |
| 530415 | 1UYVS253XTU937547 |
| 530417 | 1UYVS2531TU937548 |
| 530418 | 1UYVS2533TU937549 |
| 530419 | 1UYVS253XTU937550 |
| 530420 | 1UYVS2531TU937551 |
| 530422 | 1UYVS2535TU937553 |
| 530423 | 1UYVS2537TU937554 |
| 530424 | 1UYVS2539TU937555 |
| 530425 | 1UYVS2530TU937556 |
| 530427 | 1UYVS2534TU937558 |
| 530428 | 1UYVS2536TU937559 |
| 530429 | 1UYVS2532TU937560 |
| 530430 | 1UYVS2534TU937561 |
| 530431 | 1UYVS2536TU937562 |
| 530432 | 1UYVS253XTU937563 |
| 530434 | 1UYVS2531TU937565 |
| 530435 | 1UYVS2533TU937566 |
| 530436 | 1UYVS2535TU937567 |
| 530437 | 1UYVS2537TU937568 |
| 530438 | 1UYVS2539TU937569 |
| 530439 | 1UYVS2535TU937570 |
| 530440 | 1UYVS2537TU937571 |
| 530441 | 1UYVS2539TU937572 |
| 530443 | 1UYVS2532TU937574 |
| 530444 | 1UYVS2534TU937575 |
| 530445 | 1UYVS2536TU937576 |
| 530447 | 1UYVS253XTU937578 |
| 530448 | 1UYVS2531TU937579 |
| 530451 | 1UYVS2531TU937582 |
| 530452 | 1UYVS2533TU937583 |
| 530454 | 1UYVS2537TU937585 |
| 530455 | 1UYVS2539TU937586 |
| 530456 | 1UYVS2530TU937587 |
| 530457 | 1UYVS2532TU937588 |

EXHIBIT C
Page 5 of 7

| | |
|---|---|
| 530458 | 1UYVS2534TU937589 |
| 530459 | 1UYVS2530TU937590 |
| 530460 | 1UYVS2532TU937591 |
| 530461 | 1UYVS2534TU937592 |
| 530462 | 1UYVS2536TU937593 |
| 530463 | 1UYVS2538TU937594 |
| 530464 | 1UYVS253XTU937595 |
| 530465 | 1UYVS2531TU937586 |
| 530467 | 1UYVS2535TU937588 |
| 530468 | 1UYVS2537TU937589 |
| 530469 | 1UYVS2536TU937500 |
| 530470 | 1UYVS2537TU974801 |
| 530473 | 1UYVS2532TU974804 |
| 530474 | 1UYVS2534TU974805 |
| 530475 | 1UYVS2536TU974806 |
| 530476 | 1UYVS2538TU974807 |
| 530478 | 1UYVS2531TU974809 |
| 530479 | 1UYVS2538TU974810 |
| 530480 | 1UYVS252XTU974811 |
| 530483 | 1UYVS2535TU974814 |
| 530484 | 1UYVS2537TU974815 |
| 530485 | 1UYVS2539TU974816 |
| 530486 | 1UYVS2530TU974817 |
| 530487 | 1UYVS2532TU974818 |
| 530488 | 1UYVS2534TU974819 |
| 530489 | 1UYVS2530TU974820 |
| 530490 | 1UYVS2532TU974821 |
| 530491 | 1UYVS2534TU974822 |
| 530492 | 1UYVS2536TU974823 |
| 530493 | 1UYVS2536TU974824 |
| 530494 | 1UYVS253XTU974825 |
| 530495 | 1UYVS2531TU974826 |
| 530496 | 1UYVS2533TU974827 |
| 530497 | 1UYVS2535TU974828 |
| 530498 | 1UYVS2537TU974829 |
| 530500 | 1UYVS2535TU974831 |
| 530501 | 1UYVS2537TU974832 |
| 53502 | 1UYVS2539TU974833 |
| 530503 | 1UYVS2530TU974834 |
| 530504 | 1UYVS2327TU974835 |
| 530505 | 1UYVS2534TU974836 |
| 530506 | 1UYVS2536TU974837 |
| 530507 | 1UYVS2538TU974838 |
| 530508 | 1UYVS253XTU974839 |
| 530509 | 1UYVS2536TU974840 |
| 530510 | 1UYVS2538TU974841 |
| 530511 | 1UYVS253XTU974842 |
| 530512 | 1UYVS2531TU974843 |
| 530513 | 1UYVS2533TU974844 |

