MICHAEL N. EMERY [0990]
RUSSELL C. FERICKS [3793]
RICHARDS, BRANDT, MILLER & NELSON
Attorneys for Central Refrigerated Services, Inc.
Key Bank Tower, Seventh Floor
50 South Main Street
P.O. Box 2465
Salt Lake City, Utah 84110-2465
Telephone: (801) 531-2000
Fax No.: (801) 532-5506

RECEIVED
AUG 23 2002
OFFICE OF JUDGE
GLEN E. CLARK

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| IN RE: | |
|---|---|
| SIMON TRANSPORTATION SERVICES, INC. and DICK SIMON TRUCKING, INC.<br><br>Debtors. | Bankruptcy Case No.<br>02-22906 GEC<br><br>Chapter 11<br><br>[Jointly Administered]<br><br>Judge Glen E. Clark |

**MEMORANDUM IN OPPOSITION TO FREIGHTLINER'S MOTION FOR (I) RECONSIDERATION OF APRIL 22, 2002 ORDERS AUTHORIZING SALE, ETC. AND APPROVING ASSUMPTION AND ASSIGNMENT OF EXECUTORY VENDOR CONTRACT, AND (II) EXCLUSION OF THE FREIGHTLINER COMPANIES FROM THE EFFECTS OF THOSE ORDERS
(CENTRAL REFRIGERATED SERVICE, INC.)**

Central Refrigerated Service, Inc. ("**Central**"), through its counsel Michael N. Emery

of Richards, Brandt, Miller & Nelson, hereby submits this Memorandum in Opposition to



0222906D704

Freightliner's Motion for Reconsideration. This Memorandum is limited to the issue of whether Freightliner LLC ("**Freightliner**") and/or Freightliner Market Development Corporation ("FMDC") (collectively "**Freightliner**") received adequate notice of the Joint Motion of Debtors and Central Refrigerated Service, Inc. to Assume and Assign Certain Contracts under 11 U.S.C. § 365 ("**Assumption Motion**"). Issues relating to the actual assumption and assignment of vendor contracts will be briefed, if necessary, in a separate memorandum.

I.   **INTRODUCTION**

Few industries are as tumultuous as the trucking industry and the Debtors' cases did not disappoint. From the moment the petitions were filed, the Debtors faced one exigent circumstance after another -- without rest or relief. Despite the odds, the Debtors were able to maintain some value in their business base and to sell the same with a "going concern" premium which has maximized the possibility of a return to unsecured creditors. Jobs, tax base, competition and other social advantages arising from an operating business have been maintained.

To secure these "going concern" advantages, the Debtors proposed to assume and assign to the purchaser of the Debtors' assets its contractual rights to trade in used trucks at a fixed price in connection with the purchase of new ones. Freightliner, the party obligated to accept and pay for such trade-ins, has objected to the Debtors' Motion to Assume and Assign these rights primarily on the grounds that it did not receive adequate notice of the same. Specifically, Freightliner argues that because the mailing address used by the Debtors omit any direct reference

2

to a responsible person, by name or by title, notice of the assumption motion and the opportunity to object thereto was defective.

Unfortunately, Freightliner suggests that the above-described defect in the mailing address was "purposeful" and "was calculated to prevent Freightliner [or any one else] from objecting." Such conclusions are neither necessary for Freightliner's argument nor supported by the evidence. As discussed below, Freightliner was a knowledgeable and active participant and should not be relieved of its failure to timely object.

## II. TRADEBACK AGREEMENTS

As part of a program designed to maximize the opportunity to sell new trucks to the Debtors, Freightliner, Freightliner Market Development Corporation and the Debtors entered into various contractual relationships collectively referred to herein as "Tradeback Agreements." In general, each of the Tradeback Agreements provide that Freightliner, in connection with the Debtors' purchase/acquisition of a new truck from Freightliner, will purchase back from the Debtors a qualified "trade-in" truck for a fixed price. Stated another way, pursuant to the Tradeback Agreements, Freightliner and the Debtors agreed to the residual value of the truck which would be paid by Freightliner to the Debtors to reacquire such truck when it was traded in on the purchase of a new truck. The Debtors' right to trade in a particular truck under the Tradeback Agreement is subject to various conditions such as time, condition, mileage, etc., in addition to the express condition that the Debtors purchase one or more new trucks from Freightliner.

3

With a Tradeback Agreement in place, the Debtors would secure the financing necessary to acquire a new truck in the form of a lease. The term the lease would be equal to the time at which the tradeback right could be executed and the residual value of the truck owed by the Debtors to the lessor at the end of the lease was equal to the repurchase price to be paid by Freightliner when the truck was traded back to Freightliner. The practical effect of this arrangement was to exchange future business in return for protection against changes in the actual market value of the used truck.

