Weston L. Harris (A1387)
R. Kimball Mosier (2334)
**Parsons Davies Kinghorn & Peters**
185 South State Street, Suite 700
Salt Lake City, UT 84111
Telephone: (801) 363-4300
Facsimile: (801) 363-4378

Scott J. Goldstein    (MO #28698)
**Spencer Fane Britt & Browne LLP**
1000 Walnut, Suite 1400
Kansas City, MO 64106
Telephone: (816) 474-8100
Facsimile: (816) 474-3216

Counsel for Debtors

## In the United States Bankruptcy Court
## District of Utah, Central Division

In re:

SIMON TRANSPORTATION SERVICES
INC., DICK SIMON TRUCKING, INC. AND
SIMON TERMINAL, LLC

           Debtors.

Bankruptcy No. 02-22906 GEC
[Chapter 11]
[JOINTLY ADMINISTERED]

## DEBTOR'S RESPONSE TO FREIGHTLINER'S MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING ITS OBJECTION TO THE DEBTOR'S SUPPLEMENTAL MOTION FOR AUTHORITY TO ASSUME AND ASSIGN TRADE-BACKS TO CENTRAL



0222906D755

## TABLE OF CONTENTS

I.    INTRODUCTION.......................................................................................    1

II.    THE EVIDENCE WILL SHOW.....................................................................    4

III.    DISCUSSION...........................................................................................    13

    A.    The Trade-Back Contracts Can be Assumed and
       Assigned under 11 U.S.C. § 365 Because they are
       Executory..........................................................................................    13

        1.    Assumption and Assignment of the Trade-Back Contracts will
           Benefit the Estate..................................................................    14

        2.    The Court Should Apply the *Riodizio* Standard and Find that
           the Trade-Back Contracts are Executory..................................    16

        3.    Alternatively, the Court Should Find Under the Functional
           Approach that the Trade-Back Contracts are Executory.........    18

        4.    Strict Application of the Countryman Rule Defeats the
           Purpose of Code § 365 and Should Not be
           Applied.................................................................................    19

        5.    A Motion to Assume or Reject an Executory Contract is a
           Summary Proceeding. Freightliner's Defenses to the Trade-
           Back Contracts Will be Preserved For a Non-Bankruptcy
           Forum....................................................................................    22

        6.    Whether There is a Default Under a Contract or the Debtor
           Provides Adequate Assurance of Future Performance is
           Irrelevant to a Determination of Whether a Contract is
           Executory. Further, Freightliner's Request for Adequate
           Assurance of Future Performance is Inappropriate...............    23

        7.    Failure to Initially Schedule the Trade-Back Contracts Does
           Not  Estop Debtors from Claiming the Trade-Back Contracts
           are Executory........................................................................    25

WA 663601.8

B.    The Assumption of the Trade-Back Contracts is Appropriate Under
the Business Judgment Standard Because Assumption will Benefit
the Estate................................................................................    28

C.    Freightliner Should Not have Standing to Challenge Debtor's
Business Judgment.  Standing Should Reside Solely in the
Unsecured Creditors' Committee Which Supports Debtor's
Business Judgment........................................................................    29

IV.    CONCLUSION.............................................................................    30

WA 663601.8

Dick Simon Trucking, Inc. ("Simon" or "Debtor") submits its Response to the Freightliner Companies' ("Freightliner") Memorandum of Points and Authorities Supporting its Objection to the July 19, 2002 Supplemental Motion of Dick Simon Trucking, Inc. for Authority to Assume and Assign Certain Freightliner Contracts to Central Refrigerated Service, Inc. ("Central").

## I. INTRODUCTION

Freightliner has twisted the facts to make it and the Trade-Back Contracts the focal point of any sale. Freightliner's purpose is to avoid the risk of potential loss -- a risk it knowingly and willingly accepted when Simon ordered Freightliner tractors and Freightliner supplied them. In fact, the Trade-Back Contracts had uncertain value to Simon and were not a focal point of the sale. Of the total 515 trucks potentially subject to trade-back about which Freightliner now complains, 154 (the "Mercedes Leased Tractors") were financed by leases which were rejected before the sale. Thus, as to the Mercedes Leased Tractors, Debtor could not exercise the trade-backs because it could not obtain title. Even had the Mercedes Leased Tractors not been rejected, the underlying leases were in substantial default (in excess of $1,300,000), Simon was obligated to pay substantial residual guarantees under the leases and was also obligated to purchase new trucks (125 trucks to replace 104 old trucks). It was clear that Simon not could make such payments or have a need for new trucks, as it was not going to survive. The other 361 (the "Other Leased Tractors") were ordered by Simon and subject to the Trade-Back Contracts but were

1                          WA 663601.8

financed by leases to non-debtor entities.

The focal point of this case was keeping the Debtor operating long enough to consummate a sale under which there was hope for a distribution to unsecured creditors. That goal was achieved through a substantial increase in Central's offer on April 8, 2002, which resulted in a sale which was consummated on April 22, 2002. As ultimately consummated, Central's bid was increased to approximately $51,000,000, which included substantially all of the Debtor's assets and rights under executory contracts, including the Trade-Back Contracts. The increased bid included increases in cash and assumption of over $6,000,000 in employee and owner-operator administrative debt, which if not assumed would have resulted in an administratively insolvent estate. Additionally, a critical fact ignored by Freightliner was Central's ability to obtain releases of unsecured debt owed to lessors and estimated to exceed $30,000,000 and administrative debt owed to the same creditors estimated to exceed $2,000,000 (see April 8, 2002 transcript, page 17, line 15 to page 18, line 24). There is now a real hope unsecured creditors will receive a distribution in this case. From Simon's perspective, the release of those claims was important "consideration" paid by Central which would not have been reflected on Central's opening balance sheet.

Freightliner is only interested in one thing, and that is avoiding any potential obligation it may have under the Trade-Back Contracts. The Trade-Back Contracts had no value to the Debtor in liquidation, and uncertain value to any purchaser, including Central. While Debtor could do nothing with the Trade-Back Contracts, a purchaser might renegotiate the leases to which some of the trade-backs related, and create value for itself

2

WA 663601.8

as an incentive to consummate a sale. That is exactly what happened, although it continues to be uncertain whether Central will ultimately obtain value for the trade-backs.

Debtor would not have survived to get to a sale had Central not made a stalking-horse bid. All of Debtor's professionals advised that Debtor needed a stalking-horse bid or drivers, customers and lessors would bolt and Simon would be faced with closure and liquidation. Given the time within which Debtor had to sell its assets (which was within sixty days or lessors who were not being paid would demand a return of their tractors), a sale was consummated. Debtor now seeks to comply with the sale agreement which requires that, to the extent they are transferable or assignable, Debtor use its best efforts to obtain assumption and assignment of the Trade-Back Contracts.

