J. THOMAS BECKETT (5587)
DIANNA M. GIBSON (7533)
ANNE E. RICE (7971)
PARSONS BEHLE & LATIMER
Attorneys for Freightliner
One Utah Center
201 South Main Street, Suite 1800
Post Office Box 45898
Salt Lake City, UT  84145-0898
Telephone: (801) 532-1234
Facsimile: (801) 536-6111

*HEARING SETTING:*
*SEPTEMBER 20, 2002*
*10:00 O'CLOCK A.M.*

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>SIMON TRANSPORTATION SERVICES, INC.; DICK SIMON TRUCKING, INC.; AND SIMON TERMINAL, LLC,<br><br>Debtors. | Bankruptcy Case No. 02-22906<br>Bankruptcy Case No. 02-22907<br>Bankruptcy Case No. 02-24874<br>(Jointly Administered)<br><br>**FREIGHTLINER'S MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING ITS OBJECTION TO THE DEBTOR'S SUPPLEMENTAL MOTION FOR AUTHORITY TO ASSUME AND ASSIGN TRADE-BACKS TO CENTRAL**<br><br>Judge Glen E. Clark |



0222906D785

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 1

II.     THE EVIDENCE WILL SHOW........................................................................ 2

- The Trade-backs Do Not Contain Current Bi-Lateral
  Obligations................................................................................................ 2

- Simon and Central are Closely Related Parties ............................................. 4

- The Close Simon/Central Relationship Created Admitted
  Conflicts of Interest that Preclude Simon From Having
  Exercised Independent Business Judgment in Connection
  with Either the Proposed Transfer or this Pending Motion ........................ 4

- Notwithstanding Simon's Previous Denials, the Trade-backs
  Were/Are Enormously Significant to Simon/Central .................................. 6

- Notwithstanding their Significance to Simon/Central, the
  Trade-backs were Never Disclosed in Simon's Statements
  and Schedules ......................................................................................... 8

- Simon's Confidential Memorandum to Potential Bidders
  Inadequately Disclosed the Trade-backs and was Utterly
  Silent with Respect to the Value of the Trade-backs.................................. 10

- Central Did Not Purchase the Trade-backs Together with the
  Other Assets of Simon............................................................................. 12

- The Trade-backs are Worth up to Between $4.1 and $7.7
  Million to Simon/Central ........................................................................ 14

- Central Paid Nothing for the Trade-backs ................................................. 14

- Central Paid Less Than Fair Market Value for the Assets of
  Simon that it Purchased .......................................................................... 15

i

III.  DISCUSSION ............................................................................................ 15

    A.  This Court Should Review Simon's Motion Under a
Heightened Standard Because It Involves a Related-Party
Transaction and Because It is Part of a Pre-confirmation Sale ................... 15

        1.  Simon's Proposed Assignment of the
Freightliner Trade-backs to Central, Which Is
Owned and Operated By Simon Fiduciaries,
Requires Heightened Scrutiny. ........................................................... 15

        2.  Simon's Burden to Carry this Motion is
Substantially Heavier Because it is Made in
Connection with a So-called "Quick Sale." ....................................... 17

    B.  The Trade-backs Are Not Executory Contracts and Were
Neither Identified As Such Nor Disclosed ..................................................... 20

        1.  The Trade-backs Are Options, Not Bilateral
Obligations, and Thus Do Not Fit Within the
Accepted Definitions of Executory Contracts................................... 20

        2.  Noticeably Absent is the Indicia of an
Executory Contract; There is Nothing to Cure
and Simon Has Made No Effort to Provide
"Adequate Assurance" of Future Performance................................. 24

        3.  Simon's Failure to Schedule the Trade-backs as
Executory Contracts Should Estop Simon From
Now Claiming that they Are............................................................... 26

    C.  Even If This Court Determines That the Trade-backs Are
Executory Contracts, Simon's Decision to Assume and
Assign The Trade-backs to Central Was Not Based on Good
and Independent Business Judgment. ........................................................... 28

    IV.  CONCLUSION................................................................................................ 30

483839.13

Freightliner, by and through its undersigned counsel, Parsons Behle & Latimer,

respectfully submits this Memorandum of Points and Authorities Supporting its

Objection to the July 19, 2002 Supplemental Motion of Dick Simon Trucking, Inc.

("Simon") for Authority to Assume and Assign Certain Freightliner Contracts (the

"trade-backs") to Central Refrigerated Service, Inc. ("Central").

## I.
## INTRODUCTION

Simon asks this Court to approve its transfer to Central of Freightliner's trade-

backs for free – without consideration.  Simon makes this request notwithstanding that

Simon and Central both fully appreciated the potential value of the trade-backs – about

$4.1 million – but never adequately disclosed the existence or value of the trade-backs to

creditors or other potential bidders.  Central has already purchased the remainder of

Simon's assets for less than fair market value.  Yet Simon persists in asking that

Central's deal be even further sweetened.

To prevail, Simon must show (i) that the trade-backs are executory, (ii) that

Simon exercised good and independent business judgment in deciding to transfer them

to Central, and (iii) that doing so is in the best interest of the estate and its creditors.

Because the proposed transfer is to an insider in a related-party transaction,

Simon has a "heightened burden" to establish all necessary elements.

Furthermore, because the transfer is proposed outside of a plan and before a

disclosure statement, Simon has a heightened burden to show, additionally, (i) that

1

adequate disclosure was made as to the existence and value of the trade-backs, (ii) that the trade-backs will fetch an adequate price, and (iii) that no lucrative insider dealings are involved.

The trade-backs are not executory.  Simon did not exercise independent business judgment.  There was no disclosure regarding the trade-backs.  No payment will be made for them.  Rather, their considerable value will go straight to Central and its owner.  This may be in the best interest of Central's owner – the largest of Simon's former owners – but this is not in the best interest of the estate, its creditors, or the bankruptcy process.

Simon's motion must be denied.

## II.

## THE EVIDENCE WILL SHOW

### The Trade-backs Do Not Contain Current Bi-Lateral Obligations

1.    The trade-backs provide that Freightliner will repurchase up to 515 specifically identified, used Freightliner trucks in the future *if* Simon opts to return them in good condition and opts to purchase 515 or more new Freightliner trucks.  See Cox Affidavit attached hereto as Ex. "1" at Tab 1, "List of Trucks Supplied by Central," (515 trucks subject to trade-backs); Trade-backs attached hereto as Ex. "2;" see also Moyes Depo. p. 9 lines 15-20.  Under the terms of the trade-backs, Simon has the option, but not the obligation, to return old, and purchase new, Freightliner trucks.  Until

2

Simon elects to exercise the option, however, the trade-backs do not impose any bilateral obligations. Id.