EXHIBIT C
Page 6 of 7

| | |
|---|---|
| 530514 | 1UYVS2535TU974845 |
| 530515 | 1UYVS2537TU974846 |
| 530516 | 1UYVS2539TU974847 |
| 530517 | 1UYVS2530TU974848 |
| 530518 | 1UYVS2532TU974849 |
| 530519 | 1UYVS2536TU974850 |
| 530520 | 1UYVS2534TU897501 |
| 530521 | 1UYVS2536TU897502 |
| 530522 | 1UYVS2538TU897503 |
| 530523 | 1UYVS253XTU897504 |
| 530525 | 1UYVS2533TU897505 |
| 530526 | 1UYVS2535TU897507 |
| 530527 | 1UYVS2537TU897508 |
| 530528 | 1UYVS2539TU897509 |
| 530529 | 1UYVS2535TU897510 |
| 530530 | 1UYVS2537TU897511 |
| 530531 | 1UYVS2539TU897512 |
| 530533 | 1UYVS2522TU897514 |
| 530534 | 1UYVS2534TU897515 |
| 530535 | 1UYVS2536TU897516 |
| 530536 | 1UYVS2538TU897517 |
| 530537 | 1UYVS253XTU897518 |
| 530538 | 1UYVS2531TU897519 |
| 530539 | 1UYVS2538TU897520 |
| 530540 | 1UYVS253XTU897521 |
| 530541 | 1UYVS2531TU897522 |
| 530542 | 1UYVS2533TU897523 |
| 530543 | 1UYVS2535TU897524 |
| 530545 | 1UYVS2536TU897526 |
| 530547 | 1UYVS2537TU897528 |
| 530548 | 1UYVS2534TU897529 |
| 530549 | 1UYVS2536TU897530 |
| 530550 | 1UYVS2532TU897531 |
| 530551 | 1UYVS2534TU897532 |
| 530552 | 1UYVS2536TU897533 |
| 530553 | 1UYVS2538TU897534 |
| 530554 | 1UYVS253XTU897535 |
| 530555 | 1UYVS2531TU897536 |
| 530556 | 1UYVS2533TU897537 |
| 530557 | 1UYVS2535TU897538 |
| 530558 | 1UYVS2537TU897539 |
| 530559 | 1UYVS2533TU897540 |
| 530560 | 1UYVS2535TU897541 |
| 530561 | 1UYVS253TTU897542 |
| 530562 | 1UYVS2538TU897543 |
| 530563 | 1UYVS2530TU897544 |
| 530565 | 1UYVS2534TU897546 |
| 530566 | 1UYVS2536TU897547 |
| 530567 | 1UYVS2538TU897548 |

530568      1UYVS253XTU897549
530569      1UYVS2536TU897550

EXHIBIT C
Page 7 of 7

*Prepared and submitted by:*

Weston L. Harris (A1387)
**PARSONS DAVIES KINGHORN & PETERS**
185 South State Street, Suite 700
Salt Lake City, UT 84111
(801) 363-4300
(801) 363-4378– Fax

Counsel for Debtors

Scott J. Goldstein  (MO #28698)
Daniel D. Doyle    (MO # 36724)
**Spencer Fane Britt & Browne LLP**
1000 Walnut, Suite 1400
Kansas City, MO 64106
(816) 474-8100
(816) 474-3216– Fax

---

## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| In re: | ) | **Case Nos.  02-22906** |
| | ) | 02-22907 |
| **SIMON TRANSPORTATION SERVICES INC.,** | ) | |
| **and DICK SIMON TRUCKING, INC.,** | ) | **Chapter 11 proceedings** |
| | ) | **Jointly administered** |
| Debtors. | ) | |

## ORDER APPROVING  SALE OF SUBSTANTIALLY
## ALL OF THE DEBTORS' ASSETS AND APPROVING
## <u>ASSUMPTION AND ASSIGNMENT OF LEASES</u>

This matter, having come before the Court upon Debtors' Motion for Approval of Substantially All of the Debtors' Assets and for Approval of Assumption and Assignment of Leases and Executory Contracts, the Court having considered the Motion, statements of counsel, and the record in this case, after notice and hearing adequate under the circumstances, and for good cause shown, IT IS HEREBY ORDERED that:

A.  Based on this Court's findings (1) that there are compelling facts supporting the proposed sale a demonstrate financial emergency, (2) that the Debtors have, through its broker and financial adviser have adequately solicited other purchasers, and (3) that the sale is in the best interests of the estate when all relevant factors are taken into account,  the Debtors' Motion is granted in its entirety;

B.  The Debtors are authorized to sell all or substantially all of their assets (the "Assets") to Central Freight Lines, Inc., pursuant to the terms of the Central "Acquisition of Assets of Simon Transportation Services Inc. and Subsidiaries - Summary of Terms" dated March 8, 2002 (the "Term Sheet"), or pursuant to a subsequently approved an asset purchase agreement incorporating the Term Sheet; and subject to higher and better bids for purchase of the Assets;