Though some disputes exist respecting such conditions, under which the Debtors may exercise a tradeback right, such disputes are irrelevant to Freightliner's argument that the Debtors provided inadequate notice of the Assumption Motion.

There are approximately 565 trucks in Central's fleet which Central asserts are covered by a Tradeback Agreement. Central claims these rights constituted a significant part of the consideration which it acquired in connection with the purchase of the Debtors' assets. A total value for these tradeback rights cannot be easily calculated for several reasons. For example, no one can predict with certainty the market value for 3-year old trucks available for trade in the future. To the extent the actual market value for such trucks approaches the residual value fixed in the lease, the tradeback rights become less valuable. Further, the tradeback rights may be utilized only in connection with the acquisition of new trucks from Freightliner. If Central does not have the financial resources to acquire new trucks or the business base to utilize the same, no value will be

4

generated by the tradeback rights. Finally, Freightliner claims to have defenses to Central's exercise of the Debtors' tradeback rights.

### III. FACTS AND CIRCUMSTANCES DEMONSTRATE THAT NOTICE WAS ADEQUATE

The impact of the Debtors' failure to direct the Assumption Motion to a responsible person, either by name or title, cannot be evaluated outside of the facts and circumstances under which such notice was given. Set forth below is a chronological list of facts, acts, circumstances and events by which one can conclude that the notice given to Freightliner was sufficient to compel it to participate in the bankruptcy process.

1. For the time period relevant herein, tradeback and similar agreements have been a significant issue for Freightliner with significant adverse financial consequences. Talmage Depo., pp. 79-80; Bangston Depo., p. 20.

2. At all times Freightliner was aware that there were Tradeback Agreements between it and the Debtors.

3. By December 2001, Freightliner was aware that the Debtor was in default under its lease agreement with Daimler Chrysler Services ("**DCS**") for the trucks acquired by the Debtors from Freightliner. *See* McCarthy Depo., pp. 14-20.

4. In January 2001, Freightliner, DCS and the Debtors met to discuss a restructure of the Debtors' truck lease. At issue was the Debtors' request to reduce lease payments by extending the lease term with only a slight reduction in the stated residual value of the truck

5

which was to be paid by the Debtors to DCS at the expiration of the lease. Such a restructure was possible only if Freightliner agreed to amend the Tradeback Agreements in the same way. No agreement was reached. Goodale Depo., pp. 9-13.

5. On or about February 25, 2002, the Debtors filed their Petition for Relief. On the same day, Freightliner's treasurer, Ms. Kelly Platt, was advised of the bankruptcy filing. Goodale Depo., pp. 30-31. By memo dated February 28, 2002, Ms. Platt alerted a group of Freightliner employees responsible for legal credit and marketing issues as to the bankruptcy filing. Bangston Depo., pp. 96-99.

6. Prior to April 22, 2002, Freightliner's treasurer requested bankruptcy research regarding the assumption and assignment of Tradeback Agreements in bankruptcy. Bangston Depo., pp. 128-129.

7. From and after the petition date, Freightliner's treasurer communicated with DCS employees, by voice and by e-mail, respecting the Tradeback Agreements with the Debtors and the restructure of the same. Goodale Depo. p. 27; McCarthy Depo., pp. 67-90.

8. Negotiations concerning the restructure of the truck leases and Freightliner's financial commitment with respect thereto occurred between the Vice President of DCS and the President of Freightliner. Entenmann Depo., pp. 24-26, 37-38.

9. By memo dated March 1, 2002, DCS transmitted an agreement to Freightliner whereby Freightliner agreed, in the event some or all of the trucks were transferred by Simon to a

6

third party as part of the bankruptcy, to guarantee DCS a residual payment equal to 40% of the original cost of such trucks. Entenmann Depo., pp. 24-26.

10. On or about March 14, 2002, Freightliner advised DCS of its decision not to proceed with the guarantee described in paragraph 9. above. DCS assumes that Freightliner's decision is based upon the fact that the number of units, subject to a tradeback were for fewer than originally understood. Entenmann Depo., pp. 41-43.

11. On April 9, 2002, counsel for Central sent the Assumption Motion to both Freightliner and FMDC at the correct street address for each company, respectively.

12. Both Freightliner and FMDC received the Assumption Motion as evidenced by their respective possession of such document together with the original mailing envelopes; each post marked April 10, 2002. *See* Bangston Depo., pp. 66-70.

13. Neither Freightliner nor FMDC can testify that the Assumption was <u>not</u> received on or before April 15, 2002.

14. FMDC can testify that the Assumption Motion was received by Ed Castelberry, Manager of Business Development, who gave it to Robert Seitz with instructions to forward it to the legal department. Bangston Depo., pp. 35, 71-76.

15. Freightliner can testify that the Assumption Motion received by it has been marked with the letters "T&T" which stands for the treasury and tax department which, in turn, is

7

responsible for the processing of title documents and payments in connection with Tradeback Agreements. Bangston Depo., pp. 104-105, 109.