Debtor exercised proper business judgment when faced with the decision to close and liquidate or sell to Central. Freightliner has suggested no other viable possibility. It simply argues Debtor did not get enough. On April 8, 2002, the Court found that the sale was in the best interest of the estate, that Debtor exercised proper business judgment and approved the sale. Central paid substantial value for the whole of assets through cash, assumption of debt and by obtaining releases of claims, which included the rights to the Trade-Back Contracts for the 515 tractors. Assumption and assignment is appropriate. There is no reason why it should not be approved, except that Freightliner does not want to honor the agreements it previously made with Simon.

WA 663601 8

## II. THE EVIDENCE WILL SHOW

A.      The evidence will be what this Bankruptcy Court already knows, rather than the twisted half-truths suggested by Freightliner. The evidence will show the following:

1.      The tractors subject to trade-back about which Freightliner now complains total 515. The Mercedes Leased Tractors consist of rights to trade 154 tractors. The evidence will show 104 are due for trade in 2002 under the January 25, 2000 letter agreement (Exhibit A to the Supplemental Motion). Forty-nine (49) tractors are subject to the Agreement for Conditional Commitment to Repurchase #2000-00366 (Exhibit B to the Supplemental Motion). One (1) tractor is subject to the Agreement for Conditional Commitment to Repurchase #2000-00013 (Exhibit C to the Supplemental Motion). No tractors were ever ordered under the Agreement for Conditional Commitment to Repurchase #2000-00014 (Exhibit D to the Supplemental Motion) (collectively, the "Trade-Back Contracts"). The Mercedes Leased Tractors were originally financed through leases from Mercedes-Benz Credit Corporation (now, Daimler-Chrysler Services North America, LLC) ("MBCC"), Freightliner's sister corporation. All of these leases were rejected in Debtor's bankruptcy case before the April 8, 2002 sale date at MBCC's insistence because, among other reasons, Debtor was unable to make adequate protection payments and the tractors were not insured. Central entered into new lease agreements with extended lease dates with MBCC (which may extend beyond the trade-back dates set forth in the Trade-Back Contracts). As a part of the sale, MBCC and other lessors released administrative and unsecured claims in the bankruptcy case which provided substantial benefit to the Debtor and unsecured creditors estimated to be in excess of $30,000,000 of unsecured

4

debt and in excess of $2,000,000 of administrative claims.

2.     With respect to the Other Leased Tractors, eighty-five (85) are subject to the Agreement for Conditional Commitment to Repurchase #2000-00366 (Exhibit B to the Supplemental Motion) and two hundred seventy-six (276) are subject to the Agreement for Conditional Commitment to Repurchase #2000-00013 (Exhibit C to the Supplemental Motion). The Other Leased Tractors were ordered from Freightliner by the Debtor. These tractors were financed by leases to non-Debtor entities owned or controlled by Jerry Moyes (Interstate Equipment Leasing, Inc. and/or DST Leasing, LLC). Most of the Other Leased Tractors were operated in Debtor's fleet by owner-operators. Since Debtor did not have an absolute right to obtain title to the tractors, it is uncertain how Debtor could have ever exercised the Trade-Back Contracts relating to the Other Leased Tractors. Therefore, as with the trade-back rights relating to the Mercedes Leased Tractors, the trade-back rights relating to the Other Leased Tractors had, at best, uncertain value to Simon.

3.     Freightliner admits there are no monetary defaults under the Trade-Back Contracts pursuant to 11 U.S.C. § 365(b) (Memorandum, paragraph 2, page 3).

4.     The Debtor has never hidden that Central is owned or controlled by an insider, Jerry Moyes or that Central's counsel, Earl Scudder, Esq., formerly represented the Debtor.

5.     Debtor's professionals did not take direction from either Mr. Moyes or Mr. Scudder. Debtor's counsel took its sole direction from, and decisions were made by Robert Goates, the Chief Financial Officer, and Mark Wilkey, Esq., Vice President and General Counsel. Neither Mr. Wilkey nor Mr. Goates were offered, orally or in writing,

WA 663601.8

employment with Central until after the sale closed. Moreover, Mr. Goates will testify that other potential bidders, including Frozen Food Express Industries, Inc. ("FFE") and DFC Transportation Company ("DFC"), approached him about employment as an officer of the company if they made a bid and were successful. Mr. Goates will testify he was involved with all decisions regarding the assumption and assignment of the Trade-Back Contracts, including the Supplemental Motion. He will testify he was guided by what was in the best interest of creditors at all times and that his business judgment is the same as it was in March and April of 2002, that a sale of the whole of assets, and the consideration paid by Central was preferable to liquidation, closure and putting thousands of people out of work. Mr. Goates will testify that he agreed to remain as an officer of Debtor after April 22, 2002, at no pay, in order to assist the Unsecured Creditors' Committee until a Plan is confirmed under which the Committee will complete administration of the estate. Finally, Mr. Goates will testify that since well before April 22, 2002, and certainly since that time, the Unsecured Creditors' Committee and its counsel have been consulted on all major decisions regarding this Debtor, including the Supplemental Motion, and the Committee supports it. Mr. Goates will testify he exercised independent and appropriate business judgment in determining that the improved Central bid, which included the Trade-Back Contracts, was preferable to liquidation and destruction of this business.

6.    In Debtor's Preliminary Response, it said at page 6, paragraph 9 that, "The [trade-back] contracts were of speculative value, if any, to the Debtors and any purchaser of its assets." While Mr. Goates said in his deposition he would not have used the word "speculative," he also said, "I believe there are many circumstances or conditions which could impact the value of the repurchase agreements to both the Debtors and

6                    WA 663601.8

potential purchasers of the assets. I agree with that portion of the statement." Goates

Depo. at p. 155, line 25, p. 156, lines 1-4. Mr. Goates then stated in response to a

question about what words he would have used, "As I've already stated, that there were,

could be many uncertainties or circumstances which could affect value." Goates Depo. at

p. 156, lines 15-17. In fact, whether it be called "uncertain," "speculative," or "value, if

any," these Trade-Back Contracts had no value to the Debtor in liquidation, but at the very

least the Trade-Back Contracts relating to the Mercedes Leased Tractors had value to the

extent a purchaser could renegotiate new leases and create value.

      7.    Freightliner admits the Trade-Back Contracts had uncertain value to

Central in its Memorandum at page 23:

> "But even at that time, Freightliner's obligation to perform remains contingent
> on whether the trucks to be traded in meet certain specified requirements
> and are determined eligible for the trade-in deal. If the used trucks proffered
> by Simon do not meet the requirements, Freightliner has no obligation to buy
> back the used trucks. Until Simon opts to exercise the option, and the
> trade-in truck is determined to be eligible, Freightliner has no obligation to
> perform."

and at page 25:

> "Moreover, Central cannot predict how many trucks it will choose to
> trade-back in the future, it cannot guarantee that all or any of the trucks will
> satisfy the trade-in requirements, and it cannot guarantee that it will have the
> means to purchase any new trucks from Freightliner in the future."