2.    Simon has proposed to pay Freightliner $0.00 to "cure" existing monetary defaults as required under Section 365(b)(1)(A) of the United States Bankruptcy Code, 11 U.S.C. § § 101, et seq. (the "Bankruptcy Code"). See Simon's Supplemental Motion to Assume and Assign, Docket No. 641 attached hereto as Ex. "3." This is consistent with the fact that Simon has no current obligations under those documents, so there cannot be any current monetary defaults to cure.

3.    Similarly, Simon has proposed nothing (beyond its "best intentions") by way of "adequate assurance of future performance" as required under Section 365(b)(1)(C) of the Bankruptcy Code. Id. This is also consistent with the fact that there are no current obligations under the trade-backs. If there were, those "obligations" would include Central's "option" to purchase at least 515 new Freightliner trucks for at least $78,887 apiece as "required" under the trade-backs. See Ex. "2" attached hereto. That should require Central to post a bond for in excess of $40 million (515 trucks times $78,887 each) if Central believed it was presently obligated to perform under the trade-backs by purchasing new trucks. Inasmuch as Central has proposed nothing by way of "adequate assurance of future performance," it clearly does not view the future contingency of new truck purchases to be a present obligation. Freightliner concurs.

3

### *Simon and Central are Closely Related Parties*

4.       Simon's proposed transfer of the trade-backs to Central clearly constitutes a related-party transaction:  (i) Central is controlled by the same shareholder as Simon was, (ii) Simon's former officers are now Central's officers, (iii) the only assets that Central now operates all formerly belonged to Simon, (iv) Central was incorporated by Simon's former outside counsel for the specific purpose of purchasing Simon's assets and continuing its business, and (v) the two companies' business are exactly the same.[1]

*The Close Simon/Central Relationship Created*
*Admitted Conflicts of Interest that Preclude*
*Simon From Having Exercised Independent*
*Business Judgment in Connection with Either*
*the Proposed Transfer or this Pending Motion*

5.       Pursuant to Freightliner's request to depose "the Simon employee(s) who was (were) most responsible for the debtors' exercise of its business judgment with respect to the decision to assume the Freightliner [trade-backs] and assign them to Central in connection with (i) the joint motion of April 9, 2002, and (ii) the debtors' supplemental motion of July 19, 2002," Simon produced Mr. Robert Goates on August 26, 2002.  (See letter discovery request attached hereto as Ex. "4").  See also Goates Depo. at p. 179 lines 21-25, p. 180 line 1.

---

[1] See Goates Depo. at p. 6 line 7 through p. 8 line 11; p. 10 line 20 through p. 13 line 13; p. 15 line 18 through p. 18 line8;  p. 21 lines 3-19; p. 22 line 12 through p. 24 line 19; p. 46 line 14 through p. 47 line 3; p. 52 line 23 through p. 53 line 3; p. 24 lines 16 through 19; Moyes Depo. at p. 7 line 22 through p. 8 line 3; Scudder Depo. at p. 2 lines 7-17; p. 8 line 22 through p. 10 line 1; p. 10 line 2 through p. 11 line 11; Transcript of April 8, 2002 Hearing Before the Honorable Glen E. Clark at p. 10 lines 4-6, p. 11 lines 15-19, & p. 12 lines 21-25.

4

6.    At his deposition, however, Mr. Goates essentially denied that he was involved in the preparation of Simon's pending motion because at the time it was filed, on July 19, 2002, he was "inherently conflicted because [he was] also an officer of Central" as well as an officer of Simon.  Goates Depo. at p. 152 line 22 through p. 153 line 19.  He was also being paid by Central as of that date, but not by Simon.  Goates Depo. at p. 6 line 7 through p. 8 line 10.

7.    In fact, Mr. Goates' conflict had arisen much earlier:  As soon as Central proposed to purchase the assets of Simon (on or about March 8, 2002, see Motion for Approval of Sale of Substantially All Assets, date of attached Terms Sheet, Docket No. 106 attached hereto as Ex. "5"), "it was contemplated that if Central was successful in [its] bid that [it] would retain" him as an employee and officer.  Goates Depo. at p. 46 line 14 through p. 47 line 10.

8.    At the time Simon filed its first motion seeking this Court's approval of its assumption and assignment of the trade-backs on April 9, 2002, Central was already "successful" in its bid, and Mr. Goates – the CFO of Simon – was assured to be employed as the CFO of Central.  Goates Depo. at p. 5 line 15 through p. 6 line 6 and p. 46 line 14 through p. 47 line 10.  By April 22, 2002, he was employed full time and compensated solely by Central.  Goates Depo. at p. 6 lines 12 through 21.    At the time Simon filed its pending motion, on July 19, 2002, Simon only had two remaining officers, Messrs. Goates and Wilkie.  Goates Depo. at p. 6 line 23 through p. 8 line 9.

5

Both of them were employed fulltime by Central and paid solely by Central. Goates

Depo. at p. 8 lines 4 through 10; p. 12 lines 14 through 22. Neither of them could even

participate in the decision to file the motion that is presently before this Court, let alone

exercise any independent business judgment in any matter that involved Central.

### Notwithstanding Simon's Previous Denials, the Trade-backs Were/Are Enormously Significant to Simon/Central

9.     In its response to Freightliner's Motion for Reconsideration, and in an

early effort to downplay the significance of the trade-backs, Simon asserted that the

trade-backs "were of speculative value, if any, to [Simon] or any purchaser of its

assets." See Simon's Preliminary Response, Docket No. 642, ¶ 9 attached hereto as Ex.

"6" (emphasis added).

10.    Discovery, however, has proven that statement was entirely inaccurate.

11.    In his deposition, Mr. Goates conceded, "I would not have used [the word

"speculative" to describe the value of the Freightliner trade-backs]. I would not have

phrased it in that fashion." Goates Depo. at p. 152 line 15 through 156 line 12.[2]

12.    During the following deposition of Mr. Moyes, it became clear that Mr.

Goates had a very good reason to deny that the value of the trade-backs was

"speculative."

---

[2] In fairness, Mr. Goates properly did not participate in the drafting of that document, given his employment by Central at the time, and his untenable conflict of interest. See, supra, ¶ 6. See also Goates Depo. p. 152 line 15 through p. 153 line 19.