C.  All liens, claims, and other encumbrances in the purchased Assets shall attach to the

F:\WD\dms\ddd\bkrp\00115327.WPD



proceeds of the sale in their respective priorities;

D.   The Debtors are authorized to assume or reject any and all executory contracts or unexpired leases sought to be transferred to the Buyer through the approved sale (i) after approval of the Sale; (ii) upon 10 days' notice to the counterparty of each such agreement, with an opportunity for prompt hearing upon written objection; (iii) if the Buyer agrees to provide for the total cure of any default amount as may be negotiated; and (iv) if the Debtors and their estates are released from any liability for any further cure of defaults;

E.   The Buyer is a bona fide purchaser in good faith entitled to the protections of 11 U.S.C. § 363(m); and

F.   The 10-day stay of the effectiveness of the sale order as permitted by Bankruptcy Rule 6004(g) is hereby lifted, so that this Order effective upon its entry.

Dated: April ___, 2002

SO ORDERED:

_____
Honorable Glen E. Clark
United States Bankruptcy Judge

**C**

RECEIVED

MAR 2 2 2002

OFFICE OF JUDGE
GLEN E. CLARK

Weston L. Harris (A1387)                    Scott J. Goldstein  (MO #28698)
PARSONS DAVIES KINGHORN & PETERS            Spencer Fane Britt & Browne LLP
185 South State Street, Suite 700           1000 Walnut, Suite 1400
Salt Lake City, UT 84111                    Kansas City, MO 64106
(801) 363-4300                              (816) 474-8100
(801) 363-4378– Fax                         (816) 474-3216– Fax

Counsel for Debtors

IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF UTAH, CENTRAL DIVISION

In re

SIMON TRANSPORTATION SERVICES
INC.  and DICK SIMON TRUCKING, INC.

Debtors.

Bankruptcy No.  02-22906 GEC
[Chapter 11]
[JOINTLY ADMINISTERED]

## ORDER APPROVING (1) BIDDING AND AUCTION PROCEDURES AND DATE FOR SALE OF ASSETS; (2) THE FORM OF NOTICE; AND (3) FOR THE SCHEDULING OF AN EXPEDITED HEARING ON MOTION FOR SALE PROCEDURES, NOTICE, AND SALE HEARING

This matter, having come before the Court upon the Debtors' motion, and the Court

having considered the Motion, the arguments of counsel, and the record in this case, and

for good cause shown, it is hereby

ORDERED that the Debtors' Motion is granted, including that:

A.     The Debtors shall provide notice of the proposed bidding, auction and sale,

by service of this Order to all known creditors and parties in interest, including the U.S.

Trustee, counsel for the Unsecured Creditor's Committee, all secured parties and lessors,

all parties contacted by Morgan Keegan in connection with the marketing of the Debtors'

assets for sale, all other potential qualified bidders known to the Debtors, all parties to



0222906D206

executory contracts and leases, and all parties who have requested notice pursuant to Bankruptcy Rule 2002.

     B.     Except for the Stalking Horse Bid (as defined below), any party that intends to submit a bid to become a qualified bidder at the auction must transmit the bid so that it is received no later than 5:00 p.m. Mountain Standard Time on April 5, 2002 (the "Bid Deadline"), by: Dick Simon Trucking, Inc, 5175 West 2100 South, West Valley City UT 84120-0297, ATTN: Mr. Robert Goates, CFO.

     C.     Central Freight Lines, Inc. has submitted a bid (the "Stalking Horse Bid") for most, but not all, of the Debtors' assets, and Central Freight Lines, Inc. or an affiliate thereof ("Central" or the "Stalking Horse Bidder") is obligated to file with the Court a definitive asset purchase agreement relating to the Stocking Horse Bid (the "Asset Purchase Agreement"). Other parties may submit initial bids for assets of the Debtors' businesses (collectively the "Assets") or any part or parts of the Assets. Each bid must (i) be in writing; (ii) be for cash and other consideration; (iii) specify the property that is being bid upon; (iv) identify the bidder and the members of its investor group, as applicable; (v) provide information to demonstrate the financial wherewithal of the bidder to consummate the proposed transaction; and (vi) be substantially in the same form and content as the Asset Purchase Agreement or must in specific detail delineate the differences between the bid and the Asset Purchase Agreement to be submitted by Central.

     D.     Central's Asset Purchase Agreement shall be filed with the Court no later than March 25, 2002, with copies to be faxed to potential bidders upon their request to the Debtors' counsel. If Central's Asset Purchase Agreement is not timely filed, Debtors may proceed with the auction using the Stalking Horse Bid or similar bids as may be submitted,

2

as binding commitments to enter into a definitive asset purchase agreement after approval

of the successful bid or bids at the Sale Hearing.