16. There is no evidence that either of the Assumption Motions that were sent to Freightliner and FMDC, respectively, were handled or received by someone who would not have understood the significance of the document as a legal document and acted accordingly, or who would have routed the document to someone in the organization not otherwise familiar with the circumstances or incapable of properly processing the document.

### IV.   NOTICE WAS ADEQUATE UNDER THE CIRCUMSTANCES.

As discussed above, the Assumption Motion was sent by mail to, and was received by, both Freightliner and FMDC.

Freightliner asserts that the Motion was defective because the mailing address omitted to identify, by name or by title, a "responsible person" to whom the notice should have been directed, in accordance with Rules 9014 and 7004 of the Federal Rules of Bankruptcy Procedure. Central does not dispute that the Assumption Motions were not specifically addressed to the attention of any officer, managing or general agent or other agent authorized by law to receive service (collectively "responsible party"). As such, the issue presented is whether this omission is fatally defective requiring the Debtors to re-notice its intent to assume and thereby provide Freightliner with another opportunity to object to the Debtors' decision.

8

The standard for "notice" in connection with a motion to assume or reject an executory contract or lease is described by the Fifth Circuit in the case styled: *In Re National Gypsum Co.*, 208 F.3rd 498 (5th Cir. 2000). In *Gypsum*, the Court held that it was the debtor's responsibility to assure that the non-debtor party was on notice of the debtor's intent to assume the contract. *Id.* at 513. Absent a showing of actual knowledge of a significantly refined degree, the debtor must demonstrate the delivery of the plan of reorganization or other court ordered notice describing the debtors' intent to assume. *Id.*

Freightliner carefully denies that it had actual knowledge of the timing of the Assumption Motions and, with respect to the Assumption Motions actually received, denies the effect thereof due to an omission in the address. It is nevertheless clear, however, that Freightliner knew of the Debtors' intent to assume and maintain its rights under the Tradeback Agreements that Freightliner's lack of actual knowledge respecting the timing of such motion arose solely because it lost or misplaced the Assumption Motions, not because such documents were not called or directed to the attention of a responsible party.

Specifically, the evidence clearly shows that Freightliner was aware of: (i) the Debtors' bankruptcy; (ii) the existence of Tradeback Agreements with the Debtors; (iii) Debtors' ability to assign the Tradeback Agreements in connection with its bankruptcy; and (iv) the ongoing effort, both before the after the petition date, to restructure and maintain both the leases and the Tradeback Agreements. This level of knowledge, started at the CEO and included the treasurer who,

in turn, involved responsible persons in the legal, credit and remarketing departments. As such, Freightliner knew what would – and did – happen. Misplaced reliance upon DCS to remind it of the timing of the assumption process for which Freightliner had otherwise prepared is not a basis upon which Freightliner can avoid the consequences of its inaction.

### IV. CONCLUSION

For the reasons stated above, this Court should deny Freightliner's request for reconsideration of the Assumption Motion.

DATED this _23_ day of August, 2002.

RICHARDS, BRANDT, MILLER
& NELSON

_____
Michael N. Emery
Russell C. Fericks
Attorneys for
Central Refrigerated Service, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing instrument was sent by telefax, and mailed, first-class, postage prepaid on this _23_ day of August, 2002, to the following:

| | |
|---|---|
| Scott J. Goldstein, Esq.<br>Mark Thornhill, Esq.<br>Spencer, Fane, Britt & Browne, LLP<br>1000 Walnut, Suite 1400<br>Kansas City, MO 64106<br>**Via Facsimile 816-474-3216** | Weston L. Harris, Esq.<br>Kim Mosier, Esq.<br>Parsons, Davies, Kinghorn & Peters<br>185 South State Street, Suite 700<br>Salt Lake City, UT 84111<br>**Via Facsimile 363-4378** |
| J. Thomas Beckett, Esq.<br>Parson, Behle & Latimer<br>One Utah Center<br>201 South main Steet, Suite 1800<br>Salt Lake City, UT 84145-0898<br>**Via Facsimile 536-6111** | Peter Billings, Esq.<br>Gary Jubber, Esq.<br>Fabian & Clendenin<br>215 South State Street, #1200<br>Salt Lake City, UT 84111<br>**Via Facsimile 596-2814** |
| Kim P. Gage<br>Cooksey, Toolen, Gage, Duffy & Woog<br>535 Anton Boulevard, Tenth Floor<br>Costa Mesa, CA 92626-1977<br>**Via Facsimile 714-431-1119** | Laurie Crandall<br>U.S. Trustee<br>9 Exchange Place, #100<br>Salt Lake City, UT 84111<br>**Via Facsimile 524-5628** |

_[signature]_

G:\EDSI\DOCS\15474\0001\A35709.WPD