      8.    Freightliner asserts  that the value of the Trade-Back Contracts is

approximately $4.1 million. Such estimate is highly subjective. Freightliner's expert admits:

> "It is a volatile time for truck manufacturers. EPA regulations and economic
> pressures have slowed production lines. It is unknown how the industry
> might react. If new prices were dropped to increase new sales, the value of
> used trucks would decrease.  Likewise, in the unlikely event that
> manufacturers would dramatically raise new truck prices, the value of used

7

trucks would rise."

Freightliner argues that a value for trade-back agreements is easily determined. In doing so, it attempts to predict the future in a secondary market which historically has been subject to wide fluctuations in values of equipment. In short, Freightliner's own expert admits the value is uncertain.

        9.      Freightliner intentionally misconstrues the testimony of Jerry Moyes and Earl Scudder, Esq. with respect to the Trade-Back Contracts being a substantial factor in Debtor's decision to file bankruptcy. Mr. Goates will testify that the Trade-Back Contracts relating to the 515 units had *nothing* to do with the bankruptcy filing. Mr. Moyes and Mr. Scudder simply testified that months earlier, while Mr. Moyes was contemplating additional loans to the Debtor, it was discovered that there were fewer trade-back agreements relating to Simon's total fleet of tractors than had originally been thought. This was a factor which may have resulted in Mr. Moyes deciding not to make additional loans to the Debtor.

        10.     The testimony will show that the bankruptcy *was* caused by the fact that lessors had not received payments for months and were filing suits to replevy their equipment, there was no cash to pay lessors and fund operations and Debtor's insurance carrier had taken action to terminate its insurance coverage. Debtor was advised that it could last no longer than approximately sixty (60) days before it would be forced to close, and that a stalking-horse bid in the trucking industry was essential, or the Debtor would immediately lose drivers, customers and the cooperation of lessors.

        11.     Morgan Keegan will testify that the existence of trade-back contracts was common knowledge in the trucking industry and would not have been the focal point

8

MBCC and Central extend the leases beyond the trade-back date under the Trade-Back
Contracts, creating additional uncertainty as to whether they can be exercised. To the
extent there is potential value, however, it is because Central was able to successfully
negotiate new lease agreements with MBCC, something over which the Debtor had no
control, and which certainly could not be characterized as an asset of the Debtor. Rather,
Central created this value independent of the Debtor. Freightliner's statement that this
should have been "disclosed" in the Confidential Memorandum is wrong, as each potential
bidder had to make its own arrangements with MBCC, and Debtor understands the new
agreements were not struck until the day of the sale, April 8, 2002.

14.     The Trade-Back Contracts were not originally included in the Debtor's
bankruptcy schedules by mistake. The schedules consisted of thousands of pages, and
Debtor did the best it could under the circumstances to prepare and file the schedules
without delay.  It should also be remembered this was an emergency filing caused by
Debtor's insurance company attempting to cancel its insurance, so nothing was prepared
pre-petition. While Freightliner attempts to portray this oversight as meaningful, it is not.
The Trade-Back Contracts were not a significant asset of this estate for the reasons
described herein and did not play a significant role in Debtor's bankruptcy. The oversight
was not done intentionally to deceive anyone and has prejudiced no one.   Interested
bidders were generally aware of the existence of trade-back agreements on Freightliner
tractors, had the Trade-Back Contracts available to them in the data room and, as
previously described, FFE specifically asked for and received them.

15.     The Sale Motion, filed March 11, 2002, originally contemplated
assumption and assignment of executory contracts after closing.  However, Simon

10                                    WA 663601.8

of a transaction. Morgan Keegan will testify the Confidential Memorandum was sufficient to inform potential bidders of the assets for sale, and any potential bidder would, if it was interested, seek out trade-back information which was readily available to it in the data room set up by Morgan Keegan. In fact, FFE asked for and received the Trade-Back Contracts and DFC included the Trade-Back Contracts in the asset purchase agreement it provided the Debtor.

12.    Freightliner's statement in paragraph 28, page 11, that, "A substantial portion of the fleet could be traded in for more than fair market value via the trade-backs," and that this should have been disclosed in the Confidential Memorandum is seriously misleading. The testimony will show that since the exercise of the trade-back agreements generally would have required the cure of substantial defaults, the payment of substantial residual guarantees under the defaulted leases and the purchase of new trucks, the fact that they might *then* be traded-in for more than fair market value was not a critical fact required to be included in the Confidential Memorandum.

13.    Further, Debtor understands that the leases regarding the Mercedes Leased Tractors had a residual value guarantee at the end of the term which required payment in order to obtain title. Commonly, the residual value guarantee was close to the trade-back value promised by Freightliner. With respect to the Mercedes Leased Tractors, Debtor understands Central was able to renegotiate new leases with MBCC which reduced the residual value guarantee. This renegotiation created a gap between the trade-back and residual values, potentially creating value of as much as $15,000 per unit for the 154 units. The $15,000 amount, however, assumes Central can successfully meet all of the other requirements for a trade. As Debtor understands it, the new lease terms between

9                                    WA 663601.8

requested, and the Court ordered an expedited schedule for assumption and assignment

issues so they would correspond in time with the sale. (See Docket Nos. 368 and 369.)

This procedure was adopted to streamline the sale process. The Sale Motion made clear

that the sale included equipment repurchase agreements. (See Sale Motion, Docket No.

106, summary of Terms, ¶ 8). The Asset Purchase Agreement filed with the Court on

March 25, 2002, identified buy-back, trade-in or similar agreements as among the assets

to be purchased. (See Asset Purchase Agreement, Docket No. 319, ¶ 2.1(n)). Further,

Central's Notice of Filing Asset Purchase Agreement relating to the Stalking Horse Bid,

filed on April 4, 2002, noted that it was assuming all of Debtor's right, title and interest of

every kind, nature, or description and all contracts and agreements to which Debtor was

a party, including, but not limited to, contracts and agreements with Freightliner and/or

Freightliner Market Development. (See Notice of Filing, Docket No. 319, Schedule 2.1(g)).

It was at all times clearly contemplated that the assumption and assignment of executory

contracts would occur, to the extent possible, on or before April 22, 2002, and that the total

consideration paid by Central included assumed and assigned contracts. After the April

8, 2002 hearing, Central further negotiated revisions to the original Asset Purchase

Agreement with the Unsecured Creditors' Committee. This included in ¶ 5.12(c) of the

Amended and Restated Asset Purchase Agreement Debtor's obligation to take any action

necessary to effect the assumption and assignment of Assumed Assets (which included

the Trade-Back Contracts to the extent they were transferable or assignable). Debtor at

this time is simply doing what it is obligated to do.