6

13.    In his deposition, Mr Moyes made the remarkable declaration that the Freightliner trade-backs had in fact been a "substantial factor" in Simon's decision to file bankruptcy. Moyes Depo. at p. 39 lines 3-23; p. 41 line 5 through p. 42 line 24. The former Chairman of Simon and current Chairman of Central testified that, in mid-December, 2001, Mr. Goates had discovered – and so advised Mr. Moyes – that fewer than all of the trucks in Simon's fleet were covered by Freightliner trade-backs. Id. See also Moyes Depo. at p. 44 lines 14-16. Apparently, they had both believed otherwise. Id. According to Mr. Moyes, the collateral accounting effects of this revelation were sufficient to tip Simon inevitably into bankruptcy. Id. at p. 43 lines 4-21.

14.    Mr. Scudder, the former Director and outside counsel for Simon, and a current Director of Central's corporate parent and outside counsel for Central, heard Mr. Moyes' testimony on this point and then agreed with Mr. Moyes' assessment that the Freightliner trade-backs had been a "substantial factor" in Simon's decision to file bankruptcy. Scudder Depo. p. 17 lines 5-25.

15.    Mr. Scudder, who also became the lead negotiator for Central in connection with its purchase of Simon's assets – immediately after resigning as Simon's lead outside counsel – further testified that the Freightliner trade-backs were a material consideration in Central's analysis and decisions with respect to which truck leases to assume and which to reject. Scudder Depo. p. 9 line 1 through p. 11 line 11; p. 20 line 20 through p. 21 line 12; p. 32 line 13 through p. 33 line 2  Messrs. Moyes and Goates

7

agreed.   Goates Depo. at p. 149 line 17 through p. 151 line 2, p. 156 line 18 through p.

157 line 25; Moyes Depo. at p. 68 line 24 and p. 69 line 12.

16.    Mr. Moyes has become very familiar with the Freightliner trade-backs

because trucking companies with which he has been affiliated have had 12 years of

experience with tens of thousands of Freightliner vehicles and Freightliner trade-backs.

Moyes Depo. at p. 23 line 13 through p. 31 line 22, and p. 33 lines 7-13.

17.    Clearly, despite Simon's earlier downplaying, the Freightliner trade-backs

were, from before and throughout Simon's bankruptcy, an enormously important issue

to both Simon and Central.

*Notwithstanding their Significance to
Simon/Central, the Trade-backs were Never
Disclosed in Simon's Statements and
Schedules*

18.    On March 21, 2002, Simon filed its Statements and Schedules, including

Schedule "G," which was supposed to disclose all of its executory contracts.   See

Schedule G, Docket No. 188 attached hereto as Ex. "7".   This was a mere three weeks

after Simon had filed bankruptcy following its discovery that the Freightliner trade-

backs covered fewer than all of its trucks.   See Sale Motion, Docket No. 106 at ¶ 2

attached hereto as Ex. "5."   This was also a mere two weeks after Central had prepared

and executed its stalking horse terms sheet which obliquely expressed that:

> The Debtors will sell or assign to the Buyer all of the Debtors'
> rights in the Conditional Commitment to Repurchase
> Agreements, letters, and similar "buyback" and "trade-back"

8

agreements or other arrangements between the Debtors and
equipment manufacturers.

<u>Id.</u> at ¶ 4.

19.    Notwithstanding their significance to Simon, the trade-backs were not

listed in Simon's Schedule "G." <u>See</u> Schedule G, Docket No. 188 attached hereto as Ex.

"7".

20.    On Monday, April 8, 2002, after no other bidders appeared to upset

Central's stalking horse bid, this Court approved the sale (the "Sale") by Simon of

substantially all its assets to Central. <u>See</u> April 8, 2002 Minute Entry granting Motion to

Approve Sale.

21.    The next day, on Tuesday, April 9, 2002, Simon/Central filed their Joint

Motion seeking approval of the assumption and assignment of the trade-backs to

Central. <u>See</u> Joint Motion of Debtors and Central to Assume and Assign, Docket No.

345 attached hereto as Ex. "8."

22.    One week later, on Wednesday, April 17, 2002, Central's counsel

circulated drafts of a proposed Sales Order by e-mail to other interested parties. Those

drafts already contained language to default Freightliner for not appearing to oppose

the assumption and assignment of its trade-backs. <u>See</u> Affidavit of Mark Gaylord and

attached draft Sales Order at ¶ I attached hereto as Ex. "9."

9

23.    Two days later, on Friday, April 19, 2002, Simon amended its original Statements and Schedules to add more than *550* additional executory contracts, *but not the trade-backs*. See Amended Schedule G, Docket No. 404 attached hereto as Ex. "10."

24.    Simon's failure to disclose the trade-backs in its Statements and Schedules cannot be attributed to inattentiveness or an inability to locate copies. The trade-backs were obviously close at hand and uppermost in Simon's mind because, on the very next workday, Monday, April 22, 2002, the Freightliner trade-backs were incorporated into the Sales Order, as entered. That Order found that Freightliner was in default and therefore would be deemed to have consented to the assumption and assignment of the trade-backs to Central. Each of the trade-backs was carefully attached thereto. See executed Sales Order, Docket No. 407 attached as Ex. "11."

25.    Given the significance of the trade-backs, and the pendency of Simon's efforts to transfer them to Central, there is no good excuse for Simon's failure to list them in either their original or their amended Statements and Schedules.

### Simon's Confidential Memorandum to Potential Bidders Inadequately Disclosed the Trade-backs and was Utterly Silent with Respect to the Value of the Trade-backs

26.    With the assistance of Simon, Morgan Keegan & Company, Inc. prepared a document entitled "Confidential Memorandum" in late February or early March of 2002. Goates Depo. at p. 62 lines 18-25.

10

27.   The Confidential Memorandum was the principal marketing document used to solicit bids for Simon's assets. Id. at p. 129 lines 8-15.

28.   The Confidential Memorandum valued Simon's fleet at approximately $51 million, using an orderly liquidation valuation that did not reflect the fact that a substantial portion of the fleet could be traded in for more than fair market value via the trade-backs. See Confidential Memorandum at App. I attached hereto as Ex. "12." See also Moyes Depo. p. 8 line 10 through p. 9 line 20 ("We felt, or I felt that the [trade] back agreement was worth about $15,000 per unit over and above what the units were real worth.")

29.   With one single additional sentence, the Confidential Memorandum could have advised potential bidders that – because of the existence of the Freightliner trade-backs – the value of the assets for sale could be $4.1, or even $7.7, million higher. See ¶¶ 39-41, infra.