E.    The Debtors shall use their best efforts to accommodate all requests for

reasonable due diligence prior to the Sale Hearing. The sale to the Stalking Horse Bidder

shall be subject to Court approval and to higher and better offers.

F.    The Debtors, in their discretion, after consultation with CitiCapital Commercial

Corporation ("CitiCap") and counsel to the Official Committee of Unsecured Creditors (the

"Committee") shall qualify potential bidders according to their financial qualifications to

consummate any purchase of the Assets.

G.    Upon notification of qualification to bidders, each such bidder shall provide

Debtors with certified funds in the amount of $250,000 as an earnest money bid deposit.

H.    Central, as the Stalking Horse Bidder, is granted bid protections as follows:

(i) payment of reasonable actual out-of-pocket expenses of the Stalking Horse Bidder up

to a maximum of $250,000, subject to court approval after notice and hearing (the

"Expense Reimbursement"), plus a fee of $50,000, which represents 50% of the minimum

bid increment of $100,000, (the "Topping Fee") (together with the Expense

Reimbursement, the "Bid Fees"); and (ii) requiring that any bid submitted at the Auction

exceed the consideration to be paid pursuant to the Stalking Horse Bid by no less than the

sum of (1) the Bid Fees, and (2) an overbid amount reflecting at least a $100,000.00

increase over the prior bid for those Assets comparable to those sought to be acquired by

the Stalking Horse Bid (collectively, the "Bid Protections"). Any subsequent overbids for

such Assets shall be in increments of at least $100,000.  No sums constituting Bid

Protections shall be paid from cash collateral of CitiCapital absent its consent.

I.    The Expense Reimbursement shall be payable upon (i) the Debtors' failure to sign a definitive agreement providing for the sale of Debtors' assets to Central on the terms and conditions contained in Central's bid, or (ii) the Debtors' agreement to or closing of a transaction providing for the sale of all or substantially all of the Assets to a third party. The Topping Fee shall be payable to Central only upon the closing of a sale of all or substantially all the Debtors' Assets to a third party.    Notwithstanding anything else contained herein, no Bid Fees will be payable if the Stalking Horse Bidder fails to perform or otherwise breaches, or the Stalking Horse Bid is withdrawn or later not qualified. If a bid indicates that it seeks the assumption and assignment of certain executory contract(s) or unexpired lease(s), the bid must include sufficient information to permit the Court, the Debtors, the Committee, CitiCap , and the affected non-debtor party to the applicable contract or lease to determine the proposed assignee's ability to comply with Section 365 of the Bankruptcy Code (to the extent applicable), including providing adequate assurance of such assignee's ability to perform in the future.

J.    If for any reason the Stalking Horse Bidder notifies Debtors of its intention not to go forward with the Asset Purchase Agreement, then Debtors shall have the right to choose another stalking horse purchaser, or in the absence of the same, to go forward with the Sale Hearing without a stalking horse purchaser.

K.    Within 48 hours after the Bid Deadline, the Debtors after consultation with Citicap and the Committee, shall announce to all qualified bidders the bid or bids considered to be the highest and best, which shall be the bid or bids at the Sale Hearing.

L.    At 1:30 p.m. on April 8, 2002, or such other date as the Court may determine, the Debtors shall conduct an auction of the Assets in the Courtroom of the Honorable Glen

E. Clark,  U.S. Bankruptcy Court for the District of Utah, Room 369, 350 S. Main Street, Salt Lake City, Utah (the "Auction").

M.      Each bid or overbid submitted at the Auction must comply with the procedures set forth herein.

N.      Each entity seeking to bid at the Auction must (i)  appear in person at the Auction or through a duly authorized representative, (ii) have provided to Debtors a bid on or before the Bid Deadline, (iii) submit a Bid Deposit, and (iv) have been qualified by the Debtors.

O.      To be considered, a bid must not contain any financing or due diligence contingencies or other contingencies as to the validity, effectiveness, or binding nature of the bid. The Stalking Horse Bidder, to be considered, shall remove all such contingencies before April 5, 2002.

P.      If the Debtors receive multiple bids on or before the Bid Deadline which satisfy the bid requirements, each qualified bidder shall have the right (and opportunity) to continue to improve its bid at the Auction.

Q.      The Debtors, after consultation with CitiCap and the Committee, will select the bids at the conclusion of the Auction that they believe to be the highest or best bids for the Assets (each, as applicable, a "Winning Bid").

R.      Debtors, after consultation with CitiCap and the Committee reserve the right to select the best bid, even if not the highest bid. The determination of the Winning Bids shall remain subject to Court approval. The Winning Bidder(s) must complete and sign all agreements or other documents with the Debtors evidencing and containing the terms and conditions upon which its Winning Bid was made before the Auction is concluded.