16.    While Debtor believes it is completely irrelevant, Freightliner asserts

that because Central did not allocate any value to the Trade-Back Contracts in its opening

11                              WA 663601.8

balance sheet, it therefore "paid nothing for the trade-backs". An initial accounting for an acquisition and purchase price allocation is not intended to conclusively determine the value of assets acquired or liabilities assumed. Many acquisitions include contingent assets and liabilities. That Central did not allocate value to the Trade-Back Contracts is completely within the parameters of applicable accounting standards. Applicable accounting standards provide that for a contingent asset whose value is uncertain, it is not appropriate to allocate any value until it can be reasonably estimated. There was sufficient uncertainty in the value of the Trade-Back Contracts to make it impossible to reasonably estimate value. Accordingly, no value was allocated by Central in its opening balance sheet and the notes clearly disclosed that Central was "completing the review and determination of the fair values of certain assets and liabilities assumed. Accordingly, the allocation of the purchase price is subject to revision."

17.      Freightliner also attempts to assert that Central could not have paid for the Trade-Back Contracts because it paid less than "fair market value" for all of the assets. This assertion fails to consider that Central's offer had to exceed the liquidation value of the Debtor. The Debtor and the Unsecured Creditors' Committee negotiated and achieved a price at which they determined they were achieving the best value possible for the estate. How this value related to the fair market value that might be achieved under normal selling conditions (which was the basis for the allocation in Central's opening financial statement), as opposed to a liquidation, is irrelevant. The only relevant fact is that the Debtor and the Committee pursued the option which maximized the value of the estate's assets. Central's final offer provided that value.

18.      While the focus of the sale hearing on April 8, 2002 was most certainly

12

not on the Trade-Back Contracts, they were brought to the attention of the Court and the

Unsecured Creditors' Committee. (See Motion for Appointment of Examiner and Objection

to Proposed Sale, Docket No. 324, ¶ 8). At the time, however, Debtor faced closure and

liquidation, or a sale to Central. The Court told Central it would not approve a sale as

initially contemplated, the Committee objected to the sale as initially contemplated, and

Central improved its offer substantially with additional cash, assumption of post-petition

administrative debt and through obtaining releases of substantial pre-petition and

administrative claims in the case. Central's was the only viable bid for the "whole" of

assets. To suggest now, as does Freightliner, that the parties were required to separately

value each asset or contract at fair market value, and then only sell the assets if fair market

value could be obtained would have resulted in no sale and liquidation, which is what

Freightliner would have preferred. The real issue was whether the totality of the

consideration was better than the only other alternative--liquidation.


## III. DISCUSSION

### A.   The Trade-Back Contracts Can be Assumed and Assigned under 11 U.S.C. § 365 Because they are Executory

Section 365 of the United States Bankruptcy Code (the "Code") allows a trustee,

with court approval, to "assume or reject any executory contract ... of the debtor." 11

U.S.C. § 365(a). The Code does not define the term "executory." See In re G-N Partners,

48 B.R. 462, 464 (Bankr. D. Minn. 1985). Many Courts focus on one of the goals of Code

§ 365 which is that contracts should be assumable and assignable if it will result in a

benefit to the estate.

13                              WA 663601.8

In the context of so-called option contracts, courts have achieved this goal by adopting a standard that recognizes the unique nature of option contracts and the value they can provide to the estate. Other courts achieve this goal by applying the "Functional Approach." Both of these court-approved approaches reject the unduly rigid approach known as the "Countryman Rule" on which Freightliner essentially relies.

The Trade-Back Contracts are in the nature of option contracts and their assumption and assignment costs the estate nothing and will benefit the estate. Selecting either analysis that turns on benefit to the estate requires a conclusion that the Trade-Back Contracts are executory. The Countryman Rule, not a part of Tenth Circuit jurisprudence in the context of option contracts, should not be applied here.

### 1.    Assumption and Assignment of the Trade-Back Contracts will Benefit the Estate.

During this bankruptcy, the Trade-Back Contracts have never had anything other than uncertain value to Simon. Among other reasons already described herein, Simon could not enforce the Trade-Back Contracts unless it had title to the tractors to be traded. Simon, however, had no absolute right to obtain title to the tractors. Notwithstanding the same, the estate received substantial value in connection with the Trade-Back Contracts as a portion of the group of assets and contracts purchased by Central for which it paid approximately $51,000,000. Central included the Trade-Back Contracts in its stalking-horse bid and subsequent asset purchase agreement. As the stalking-horse bid, Central entered into negotiations with Simon's former lessors regarding new leasing arrangements. As a result of those negotiations, the lessors agreed to waive substantial unsecured and

14    WA 663601.8

administrative claims against the estate. Central increased its bid to pay more cash and assume millions of dollars of administrative debt. If Central had not done so, the estate would have been administratively insolvent and the unsecured creditors would have no opportunity to recover anything. The sale to Central prevented Simon from having to liquidate. Had Simon undergone liquidation, thousands of jobs would have been lost.

Clearly, the Central bid, which included the Debtor's obligation to assume and assign the Trade-Back Contracts, has resulted in substantial benefit to the estate. Simon did not separately value each asset sold or each contract assumed and assigned, nor was it required to do so. That Central increased its bid to pay $51,000,000 for the "whole" of the assets and contracts, obtained releases of over $30,000,000 in unsecured claims and over $2,000,000 in administrative claims, assumed over $6,000,000 of post-petition administrative claims which otherwise would have assured the administrative insolvency of the estate; that this estate presently has in excess of $2,000,000 in cash (after payment of substantial post-petition, pre-closing expenses); that there are more payments to be made to the Debtor under the Amended and Restated Asset Purchase Agreement of potentially hundreds of thousands of dollars; and that thousands of jobs and a business with which creditors can continue to do business was saved, should be considered sufficient "benefit to the estate" to support assumption and assignment of what Freightliner admits are contracts of uncertain value which might never be exercised.

15

### 2.    The Court Should Apply the *Riodizio* Standard and Find that the Trade-Back Contracts are Executory

The Trade-Back Contracts are in the nature of option contracts.[1] Utah Courts have

never confronted the issue of whether option contracts are executory. Many courts in other

jurisdictions have found that option contracts are executory. *See In re Riodizio, Inc.*, 204

B.R. 417, 422 (Bankr. S.D.N.Y. 1997); *In re III Enterprises, Inc. V*, 163 B.R. 453, 468

(Bankr. E. D. Pa. 1994); *G-N Partners*, 48 B.R. at 464; *In re A.J. Lane & Co.*, 107 B.R. 435,

437 (Bankr. D. Mass. 1989); *In re Waldron*, 36 B.R. 633, 639 (Bankr. S.D. Fla. 1984), *rev'd*

*on other grounds*, 785 F.2d 936 (11th Cir. 1986); *In re Hardie*, 100 B.R. 284, 286 (Bankr.

E.D.N.C. 1989).