30.   The Confidential Memorandum's only reference to the Freightliner trade-backs contained the following language (which makes the trade-backs sound more like liabilities than assets) from the footnotes to the attached SEC filings and audited financial statements:

> A substantial portion of the Company's tractor fleet is covered by trade-in and repurchase agreements with the manufacturer.   The trade-in and repurchase agreements require the Company to purchase additional tractors in connection with the trade-ins or repurchases. These trade-in and repurchase agreements have been structured in

11

alignment with the Company's historic tractor life cycles. During December 2001, the Company commenced discussions with the manufacturer of its tractors regarding extension of the trade-in or repurchase periods, as well as the revised trade-in or repurchase values and related provisions.

See, e.g., Confidential Memorandum, attached hereto as Ex. "12," at Appendix III, p. 34. Despite the fact that it superficially touted the value of Simon as a going concern, however, the Confidential Memorandum contained no other references to the existence or potential value of the Freightliner trade-backs. See generally Confidential Memorandum; see also Goates Depo. at p. 173 line 17 through p. 175 line 15.

31.     The trade-backs purportedly contributed to Simon's bankruptcy. Their potential value drove Central's decisions regarding which equipment leases to assume or reject. Yet they were never disclosed on Simon's Statements and Schedules, and they were never disclosed to the other potential bidders who might upset Central's stalking horse bid. These failures constituted material misrepresentations by Simon of the value of the assets for sale.

### Central Did Not Purchase the Trade-backs Together with the Other Assets of Simon

32.     Central and Simon have both taken the position that Central purchased the trade-backs concurrently with its purchase of the balance of Simon's estate. Goates Depo. at p. 176 line 16 through p. 178 line 21; Moyes Depo. at p. 8 line 10 through p. 10 line 12; and Scudder Depo. at p. 30 line 19 through p. 31 line 21. That is not the case.

12

33.     Simon's March 11, 2002 Bidding and Auction Procedures Motion provided that Morgan Keegan would be retained to explore a sale of Simon's assets in whole or in part. That Motion also provided that "[p]arties may submit initial bids for all of the Assets or any part or parts of the Assets." See Bidding and Auction Procedures Motion, Docket No. 107 attached hereto as Ex. "13."

34.     Simon's March 11, 2002 Sale Motion provided that Central would negotiate with parties to executory contracts in due course after the sale was closed:

> Under the circumstances, the Court should permit the Debtors to assume or reject any and all executory contracts or unexpired leases sought to be transferred to the Buyer in the sale (a) after the closing of the Sale; (b) upon 10 days' notice to the counterparty of each such agreement, with an opportunity for prompt hearing upon written objection . . .

See Sale Motion at ¶ 23 attached hereto as Ex. "5."

35.     On April 8, 2002, in open court, this Court found that no other higher and better offers had been presented, overruled all pending objections and approved the Sale. See April 8 Transcript attached hereto as Ex. "14." Nothing stated on the record at that time, and nothing in any document filed in this Court as of that time, provided that the Sale was contingent on the subsequent transfer of the Freightliner trade-backs. Id.

36.     As of April 8, the Sale was a done deal.

37.     *The following day*, Simon/Central filed their first motion to assume and assign the Freightliner trade-backs to Central. See Joint Motion attached as Ex. "8" hereto.

13

38.     The trade-backs were not an integrated part of the rest of the Sale.   At least, the Sale was a done deal and then Simon/Central assumed the risk that this Court would not approve the proposed transfer of the trade-backs.

### *The Trade-backs are Worth up to Between $4.1 and $7.7 Million to Simon/Central*

39.     The Freightliner trade-backs are worth up to $4,115,272 to Central.  <u>See</u> Affidavit of Michael J. Cox, together with his expert report attached hereto as Ex. "1".

40.     Whatever they are worth to Central, *they are worth exactly the same to Simon,* for it should be expected that Central would pay Simon fairly for them.

41.     Mr. Moyes, the former Chairman of Simon and current Chairman of Central, values the trade-backs a little higher, at "generally" $15,000 per truck.  Moyes Depo. at p. 8 line 10 through p. 9 line 20 ("We feel, or I felt that the [trade] back agreement was worth about $15,000 per unit over and above what the units were real worth.").  For 515 trucks, that is a value of $7,775,000.

### *Central Paid Nothing for the Trade-backs*

42.     Central did not pay for the Freightliner trade-backs.  <u>See</u> Affidavit of Christine Botosan, Ph.D, Expert Report at Tab "B"attached hereto as Ex. "15";  Central Refrigerated Service, Inc. Balance Sheet as of April 22, 2002 attached hereto as Ex. "16." Moyes Depo at p. 21 line 9 through p. 22 line 6; Scudder Depo. p. 44 lines 14-24.

14

*Central Paid Less Than Fair Market Value for
the Assets of Simon that it Purchased*

43.   Central paid less than fair market value for the assets of Simon that it

purchased. See Independent Auditors' Report, Central Refrigerated Services, Inc., as of

April 22, 2002, prepared by the accounting firm of KPMG, notes to financial statements,

Note 1 attached hereto as Ex. "16."  ("The total consideration paid was approximately

$658,000 less than the estimated fair value of the acquired assets....")

44.   If the assignment of the trade-backs is now permitted, without

consideration, that deficit will grow by between $4.1 and $7.7 million.  See ¶¶ 39-41,

supra. The financial statement footnote would then read: *The total consideration paid by
Central for Simon's assets was between approximately $4,773,272 and $8,383,000 less than the
estimated fair value of the acquired assets.*

## III.

## DISCUSSION

A.   **This Court Should Review Simon's Motion Under a
Heightened Standard Because it Involves a Related-Party
Transaction and Because It is Part of a Pre-confirmation
Sale.**

1.   **Simon's Proposed Assignment of the
Freightliner Trade-backs to Central, Which Is
Owned and Operated By Simon Fiduciaries,
Requires Heightened Scrutiny.**

Ordinarily, when a debtor decides to transfer property of the estate, it is entitled

to the "kid-glove" treatment of the business judgment rule.  The business judgment rule

15

presumes that in making a business decision, the officers and directors of a corporation

"acted on an informed basis, in good faith and in the honest belief that the action taken

was in the best interests of the company." In re Biderman Indus. U.S.A., Inc., 203 B.R.

547, 552 (Bankr. S.D.N.Y. 1997) (refusing to approve sale to debtor's CEO in light of

conflicts of interest and self-dealing).   Generally, the business judgment rule shields

corporate decision-makers and their decisions from judicial second-guessing when the

following elements are present:  (1) a business decision, (2) disinterestedness, (3) due

care and (4) good faith.  See id.  When any of these elements is absent, the corporate

decision-makers are afforded no deference.  See, e.g., Schreiber v. Pennzoil Co., 419

A.2d 952, 956-957 (Del. 1980) ("The business judgment rule is a presumption that a

rational business decision of the officers or directors of a corporation is proper unless

there exist facts which remove the decision from the protection of the rule – such as self-

dealing and conflict of interest.").