The Bankruptcy Court for the Southern District of New York in *Riodizio* provides a

thorough analysis in concluding that option contracts are executory.  In *Riodizio*, the Court

found that "a contract is executory if each side must render performance, on account of an

---

[1] Utah Courts define an option contract as follows:

> An option contract is a continuing offer, supported by consideration, which the promisor
> is bound to keep open. It is a unilateral obligation binding only on the optionor. It is
> unique; the holder has the legal power to consummate a second contract ... and at the
> same time the legal privilege of not exercising it.  An option [contract] consists of the
> following two elements (1) an offer to sell [or in the case of a "put option" an offer to buy],
> which does not become a contract until accepted; and (2) a contract to leave the offer
> open for a specified time.

*Coulter & Smith, Ltd. v. Russell*, 966 P.2d 852, 858 (Utah 1998) (internal citation and quotation omitted).
Stated another way:

> An option contemplates performance by both parties but requires it only from one.  The
> optionor must keep the offer open. The optionee may but need not exercise the option;
> if he does, each party must perform its obligations under the resulting bilateral contract.

*In re Riodizio, Inc.*, 204 B.R. 417, 422 (Bankr. S.D.N.Y. 1997).

existing duty *or to fulfill a condition to obtain the benefit of the other party's performance.*"
*Riodizio*, 204 B.R. at 424 (emphasis added).  The Court should apply this standard
because it supports the legislative history behind Code § 365 and incorporates the positive
aspects of the Countryman Rule and the Functional Approach. Drawing from the legislative
history and the Countryman Rule, the *Riodizio* standard stays true to the requirement of
mutual performance by both parties. *See id.* Drawing from the Functional Approach, it
recognizes that the ultimate purpose of Code § 365 is to allow the debtor to assume and
assign contracts when to do so will benefit the estate and rejects the rigidity of the
Countryman Rule when it would frustrate that purpose. *See id.* at 424.

In *Riodizio*, the court had to decide whether a warrant was an executory contract.
*Riodizio*, 204 B.R. at 420. The warrant granted the non-debtor party the option to purchase
shares of the debtor's common stock. *Id.* In holding that the warrant was an executory
contract, the court found that both parties must perform in order to receive their respective
benefits and burdens from the warrant. *Id.* at 424. Specifically, the debtor had to keep the
option open in order to sell the shares and to receive payment. Likewise, the non-debtor
party had to exercise the option in order to receive the shares and to make payment. *Id.*

The Trade-Back Contracts are executory under the *Riodizio* standard. Similar to
*Riodizio*, both Simon and Freightliner must render performance in order to fulfill conditions
to obtain the benefit of each other's performance. In order to sell new tractors to Simon
and receive payment for those tractors, Freightliner must keep Simon's option to trade
back used tractors open for a specified commitment period.

In order to receive new tractors and to trade back used tractors, Simon must

17                              WA 663601.8

exercise its rights under the Trade-Back Contracts.  In order to exercise its right to trade

back used tractors under the contracts, Simon must, among other things, (1) give notice

to Freightliner that it intends to exercise its rights; (2) place a non-cancelable order for the

purchase of new tractors equal to or greater than the number offered for repurchase; (3)

properly deliver the trucks to an acceptable location for inspection; (4) have clear and

unencumbered title of the tractors; (5) have proof of payment of Federal Highway Use Tax;

(6) have proof of payment of ad valorem tax (when required); (7) provide certifications that

all recall campaigns have been completed; (8) provide an odometer certificate; and  (9) the

tractors must meet certain maintenance requirements.  Under the *Riodizio* standard, the

Trade-Back Contracts are executory.

### 3.    Alternatively, the Court Should Find Under the Functional Approach that the Trade-Back Contracts are Executory

Alternatively, the Court should adopt and apply the Functional Approach. Under this

approach, there is no "executoriness" prerequisite to assumption or rejection of a contract.

*See In re Drexel Burnham*, 138 B.R. 687, 708 (Bankr. S.D.N.Y. 1992); *In re Seymour*, 144

B.R. 524, 529 (Bankr. D. Kan. 1992). The real question is whether assumption or rejection

of the contract would produce a benefit to the estate and creditors. *See In re General Dev.*

*Corp.*, 177 B.R. 1000, 1012 (Bankr. S.D. Fla. 1995), *aff'd*, 84 F.3d 1364 (11th Cir. 1996).

In other words, whether a contract is executory  is measured by the benefit the contract

provides to the estate rather than the form of the contract. *See In re Booth*, 19 B.R. 53,

56 (Bankr. D. Utah 1982).

The Functional Approach is preferable to the Countryman Rule.  Under the

18

Functional Approach the analysis focuses on benefit to the estate. As a result, there will

be no instance when the estate will be precluded from assuming contracts when it would

be in the best interest of the estate to do so. Because option contracts are unique, and

assumption and assignment can provide benefit to the estate, the Court should recognize

Countryman's limitations and alternatively apply the Functional Approach to determine if

the Trade-Back Contracts are executory contracts for purposes of Code § 365. Applying

the Functional Approach, the Trade-Back Contracts are executory and may be assumed

and assigned.

### 4.    Strict Application of the Countryman Rule Defeats the Purpose of Code § 365 and Should Not be Applied.

The Countryman Rule should not be applied. Under the Countryman Rule, an

executory contract is one "under which the [debtor] and the other party to the contract are

so far unperformed that the failure of either to complete performance would constitute a

material breach excusing the performance of the other." *Thomas Am. Stone & Bldg., Inc.*

*v. White*, 142 B.R. 449, 452-53 (D. Utah 1992) (quoting V. Countryman, Executory

Contracts in Bankruptcy: Part 1, 57 Minn. L. Rev. 439, 460 (1974)). Although many courts

have adopted the Countryman Rule, many courts have recognized its limitations. *See In*

*re Jolly,* 574 F.2d 349, 350-51 (6th Cir. 1978) (finding that although the Countryman

definition is helpful, it does not resolve the problem of whether a contract is executory); *In*

*re Gladding Corp.*, 22 B.R. 632, 635 (Bankr. D. Mass. 1982); *Riodizio*, 204 B.R. at 422; *G-*

*N Partners*, 48 B.R. at 464.

These courts have found that in certain circumstances the rigidity of the Countryman

19                              WA 663601.8

Rule can actually defeat a major goal of Code § 365 which is to allow assumption and assignment when to do so will benefit the estate. *See Drexel Burnham*, 138 B.R. at 707. The Utah Bankruptcy Court's decision in *Booth* provides well reasoned guidance when such an apparent conflict arises. In *Booth*, Judge Mabey correctly recognized that it is the benefit to the estate and protection of creditors that should control, not the form of the contract. *See Booth*, 19 B.R. at 56; *see also Gladding*, 22 B.R. at 635 (finding that "bankruptcy courts should not be bound by static definitions of what is an executory contract, but should strive to satisfy the purposes of the [Bankruptcy] Act in conjunction with the goals of the debtor (or trustee), in order that equity may be served"); *G-N Partners*, 48 B.R. at 465 ("It is inappropriate to apply a generalized rule such as Countryman to all situations.... To hold otherwise would be inconsistent with the Code's underlying policies of benefit to the estate and rehabilitation.").