Courts unanimously agree that transfers of corporate property to fiduciaries  are

subject to "heightened scrutiny because they are rife with the possibility of abuse." In re

Wingspread Corporation, 92 B.R. 87, 93 (Bankr. S.D.N.Y. 1988) (granting injunction of

sale to insider, where insider did not reveal the existence or extent of certain assets

purchased, as they were not identified in schedules); see also In re W.A. Mallory Co.,

Inc., 214 B.R. 834, 837 (Bankr. E.D. Va. 1997) (acknowledging potential for abuse and

stating proposed section 363 sale to insider requires higher scrutiny and satisfaction of

heightened standard); In re Biderman, 203 B.R. at 551 (same); In re The Landing, 156 B.R. 246, 249 (Bankr. E.D. Mo. 1993) (same).

Here, the sale by Simon to Central, which is now owned and operated by Simon fiduciaries, is unquestionably a related party transaction.   Accordingly, Simon must sustain a heightened burden to establish that it should be allowed to assume and assign the Freightliner trade-backs to Central.

> 2.   **Simon's Burden to Carry this Motion is Substantially Heavier Also Because it is Made in Connection with a So-called "Quick Sale."**

Simon's Supplemental Motion to Assume and Assign contemplates the transfer of estate property prior to the filing of a disclosure statement and plan and in connection with an expedited sale under Section 363(b).   Section 363(b) provides that a trustee or debtor in possession "may use, sell or lease . . . property of the estate" outside of the ordinary course of business, after notice and a hearing.   11 U.S.C. § 363(b). Section 363(b) certainly does not prohibit the sale of estate assets prior to the filing of the disclosure statement and confirmation of a plan.   However, in the absence of the disclosure and finality offered by a disclosure statement and plan, a transaction pursuant to section 363(b) requires specific authorization by the court.   See In re Channel One Communications, Inc., 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) (approving section 363(b) sale).

17

To prevent debtors from using section 363 as a vehicle for circumventing the protections afforded creditors under Chapter 11, such "quick sale" transactions will be closely scrutinized. See id. The proponent bears a heightened burden[3] of proving the necessary elements. See id. These elements include: (1) a sound business purpose for the sale without a disclosure statement and plan; (2) accurate and reasonable notice to all creditors and parties in interest; (3) a fair and reasonable price; and (4) good faith, i.e., a showing that the sale does not unfairly benefit insiders or the prospective purchasers, or unfairly favor a creditor or class of creditors. See id. The need for expedition does not justify abandoning proper standards. See In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 984 (Bankr. N.D.N.Y. 1988) (denying debtor's motion to approve lease of business to insider based on failure of notice and insufficient proof of sound business purpose).

First, "accurate and reasonable notice" of a pre-confirmation sale and transfers of estate assets is essential. Notice in such expedited transactions is "a functional substitute for the adequate information which would be contained in a disclosure

---

[3] "The strength of the showing necessary to satisfy each of these elements is _heightened_ by the fact that the protections of Subchapter II of Chapter 11 are absent, and such agreements are typically considered on an expedited basis, thus impeding interested parties from making the complete investigation and amassing of contrary evidence which otherwise would be possible." In re Industrial Valley Refrigeration & Air Conditioning Supplies, Inc., 77 B.R. 15, 21 (E.D. Pa. 1987) (rejecting sale to insider where price was inadequate and good faith, where insider was profiting, was lacking); see also In re Biderman Indus. U.S.A., Inc., 203 B.R. at 551. Specifically, the proponent's burden of proving elements (2), (3) and (4), which are the ordinary requirements of any sale under § 363(b)(1), is heightened in the context of a pre-confirmation sale of substantially all assets." In re Industrial Valley Refrigeration & Air Conditioning Supplies, Inc., 77 B.R. at 17, 21.

18

statement concerning the transaction." Id. at 983. Notice "serves as a substitute for the safeguards of disclosure, voting, acceptance and confirmation." Id. With respect to the trade-backs, virtually no information about them was conveyed to creditors. They were not even listed in Simon's Statements and Schedules. Had there been a disclosure statement, the trade-backs would have been featured as a contributing factor in the events leading up to the filing, and they would have been identified as a substantial asset of the estate.

Second, property transferred in a "quick sale" must fetch a fair and reasonable price. A fair and reasonable price is the product of a negotiated, arm's length transaction, an exercise that is difficult to accomplish when an insider is involved. In sales involving an insider, courts have held that under closer scrutiny, a proposed purchase price is deemed fair and reasonable if it equals at the very least the lesser of the acceptable appraised values. See In re W.A. Mallory Co., Inc., 214 B.R. at 838. Here, Central paid *nothing* for the trade-backs. See In re Wintz Companies, 219 F.3d 807, 813 (8th Cir. 2000) (bankruptcy court has obligation to reopen bidding where there is a grossly inadequate price or fraud in the conduct of the proceedings); In re The Landing, 156 B.R. 246, 250 (Bankr. E.D. Mo. 1993) (rejecting sale of debtor's assets when record did not establish that the price to be paid was fair and reasonable). See also In re Industrial Valley Refrigeration & Air Conditioning Supplies, Inc., 77 B.R. 15, 21 (Bankr.

19

E.D. Pa. 1987) (rejecting sale to insider where price was inadequate and good faith – due to insider's profiting from transaction – lacking).

Third, the requirement of "good faith" speaks to the integrity of the purchaser's conduct in the course of the sale proceedings. See In re Rock Indus. Machinery Corp., 572 F.2d 1195, 1198 (7th Cir. 1978). Conduct that destroys good faith includes fraud, collusion between the purchaser and other bidders, the debtor or the trustee, or an attempt to take grossly unfair advantage. See id. Here, the fact that Central is a related party, owned and operated by Simon fiduciaries, is not necessarily dispositive. However, Simon's failure to disclose the trade-backs or fetch any value for them must be viewed in the context of a related-party transaction fraught with conflicts of interest.

Based on these facts, Simon cannot meet its heightened burden to show that this Court should authorize the assumption and assignment of the trade-backs.

**B.    The Trade-backs Are Not Executory Contracts and Were Neither Identified As Such Nor Disclosed.**

Section 365 of the Bankruptcy Code provides that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." By its terms, section 365 only applies if the contract at issue is "executory."