Contracts such as the Trade-Back Contracts, similar to option contracts, are one context where the Countryman Rule's rigidity unjustifiably defeats the purpose of the Code. *See Riodizio*, 204 B.R. at 424; *Drexel Burnham*, 138 B.R. at 697. Under an option contract both parties must still perform to some degree in order to receive the benefits and burdens from the contract. *Riodizio*, 204 B.R. at 424. Unlike a non-option contract, however, the optionee's failure to perform constitutes a failure of a condition, not a breach of a duty. *Id.* at 422-23. A failure of condition in most cases would not be considered a material breach. *Id.* In the option context, the Countryman Rule would exclude from the definition of executory, "contracts under which the [parties have] benefits and burdens, each party must still perform as a condition to the other party's performance, and assumption or rejection

may confer a net benefit on the estate." *Id.* at 424. Following Judge Mabey's decision in *Booth*, the Court should not apply the Countryman Rule because to do so would allow the form of the contract rather than the purpose of Code § 365 to control.

In support of its argument, Freightliner relies on several cases finding that option contracts are not executory. All of the cases cited by Freightliner adopt the Countryman Rule. Of those cases, Freightliner relies primarily on *In re Helms*, 139 F.3d 702 (9th Cir. 1998). Although the Ninth Circuit in *Helms* stated that not all option contracts would necessarily be excluded by its rule, Simon believes it would be hard to find an option contract that could meet it. The *Helms* decision should not be relied upon because the facts are distinguishable from the present case, and the Ninth Circuit's reason for the rule does not take into account the benefits derived from assumption and assignment of an option contract.

In *Helms*, the option contract at issue was an option to buy real estate. *Helms*, 139 B.R. at 703-04. The debtors, who were unaware of the option, accidentally rejected the option through their Chapter 11 Plan. *Id.* at 705. Applying the Countryman Rule, the Court reversed the Bankruptcy Appellate Panel and found that the option contract appeared not to be executory, but remanded the issue back to the bankruptcy court because the factual record was unclear. *Id.* In *Helms,* the application of the Countryman Rule prevented the non-debtor party from receiving a windfall thereby helping to preserve a valuable asset of the estate. *Id.* Unlike the present case, application of the Countryman Rule in *Helms* benefitted the estate.

Further, the Ninth Circuit's rule could potentially defeat one of the goals it sought to

21

achieve. The Ninth Circuit found that the stricter Countryman Rule was needed in order to maximize the value of the estate. *Helms*, 139 B.R. at 705. The Ninth Circuit's fear was that an option contract which it recognized as a valuable asset could be accidentally rejected. *Id.* Thus, in order to protect the asset from accidental rejection, the Court adopted a standard which excluded most (if not all) option contracts from the realm of executory contracts.

The Ninth Circuit's remedy, however, does not take into account the fact that an estate may also receive benefit from the assumption and assignment of option contracts. The Ninth Circuit's decision effectively foreclosed future bankruptcy estates from maximizing the potential value to be achieved by assuming and assigning valuable option contracts, thereby defeating the purpose it originally sought to accomplish. This Court should not, therefore, adopt the reasoning in *Helms*.

5.    **A Motion to Assume or Reject an Executory Contract is a Summary Proceeding. Freightliner's Defenses to the Trade-Back Contracts Will be Preserved For a Non-Bankruptcy Forum.**

A motion to assume or reject an executory contract should be considered a summary proceeding. The ruling on a motion to assume or assign is a not a formal ruling on the underlying issues concerning the validity of a contract. *See In re Orion Pictures Corp.*, 4 F.3d 1095 (2nd Cir. 1993); *In re G.I. Indus., Inc.*, 204 F.3d 1276, 1282 (9th Cir. 2000); *In re Gateway Apparel, Inc.*, 210 B.R. 567 (Bankr. E.D. Mo. 1997) (proceeding on a motion to assume is summary in nature). Further, Code § 365 does not require the cure of nonmonetary defaults as a condition to assumption and assignment. *See In re Bankvest Capital Corp.*, 270 B.R. 541 (Bankr. D. Mass. 2001) (in order to assume or assign

WA 663601.8

executory contract, cure of nonmonetary defaults is irrelevant as not required under Code
§ 365(b)(1)(A) and (b)(2)(D)).

As previously stated in its Preliminary Response, to the extent Freightliner believes
it has defenses to the enforcement of the Trade-Back Contracts, it can and should proceed
with them in a non-bankruptcy forum. The estate has already incurred substantial expense
relating to the Trade-Back Contracts. Freightliner's initial objections to the assumption and
assignment of the contracts centered on the language of earlier orders that attempted to
limit Freightliner's rights to assert claims, counterclaims or defenses. Debtor offered
months ago to remove such language as a part of an amended assignment and
assumption order, but this was unacceptable to Freightliner. If the Trade-Back Contracts
are found to be executory and assumable and assignable, Debtor urges this Court to order
assumption and assignment and let Freightliner and Central litigate further matters relating
to Trade-Back Contracts in a non-bankruptcy forum in which Freightliner can assert any
defenses it wants.

6.   **Whether There is a Default Under a Contract or the Debtor Provides
      Adequate Assurance of Future Performance is Irrelevant to a
      Determination of Whether a Contract is Executory.   Further,
      Freightliner's Request for Adequate Assurance is Inappropriate.**

In determining whether a contract is executory, it is irrelevant whether there was a
default to cure or whether Freightliner has been provided with adequate assurance of
future performance. In order for Code § 365(b)(1) to apply, Simon must be in monetary
default on the Trade-Back Contracts.   As stipulated by Freightliner, Simon has not
monetarily defaulted on the Trade-Back Contracts. *See* Freightliner Memorandum p. 3.

23                                         WA 663601.8

As a result, Code § 365(b) does not apply.

Freightliner is attempting to make the existence of a default a requirement for a finding that a contract is executory. However, cases applying Code § 365 do not support such a position. *See In re Travel Shoppe, Inc.*, 88 B.R. 466, 471 (Bankr. N.D. Ga. 1988) (finding a contract executory where the parties stipulated there was no default); *In re National Sugar Refining Co.*, 26 B.R. 765, 768 (Bankr. S.D.N.Y. 1983) (finding that Code § 365(a) "provides that a debtor in possession has a right to assume an executory contract under which there has been no default without providing adequate assurance of future performance"). Moreover, Freightliner's position is not good policy because it has the potential to encourage debtors to intentionally default on their contracts prior to bankruptcy in order that the contracts may later be assumed.