**1.    The Trade-backs Are In Essence Options, Not Bilateral Obligations, and Thus Do Not Fit Within the Accepted Definitions of Executory Contracts.**

An "executory contract" is not defined in the Bankruptcy Code. Utah Courts, however, have recognized two operative definitions of executory contract: the

20

"Countryman Definition" and the definition originally set forth by the United States

Supreme Court in <u>National Labor Relations Board v. Bildisco & Bildisco</u>, 465 U.S. 513

(1984). <u>See</u> <u>Thomas American Stone & Bldg., Inc. v. White</u>, 142 B.R. 449, 452-53 (D. Utah

1992) (discussing <u>Bildisco</u> definition without reference to <u>Bildisco</u> case).

Under the Countryman Definition, an executory contract is "a contract under

which the *obligations of both* the bankrupt and the other party to the contract are so far

unperformed that the failure of either to complete performance would constitute a

material breach excusing the performance of the other." <u>Id</u>. (emphasis added) (quoting

Vern Countryman, *Executory Contracts in Bankruptcy: Part 1*, 57 Minn. L. Rev. 439, 460

(1974)). The <u>Bildisco</u> definition, which is rooted in section 365's legislative history,

provides that an executory contract is "a contract 'on which *performance is due* to some

extent *on both sides.*'" <u>Id</u>. at 452 (emphasis added); <u>see also</u> <u>Bildisco</u>, 465 U.S. at 522 n.6.

Both definitions of "executory contract" contemplate a bilateral contract with current

*obligations* of performance owing on both sides.

An option contract, by its very nature, is not bilateral and, if unexercised, creates

no *obligation* of performance. An option contract is really an *executed* unilateral contract,

not an executory contract. <u>See</u> <u>In re Nat'l Financial Realty Trust</u>, 226 B.R. 586, 587

(Bankr. W.D. Ky. 1998). "The option agreement does not bind the optionee to purchase.

Rather, it simply grants the optionee the right or privilege to *elect* to purchase by

tendering the consideration agreed upon within a certain time frame." <u>Id</u>. at 589-90.

21

The contingent nature of the obligations arising from an option agreement distinguishes them from the typical contract. If the optionee chooses to exercise the option, the duty to perform then arises. See id. at 589. If the option is not exercised, the obligations never become due and neither party commits a breach. See id. Accordingly, an unexercised option agreement does not fit within the Countryman and Bildisco definitions of executory contract.

While Utah courts have not yet determined whether option contracts are executory, other courts have concluded persuasively that they are not. See, e.g., In re Robert L. Helms Constr. & Dev. Co., Inc., 139 F.3d 702, 705-06 (9th Cir. 1998) (overruling prior Ninth Circuit precedent and holding option contract not executory); In re Nat'l Financial Realty Trust, 226 B.R. 586, 587, 589-90 (Bankr. W.D. Ky. 1998) (adopting Helms reasoning, and further explaining basis for holding); In re America West Airlines, Inc., 179 B. R. 893, 896 (Bankr. D. Ariz. 1995); In re Giesling, 96 B. R. 229, 232 (Bankr. W.D. Mo. 1989); In re Continental Properties, Inc., 15 B. R. 732, 736 (Bankr. D. Haw. 1981).

In a very well reasoned opinion, the Ninth Circuit in Helms held that an unexercised option agreement is not an executory contract. See Helms, 139 F.3d at 705-06. The Helms court recognized that some options may be executory and that others may not. The issue is: "whether the option requires further performance from each party at the time the [bankruptcy] petition is filed," i.e., had the option been exercised as of the petition date? Id. at 705. If the answer is no, the option is not executory. See

22

id. The Helms court reasoned that an option contract is not executory when the creation of obligations lies wholly within the optionee's sole discretion to exercise the option. See Helms, 139 F.3d at 705-06. "Performance due only if the optionee chooses at his discretion to exercise the option doesn't count unless he has chosen to exercise it [pre-petition]." Id.

Here, it is undisputed that, at the time Simon filed its petition for bankruptcy, none of the trade-backs had been exercised. Each trade-back gives Simon the option, but not the obligation, to perform. Simon's decision not to exercise any specific option will not place either one of the parties in default, and Freightliner cannot compel Simon's performance. Moreover, Freightliner's obligation to perform arises only after Simon, at its discretion, opts to trade in a used truck and purchase a new one from Freightliner. But even at that time, Freightliner's obligation to perform remains contingent on whether the trucks to be traded in meet certain specified requirements and are determined eligible for the trade-in deal. If the used trucks proffered by Simon do not meet the requirements, Freightliner has no obligation to buy back the used trucks. Until Simon opts to exercise the option, and the trade-in truck is determined to be eligible, Freightliner has no obligation to perform. Until both of these circumstances occur, there is no bilateral contract between Freightliner and Simon. Therefore, there is no executory contract between Freightliner and Simon to be assumed.

23

2.    **Noticeably Absent is the Indicia of an
Executory Contract; There is Nothing to Cure
and Simon Has Made No Effort to Provide
"Adequate Assurance" of Future Perform-
ance.**

In order to assume and assign an executory contract, Bankruptcy Code Section

365(b)(1) requires the debtor:  (1) to provide adequate assurance of future performance,

and (2) to cure any past defaults.  <u>See</u> 11 U.S.C. § 365(b)(1).    Analyzing Simon's

treatment of these factors further supports the position that the trade-backs are not

executory, and therefore cannot be assumed and assigned to Central.

First, neither Simon nor Central has provided "adequate" assurance of future

performance.  To determine if a debtor has provided "adequate assurance" of future

performance, courts generally look to "factual conditions, including consideration of

whether the debtor's financial data indicated its ability to generate an income stream

sufficient to meet its obligations, the general economic outlook in the debtor's industry,

and the presence of a guarantee."  <u>In re Liljeberg Enter., Inc.</u>, 2002 WL 1980447, *18 (5th

Cir. Aug. 28, 2002). There has been no such showing.

Instead, Simon baldly states that "Central's financial condition and willingness to

provide sufficient resources to its business operations to ensure its continued viability

constitute sufficient adequate assurance of future performance under the [trade-back]

agreements."   <u>See</u> Debtor's Supplemental Motion to Assume and Assign, at 5, ¶ 16

attached hereto as Ex. "3."  There is no assurance that Central will exercise any of the

24

options or that it will be willing and able to do so *in the future*. Instead, Central conclusorily makes representations about its current financial condition and its current willingness to ensure Central's viability. Such "assurance" (in light of a potential obligation to pay for the purchase of new Freightliner trucks) is inadequate.

Simon's failure to provide adequate assurance of future performance likely stems from the fact that Central is not currently obligated to trade-in the used trucks or purchase any new trucks from Freightliner. The trade-back option has not been exercised and there is no current obligation to perform by any party. Moreover, Central cannot predict how many trucks it will choose to trade-back in the future, it cannot guarantee that all or any of the trucks will satisfy the trade-in requirements, and it cannot guarantee that it will have the means to purchase any new trucks from Freightliner in the future. Rather than make such binding assurances, Central, instead, wishes to keep its options open.