Further, whether an assignee can perform under the contract is irrelevant to the question of whether the contract is executory. Code § 365(f)(2)(B) states that a debtor "may assign an executory contract ... if (B) adequate assurance of future performance by the assignee of such contract ... is provided, whether or not there has been a default in such contract or lease." Code § 365(f)(2)(B). By definition, Code § 365(f)(2)(B) does not apply unless the contract is already determined to be executory.

Further, Freightliner's request for adequate assurance is inappropriate. "Congress intended that the words 'adequate assurance' be given a practical, pragmatic construction, and [are] to be determined under the facts of each case." *In re Bygaph, Inc.*, 56 B.R. 596, 605 (Bankr. S.D.N.Y. 1986). Code § 365(f)(2)(B) requires only adequate assurance, not a guarantee of future performance. This provision is meant as protection for the non-

24

WA 663601.8

debtor party to the contract, but should not be used in a manner that will provide a party

with additional benefits that were not originally bargained for in the contract. *See Bygaph,*

56 B.R. at 605.

Freightliner is attempting to receive more assurance than is warranted under Code

§ 365(f)(2)(B) and the facts of this case. First, Freightliner asserts that a bond should be

posted as adequate assurance of performance. *See* Freightliner Memorandum, p. 3. The

Trade-Back Contracts do not require that a bond be posted. Further, a bond in this case

would essentially be a guarantee of performance, which is not required under Code §

365(f)(2)(B). *See Bygaph,* 56 B.R. at 605.

Second, the nature of the Trade-Back Contracts does not require assurance of

Central's future performance because Freightliner is sufficiently protected in the event that

Central does not perform. *See Bygaph,* 56 B.R. at 605 ("the lessor must be given

adequate assurance of future performance so that it will be protected from having to take

on the burden of a tenant who may be likely to default on his lease obligations"). If Central

does not perform under the Trade-Back Contracts, Freightliner will not be required to

perform and, from its standpoint, is in a better position. In fact, the sole reason that

Freightliner has objected to the Supplemental Motion is to escape having to perform under

the Trade-Back Contracts.

### 7.    Failure to Initially Schedule the Trade-Back Contracts Does Not Estop Debtor from Claiming the Trade-Back Contracts are Executory

Freightliner asserts that Simon should be estopped from claiming the Trade-Back

Contracts as executory because they were not listed in Simon's Schedule G and Amended

25

Schedule G. *See* Freightliner Memorandum, pp. 8-10, 26-28. A party seeking equitable estoppel must prove each of the following elements:

> (1) the party to be estopped is aware of the facts;
> (2) the party to be estopped intended its act or omission to be acted upon;
> (3) the party asserting estoppel did not have knowledge of the facts; and
> (4) the party asserting estoppel reasonably relied upon on the conduct of the other party to his substantial injury.

*In re Parker*, 264 B.R. 685, 691 (10th Cir. B.A.P. 2001). In this case, Freightliner cannot meet elements (2), (3) and (4).

Simon did not intentionally omit the Trade-Back Contracts from Schedule G or Amended Schedule G, nor did it intend to have that omission acted upon. Simon understands the importance of full disclosure in bankruptcy and has acted in good faith and to the best of its ability in putting together complete and accurate schedules. As the Court knows, however, this case has been on a fast track from its beginning and as a result of such a pace the possibility of error becomes greater. Simon has investigated and continues to investigate any possible omissions from the schedules in order to keep the schedules properly updated.[2] Thus, contrary to Freightliner's assertions, the fact that the Trade-Back Contracts were left off the schedules was because of oversight, not intention.

Freightliner cannot claim that it was unaware of the facts that the Trade-Back Contracts existed or may be executory and as a result could be assumed and assigned. Chris Edwardsen is a 20-year employee of the Freightliner legal department. Talmadge

---

[2] Debtors attempted to amend Schedule G to make it correct, but see no reason at this point to further do so to add the subject contracts. Amended Schedule G (Docket No. 404). Fed. R. Bankr. P. 1009(a) grants a Debtor the general right to amend its schedules "as a matter of course at any time before the case is closed," as long as such right is not exercised in bad faith or the amendment will not prejudice creditors. *See In re O.J. Osborn*, 24 F.3d 1199, 1206 (10th Cir. 1994).

WA 663601.8

Dep., p. 7. Throughout his tenure, one specific area of Mr. Edwardsen's focus was Freightliner's trade-back contracts. Talmadge Dep., p. 27. Prior to Simon's bankruptcy, trade-back contracts became a matter of "substantial concern to Freightliner" because the resale price for used trucks had plummeted, making trade-back contracts uneconomical to Freightliner. Talmadge Dep., pp. 79-80. When Simon's bankruptcy was filed, Mr. Edwardsen's focus on the trade back agreements with Simon was sharpened. After Simon's bankruptcy case was filed, Freightliner's treasurer, Kelly Platt, sent an e-mail to Mr. Edwardsen and a few other Freightliner executives. Debtors' Submission, Ex. 3 (Docket No. 702). The e-mail noted that Simon's bankruptcy had been filed. Mr. Edwardsen then was charged with responsibility to track the status of Freightliner's various trade back agreements with Simon. Talmadge Dep., pp. 70-71. Further, the instruction to Mr. Edwardsen came after Freightliner had conducted legal research into the possibility of assumption and assignment of its trade back contracts in the event of a customer bankruptcy. Bangston Dep., pp. 93-94, 129. Thus, Freightliner was well aware that the Trade-Back Contracts may be considered executory, and that Simon may attempt to assume and assign them.

Freightliner does not assert that it has reasonably relied on the omission to its substantial injury, nor has it. Freightliner has been given the chance to object and have a hearing regarding whether the Trade-Back Contracts can be assumed and assigned. Freightliner in its Memorandum has argued that the Trade-Back Contracts are not executory for many reasons, but none of which have anything to do with reliance on Schedule G. See Freightliner's Memorandum, pp. 20-25.

WA 663601.8

**B.    The Assumption of the Trade-Back Contracts is Appropriate Under the Business Judgment Standard Because the Assumption will Benefit the Estate.**

The assumption of an executory contract is subject to review under the business judgment standard.[3] *See In re Tilco, Inc.* 558 F.2d 1369, 1372 (10th Cir. 1977); *In re TS Indus., Inc.*, 117 B.R. 682, 685 (Bankr. D. Utah 1990). The business judgment standard is satisfied as long as Simon can demonstrate that assumption will benefit the estate.[4] *See Westship*, 247 B.R. at 866; *Riodizo*, 204 B.R. at 424-25. Of course, it is clear assumption costs the estate nothing and, as stated above, the assumption and assignment of the contracts clearly provides benefit to the estate.

Once the debtor has demonstrated that assumption and assignment benefits the estate, *it is unnecessary for the court to inquire whether another option would yield a better return. Westship*, 247 B.R. at 866. Notwithstanding the same, as the Court well knows, there *was* no other option except liquidation. Thus, Freightliner's "theoretical" fair market value analysis is unnecessary and should be ignored.