Second, there is nothing to cure. Not only is there nothing to cure, cure is irrelevant with respect to the trade-backs (and yet it is a condition precedent to assigning executory contracts). As stated above, neither party currently is obligated to perform under the contract. Again, where there is no bilateral obligation, there is no executory contract to assume and assign.

25

3. **Simon's Failure to Schedule the Trade-backs
as Executory Contracts Should Estop Simon
From Now Claiming that they Are.**

The Federal Bankruptcy Rules require the debtor promptly to disclose all of its executory contracts and unexpired leases in schedules prepared pursuant to official forms. See Fed. R. Bankr. P. 1007(d)(1), 1007(k) ("[T]he debtor, unless the court orders otherwise, shall file ... a schedule of executory contracts and unexpired leases...."). Simon, however, never listed the Freightliner trade-backs in its Schedule G or its Amended Schedule G. Simon was not merely aware of the existence of the Freightliner trade-backs pre-petition, the chairman of its Board of Directors and its lead outside counsel both testified that these trade-backs played a significant role in Simon's decision to file bankruptcy. By not listing the Freightliner trade-backs in Schedule G or Amended Schedule G, Simon essentially admitted, or at least should now be estopped from denying, that the Freightliner trade-backs are not executory contracts and therefore are not subject to assumption and assignment. See In re Bane, 228 B.R. 835, 841 (Bankr. W.D. Va. 1998) (estopping Chapter 7 debtor from assuming or rejecting a lease that debtor failed to list on the mandatory schedule); see also In re Wingspread Corp., 92 B.R. at 93-94 (granting injunction based on evidence suggesting fraud by fiduciary, who through corporate vehicle purchased all debtor's assets, and failed to list asset on schedules and failed to disclose existence of asset).

26

Simon's failure to disclose the existence (and value) of the trade-backs is not to be taken lightly.[4]   Bankruptcy and other federal courts have recognized that the bankruptcy laws "are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction." In re Tully, 818 F.2d 106, 110 (1st Cir. 1987).  These rules make certain that "those who seek shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs." Id. ("Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight").

Accordingly, Simon should be bound by its failures to disclose. See, e.g., In re Calder, 907 F.2d 953, 954 (10th Cir. 1990) (affirming bankruptcy court's determination that debtor's failure to disclose material information in Statement of Affairs and accompanying schedule constituted a false oath precluding discharge in bankruptcy and allowing untimely proof of claim). Its failure to properly list and disclose the trade-backs should preclude Simon from asserting that these contracts are executory and prohibit Simon from assuming and assigning the undisclosed trade-backs.

The trade-backs are not executory contracts. They do not satisfy the accepted definitions of executory contracts, and noticeably absent is the indicia of an executory

---

[4] See In re Continental Holdings, Inc., 170 B.R. 919, 930 (Bankr. N.D. Ohio 1994) ("[T]he Court cannot agree with the DIP's counsel that the DIP's failure to list an executory contract with…a corporation wholly owned by…an insider of the DIP[] on its bankruptcy schedules represents a 'hypertechnical' violation of the DIP's fiduciary duties. *'If a debtor chooses to seek the protection of the bankruptcy court, it must play by the rules.'"*) (internal citation omitted) (emphasis added)).

contract. There is no current obligation, no obligation to perform in the future, no need for cure and absolutely no assurance that Central will be able to perform (exercise the trade-back option) on any or all of the trade-backs in the future. Simon should not be entitled to treat the trade-backs as executory contracts, in any event, given its failure to schedule or disclose them.

C.   Even If This Court Determines That the Trade-backs Are Executory Contracts, Simon's Decision to Assume and Assign the Trade-backs to Central Was Not Based On Good and Independent Business Judgment.

Simon's decision to assume the Freightliner trade-backs must be based on good business judgment and be in the best interest of the estate or its creditors. In re TS Indus., Inc., 117 B.R. 682, 685 (Bankr. D. Utah 1990). The evidence will show that Simon's decision to assume the trade-backs and assign them to Central was made in the midst of conflicts of interest and self-dealing, and therefore no deference should be given to its alleged exercise of "business judgment." Further, Simon's assumption and assignment in effect transferred to an insider a valuable asset of the estate for free, to the detriment of the estate and the creditors. The decision to assign the trade-backs to an insider, without notice, without full disclosure and without any effort to market the asset, is a decidedly poor business decision for a fiduciary to make.

Simon did not exercise, nor could it have exercised, independent business judgment when it decided to assume the Freightliner trade-backs and assign them to Central. Ordinarily, Simon would be entitled to a presumption under the business

28

judgment rule that the corporate decision-makers are acting in the best interests of the estate. The corporate decision-makers, however, are not entitled to this presumption if there is evidence of self-dealing or a conflict of interest. Schreiber v. Pennzoil Co., 419 A.2d 952, 956-957 (Del. 1980).

In this case, Simon's sale to Central of substantially all of Simon's assets is embroiled in conflict. Specifically, each and every corporate-decision maker for Simon was either involved with, employed with, or anticipated employment with Central at the time all of the critical decisions pertaining to Simon's assets were made. Specifically, Mr. Jerry Moyes was a majority owner and Chairman of Simon's board, and he is now the owner and Chairman of Central's board. Mr. Scudder was a director and outside general counsel for Simon (until shortly before Simon filed bankruptcy), and is now a director of Central's parent company and outside general counsel for Central. Incidentally, Mr. Scudder also incorporated Central for the purpose of acquiring Simon's assets and was lead counsel for Central in negotiating the purchase of substantially all of Simon's (his former client's) assets. Moreover, Mr. Goates, who Simon identified as the person most responsible for exercising Simon's business judgment with respect to Simon's pending motion, was the former CFO of Simon, and is now the CFO of Central.

The conflict of interest is readily apparent. On the one hand, Mr. Moyes, Mr. Scudder and Mr. Goates each have the fiduciary duty to enhance the value of Simon's

estate, and to ensure that the estate (and therefore the creditors) receives the highest and best offer available from any proposed sale. On the other hand, by virtue of their ownership, employment or imminent employment with Central, "if the sale to Central was successful," Mr. Moyes, Mr. Scudder and Mr. Goates must have been, or at least appear to have been, motivated to secure for Central the lowest sale price reasonably attainable, to the detriment of the estate. See generally, In re Biderman, 203 B.R. at 551 (finding inherent conflict of interest where decision makers for both debtor and purchaser were one in the same); In re Industrial Valley Refrigeration & Air Conditioning Supplies, Inc., 77 B.R. 15, 22 (Bankr. E.D. Pa. 1987) (finding lack of good faith where debtor's principle entered into employment agreement with purchaser and there was evidence of collusion between debtor and purchaser).