_____

[3]Simon does not dispute that the assignment is to an insider, nor is it relying on the business judgment presumption. Nevertheless, it is not clear whether a heightened scrutiny test is applicable. *See Westship Inc. v. Trident Shipworks, Inc.*, 247 B.R. 856, 865 (M.D. Fla. 2000) (questioning whether the heightened scrutiny analysis is appropriate under Code § 365 or whether it is confined to transactions under Code § 363).

[4]Freightliner applies a Code § 363(b) four prong sale analysis to the Code § 365 assumption and assignment of the Trade-Back Contracts. *See* Freightliner Memorandum at 17-20. Freightliner announced in open court that it was not trying to upset the sale. The only matter before the Court is assumption and assignment under Code § 365. To the extent Freightliner is applying a Code § 363(b) analysis to Code § 365 assumption and assignment, it is inapplicable. Notwithstanding the same, Simon meets the prongs of the Code § 363(b) analysis. First, Debtor had a sound business purpose in conducting the sale before a disclosure statement because if Debtor had not acted as quickly as it did, it would have faced closure and liquidation. Second, there was accurate and reasonable notice to creditors and the Confidential Memorandum was sufficient to inform potential bidders of the assets for sale. Any potential bidder would, if it was interested, have sought out trade-back information which was readily available to it . Third, Debtor and the Unsecured Creditors' Committee negotiated a price that achieved the best value possible for the estate. Finally, Debtor has acted in good faith throughout the sale process.

WA 663601.8

**C.    Freightliner Should Not Have Standing to Challenge Debtor's Business
Judgment.  Standing Should Reside Solely in the Unsecured Creditors'
Committee Which Supports Debtor's Business Judgment.**

At the hearing on April 8, 2002, Debtor exercised its business judgment jointly with

the Unsecured Creditors' Committee.  The Committee ultimately negotiated with Central

increases in its bid and amendments to the sale agreement, which resulted in the

Amended and Restated Asset Purchase Agreement filed with the Court on April 22, 2002.

Debtor, given the sale to an insider, deferred to the Committee.  Therefore, the business

judgment which Freightliner now attacks was the joint business judgment of the Debtor and

the Committee, and the Court found that the best business judgment had been exercised.

While Freightliner will presumably argue it has standing to question this business

judgment as a creditor, Freightliner, as the other party to the contracts at issue, itself has

an obvious and substantial conflict of interest.  It should be readily apparent that

Freightliner's real interest is to avoid any potential obligation under the Trade-Back

Contracts.  Freightliner would have preferred that Simon close and liquidate since it would

then have avoided any trade-back obligations.  In fact, Freightliner has already received

a windfall because as a result of rejections and repossessions by many lessors,

Freightliner was not obligated to accept trade-back of many tractors.

The Tenth Circuit applies a fact specific analysis in bankruptcy to determine if a

party should be granted standing.  *See In re Kaiser Steel Corp.*, 998 F.2d 783, 788 (10th

Cir. 1993); *In re Alpex Computer Corp.*, 71 F.3d 353, 356 (10th Cir. 1995).  The fact

specific inquiry should focus on the particular purpose of the provision in question."  *In re

Peachtree Lane Assoc., Ltd.*, 188 B.R. 815, 824-825 (Bankr. N.D. Ill. 1995) ("An entity may

be [a] real party in interest and have standing in one respect while he may lack standing for another purpose.") (internal quotations omitted). The assumption and assignment of the Trade-Back Contracts maintain the prepetition status quo as to Freightliner and do not affect its rights or create additional obligations upon it. *See In re Specialty Foods of Pittsburgh, Inc.,* 91 B.R. 364, 373 (Bankr. W.D. Pa. 1988). Freightliner is not a person aggrieved as to the assumption and assignment issue, as its rights and interests are not directly or adversely affected pecuniarily. *See id.*

Given Freightliner's conflicted position and its status as the other party to the contracts, the Court should find that standing regarding the exercise of business judgment resides in the Committee. The Committee supports assumption and assignment and has not questioned the Debtor's business judgment. Thus, any attack by Freightliner on Debtor's business judgement should be ignored.

## IV. CONCLUSION

The Trade-Back Contracts can be assumed and assigned under Code § 365. The Trade-Back Contracts are executory contracts. Under the Trade-Back Contracts, both Simon and Freightliner must still perform as a condition to the other party's performance and assumption and assignment will confer a net benefit on the estate. Moreover, there are no monetary defaults to be cured. Debtor and the Committee exercised proper business judgment because the assumption of the Trade-Back Contracts benefit the estate. Freightliner should not have standing to challenge Debtor's business judgment. That standing should reside solely in the Unsecured Creditors' Committee, which supports

30                                                    WA 663601.8

the assumption and assignment of the Trade-Back Contracts and is not questioning

Debtor's business judgment. Debtor's Supplemental Motion to Assume and Assign the

Trade-Back Contracts to Central should be approved.

Respectfully submitted,

SPENCER FANE BRITT & BROWNE LLP

Scott J. Goldstein      MO #28698
Mark A. Thornhill       MO #26326
Daniel D. Doyle         MO #36724
Lisa A. Epps            MO #48544
1000 Walnut Street, Suite 1400
Kansas City, MO  64106
Telephone:   (816) 474 8100
Facsimile:   (816) 474-3216

-and-

Weston L. Harris        UT #A1387
R. Kimball Mosier       UT #2334
PARSONS DAVIES KINGHORN & PETERS
185 South State Street, Suite 700
Salt Lake City, Utah  84111
Telephone:   (801) 363-4300
Facsimile:   (801) 363-4378

COUNSEL FOR DEBTORS

31

WA 663601.8

## CERTIFICATE OF SERVICE

I hereby certify a copy of the foregoing DEBTOR'S RESPONSE TO FREIGHTLINER'S MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING ITS OBJECTION TO THE DEBTOR'S SUPPLEMENTAL MOTION FOR AUTHORITY TO ASSUME AND ASSIGN TRADE-BACKS TO CENTRAL was served this 27TH day of September, via first class mail, postage prepaid, to the following:

Laurie A.  Cayton
Office of the United States Trustee
Boston Building
9 Exchange Place, Suite 100
Salt Lake City, UT 84111

Mark Wilkey, Esq.
Central Refrigerated Systems
PO Box 26297
West Valley City, Utah 84126

Peter W.  Billings, Esq.
Gary E.  Jubber, Esq.
**FABIAN & CLENDENIN**
215 South State, #1200
Salt Lake City, UT 84111
*Counsel for Unsecured Creditors' Committee*

J.  Thomas Beckett, Esq.
Parsons Behle & Latimer
One Utah Center
201 South Main, #1800
Salt Lake City, UT 84145-0898
Attorneys for Freightliner

Michael N. Emery
Richards Brandt Miller & Nelson
50 South Main Street, Suite 700
P O Box 2465
Salt Lake City  UT  84110
Attorneys for Central Refrigerated
Service, Inc.