Ultimately, at every moment in time when Simon's agents could have made the decision to assume and assign the trade-backs to Central, they were so personally beholden to Central that their exercise of independent business judgment was impossible.

## IV.

## CONCLUSION

By its motion, Simon seeks to transfer property of the estate of which it is the trustee to a related party before filing a disclosure statement or a plan. Central is more than merely a related party – Central comprises substantially the same owners, officers,

30

directors, employees, assets and businesses that Simon formerly did. Further, Simon seeks to transfer valuable estate property to Central without any expectation of compensation. These circumstances require Simon to defend its motion in terms that leave absolutely no doubt as to its propriety.

That will be difficult. Simon did nothing to maximize the value of the trade-backs. It did not notify Freightliner of the impending disposition of those assets, and it did not disclose the value of those assets to any interested party.

Central has already purchased substantially all of the assets of the estate that had any value, and it paid less than fair market value for them. Simon's pending motion – which seeks to transfer the trade-backs to Central for free – will benefit no one other than the owners of the equity in Central.

The Bankruptcy Code does not intend the result that Simon seeks. The trade-backs are not executory and they cannot be assumed and assigned. Even if they are executory, they cannot be assumed and assigned because (i) they were not disclosed to interested parties, (ii) they did not fetch a reasonable price, and (iii) Simon is incapable of exercising independent business judgment.

31

For all the reasons stated above, Simon's pending motion must be denied.

RESPECTFULLY SUBMITTED: this 11th day of September 2002.

J. THOMAS BECKETT
DIANNA M. GIBSON
ANNE E. RICE
PARSONS BEHLE & LATIMER
Attorneys for the Freightliner Companies

32

483839.13

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of September, 2002, I caused to be delivered, a true and correct copy of the foregoing **FREIGHTLINER'S MEMORANDUM OF POINTS AND AUTHORITIES SUPORTING ITS OBJECTION TO THE DEBTOR'S SUPPLEMENTAL MOTION FOR AUTHORITY TO ASSUME AND ASSIGN TRADE-BACKS**, by the means set forth below, to:

**VIA E-MAIL (W/O EXHIBS.) & FEDEX OVERNIGHT COURIER**

Scott J. Goldstein
[sgoldstein@spencerfane.com]
Mark Thornhill
[mthornhill@spencerfane.com]
Spencer Fane Britt & Browne LLP
1000 Walnut, Suite 1400
Kansas City, Missouri 64106

**VIA E-MAIL (W/O EXHIBS.) & HAND DELIVERY**

Michael N. Emery
[mne@rbmn.com]
Russell C. Fericks
[rcf@rbmn.com]
Richards Brandt Miller & Nelson
50 South Main Street, #700
Salt Lake City, UT 84144

**VIA E-MAIL (W/O EXHIBS.) & HAND DELIVERY**

Peter W. Billings
[pbillings@fabianlaw.com]
Gary E. Jubber
[gjubber@fabianlaw.com]
Fabian & Clendenin
215 South State, #1200
Salt Lake City, UT 84111

**VIA E-MAIL (W/O EXHIBS.) & HAND DELIVERY**

Weston L. Harris
[wlh@pdkplaw.com]
R. Kimball Mosier
[rkm@pdkplaw.com]
Parsons Davies Kinghorn & Peters
185 South State, #700
Salt Lake City, UT 84111

J. Thomas Beckett

33

## EXHIBITS TO FREIGHTLINER'S MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING ITS OBJECTION TO THE DEBTOR'S SUPPLEMENTAL MOTION FOR AUTHORITY TO ASSUME AND ASSIGN TRADE-BACKS

1.   Affidavit of Michael J. Cox

2.   Trade-back Repurchase Agreements

3.   Debtors' Supplemental Motion to Assume and Assign

4.   8/21/02 Discovery Correspondence

5.   Motion for Approval of Sale of Substantially All of the Debtors' Assets and to Approve Assumption and Assignment of Leases and Executory Contracts

6.   Debtors' Preliminary Response to Memorandum of Points and Authorities Supporting Freightliner's Motion for (I) Reconsideration of April 22, 2002 Orders Authorizing Sale, Etc. and Approving Assumption and Assignment of Executory Vendor Contracts, Etc., and (II) Exclusion of the Freightliner Companies from the Effects of those Orders

7.   Schedule G, Docket #188

8.   Joint Motion to Assume and Assign

9.   Affidavit of Mark R. Gaylord

10.   Amended Schedule G, Docket #404

11.   Sales Order, Docket #407

12.   Confidential Memorandum

13.   Motion Re: Bidding/Auction Procedures

14.   Transcript of Hearing on Motion for Order Approving Stipulation Between Debtors and Orix USA Corp. for an Order Approving Rejection of Lease Upon Certain Conditions, Motion to Prohibit Use of Leased Equipment or for Relief from Stay Filed by First Union Commercial Corp., and Motion for Approval of Sale of Substantially All of the Debtors' Assets and to Approve Assumption and Assignment of Leases and Executory Contracts

15.   Affidavit of Christine Botosan, Ph.D

16.   Central Refrigerated Service, Inc. Balance Sheet as of 04/22/02 (w/Independent Auditors' Report)

486911.1

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>**SIMON TRANSPORTATION SERVICES, INC.; DICK SIMON TRUCKING, INC., AND SIMON TERMINAL, LLC,**<br><br>Debtors. | Case No. 02-22906<br>Case No. 02-22907<br>Case No. 02-24874<br>Chapter 11<br>(Jointly Administered)<br><br>**AFFIDAVIT OF MICHAEL J. COX**<br><br>Judge Glen E. Clark |

MICHAEL J. COX, being duly sworn, deposes and says:

1.    I am over 21 years of age and competent in all respects to testify as to the matters stated herein. I have been asked by Freightliner LLC and Freightliner Market Development Company to give my expert opinion on the value of the Freightliner "trade-backs" to Central Refrigerated Service, Inc.

2.    A copy of my resume is attached as Exhibit "A" hereto.

3.    A copy of my opinion is attached as Exhibit "B" hereto.

MICHAEL J. COX

Subscribed and sworn to before
me this 9th day of September, 2002.

Kathleen J. Hartsock
Notary Public

GENERAL NOTARY-State of Nebraska
KATHLEEN J. HARTSOCK
My Comm. Exp. June 28, 2003

486627.1